## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, solely as Trustee for the MORGAN STANLEY ABS CAPITAL I INC. TRUST, SERIES 2007-HE6, | CIVIL ACTION NO.: |
| Plaintiff, | |
| v. | |
| WMC MORTGAGE L.L.C., as successor-by-merger to WMC Mortgage Corp., and GENERAL ELECTRIC CAPITAL CORPORATION, | |
| Defendants. | September 13, 2013 |

## COMPLAINT

Plaintiff Deutsche Bank National Trust Company, solely in its capacity as Trustee (the "Trustee") of the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-HE6 (the "Trust"), brings this Complaint against WMC Mortgage L.L.C., as successor-by-merger to WMC Mortgage Corp. ("WMC"), and General Electric Capital Corporation ("GE Capital" and together with WMC, "Defendants"). The Trustee hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is a breach of contract action concerning a transaction known as a mortgage securitization. WMC, GE Capital's wholly-owned subsidiary, "originated" or made loans totaling more than $666 million to 3,399 borrowers (the "Mortgage Loans"), then grouped or "pooled" the loans and sold them to the Trust. Investors in the Trust, known as "Certificateholders," were supposed to receive income as the borrowers repaid the Mortgage Loans.

2.     WMC, by the terms of the contract, assured the Trust and Certificateholders that the borrowers were in a position to repay the Mortgage Loans.  It did so in four crucial ways: *First*, WMC made 67 separate representations and warranties that the borrowers were creditworthy and that the Mortgage Loans were properly originated and represented accurately; *second*, WMC promised to notify the Trustee when those representations and warranties were breached; *third*, WMC promised to repurchase Mortgage Loans in material breach of its representations and warranties to make the Trust whole; and, *fourth*, WMC promised to indemnify the Trustee for breaches.  This four-part remedial framework allocates to WMC the risk that the Mortgage Loans may breach WMC's representations and warranties.

3.     It turns out that the bulk of the Mortgage Loans were bad because the borrowers were not creditworthy or because WMC did not conform to underwriting standards.  WMC has breached its representations and warranties, has breached its duty to notify the Trustee of breaches, has refused to repurchase the bad loans, and has breached its duty to indemnify the Trustee.  The Trust, and consequently Certificateholders, are entitled to damages in excess of $500 million.

4.     Accordingly, the Trustee, on behalf of the Trust, brings this action to enforce the contract and receive the benefit of the bargain.

## PARTIES

5.     Morgan Stanley ABS Capital I Inc. Trust, Series 2007-HE6 is a common-law trust created and existing under the laws of the State of New York.

6.     Plaintiff Deutsche Bank National Trust Company, acting solely in its capacity as Trustee on behalf of the Trust in this action, is a national banking association organized to carry out the business of a limited-purpose trust company under the laws of the United States, with its

principal place of business in Los Angeles, California, and its principal place of trust administration in Santa Ana, California.

7.     WMC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Woodland Hills, California.  WMC's business is directed, controlled, and coordinated from the offices of its sole member, GE Capital, a Delaware corporation whose principal place of business is Norwalk, Connecticut.

8.     WMC is the successor entity to WMC Mortgage Corp., which originated residential home mortgage loans.  WMC Mortgage Corp. was licensed by the Connecticut Department of Banking from 1995 to 2007 as a Mortgage Lender/Broker and was registered with the Connecticut Secretary of State as a foreign corporation doing business in Connecticut.

9.     GE Capital is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.

## JURISDICTION AND VENUE

10.     Jurisdiction lies in this Court under 28 U.S.C. § 1332(d) and § 1348 because the parties are citizens of different States and because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Further, because an active controversy between the parties lies within this Court's jurisdiction, this Court has power under 28 U.S.C. § 2201(a) to issue a declaratory judgment establishing the rights and other legal relations of the Trustee and Defendants.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside within the District of Connecticut and because a substantial part of the events giving rise to this cause of action occurred within the District of Connecticut.

## FACTUAL ALLEGATIONS

**I.     The 2007-HE6 Mortgage Securitization Deal**

12.     The Trust stands at the center of a mortgage-backed securitization – a complex structured-finance transaction in which numerous residential mortgage loans are pooled and deposited into the Trust for the benefit of Certificateholders (the "2007-HE6 Deal"). The Mortgage Loans serve as collateral for securities, called "Certificates," issued by the Trust. The Certificates generate cash flow to Certificateholders when borrowers make principal and interest payments on the Mortgage Loans in the Trust.

13.     The cash flow generated by the Certificates depends upon the quality of the individual Mortgage Loans within the loan pool. Accordingly, the Mortgage Loans deposited into the Trust were subject to a specific set of representations and warranties which were meant to ensure that borrowers were creditworthy and that the loans would be repaid in accordance with the terms of the loan documents.

14.     The 2007-HE6 Deal closed on May 31, 2007 (the "Closing Date"), employing a transaction structure that is used within the securitization industry.

15.     *First*, WMC made 3,399 Mortgage Loans to borrowers. Those Mortgage Loans were then pooled together. WMC was one of two originators whose loans were pooled in this transaction and was responsible for approximately 55% of the loans in the Trust. The WMC Mortgage Loans are the only loans at issue in this action.

16.      *Second*, the pool of Mortgage Loans passed through two intermediary entities: first through Morgan Stanley Mortgage Capital, Inc., the "Sponsor," and then to Morgan Stanley ABS Capital I, Inc., the "Depositor."

17.     *Third*, the Depositor conveyed the Mortgage Loans into the Trust. The Trust was created by a Pooling and Servicing Agreement ("PSA") among the Trustee, WMC as

- 4 -

Responsible Party, and other parties to the transaction.  The PSA, a copy of which is attached as

Exhibit A, is the contract at the center of this case, as it governs the rights and obligations of the

parties to the transaction.

18.     *Fourth*, upon the closing of the transaction, the Trust issued Certificates to

Certificateholders, and over $666 million invested by Certificateholders was transferred to

WMC.

19.     *Fifth*, after closing, loan payments on the Mortgage Loans were to be collected by

"Servicers," parties independent of the Trustee, and then passed on to the Trust for funding

payments to Certificateholders.

20.     A diagram of the deal appears below:



21.    The entire transaction was structured so that WMC, GE Capital, and their subsidiaries and affiliates could sell the Mortgage Loans' future cash flows to Certificateholders (via the Trust) in exchange for substantial amounts.  The Certificateholders' ability to receive those future cash flows depended entirely on borrowers' ability to repay their loans – and, in turn, the likelihood of full repayment depended on the quality of the Mortgage Loans and their compliance with underwriting guidelines, which cover such critical issues as the truthfulness of statements made by borrowers when applying for loans.

22.    As a result of the PSA, which constitutes a valid contract between the Trust, WMC, and other parties, WMC received in excess of a half billion dollars.  In exchange, WMC provided 3,399 Mortgage Loans, certain representations and warranties regarding the quality of the Mortgage Loans, and continuing contractual obligations relating to those representations and warranties.

23.    The PSA deems WMC a "Responsible Party."  PSA Art. I at 49.  As such, it is accountable for the representations and warranties regarding the quality of the Mortgage Loans. It also has a duty to notify the Trustee of breaches of those representations and warranties; a duty to repurchase Mortgage Loans that materially breach those representations and warranties ("Defective Mortgage Loans"); and a duty to indemnify the Trustee for expenses incurred as a result of claims resulting from breaches of those representations and warranties.  PSA §§ 2.03(b), (f), (p).

## II.    WMC's Contractual Obligations

24.    Certificateholders are several steps removed from the actual borrowers whose future payments they effectively purchased.  As is standard in the securitization industry, Certificateholders here, upon information and belief, did not have access to loan-level detail

about whether the individual Mortgage Loans in the pool – which comprised thousands of homes and borrowers across the country – were in fact what they were represented to be.

25.    WMC, by contrast, had a great deal of detailed information about the WMC Mortgage Loans at the time the 2007-HE6 Deal closed.  In particular, WMC, which acquired or originated the Mortgage Loans in the first place, had intimate, first-hand knowledge of the contents of the loan files containing detailed information about the history and creditworthiness of individual borrowers and the quality of the real estate serving as collateral for the Mortgage Loans.  Upon information and belief, WMC had first-hand knowledge of loan files of mortgages it originated because it created those loan files when it processed applications and made the loans.  The Trustee lacked WMC's detailed knowledge.  And Certificateholders generally do not have access to the loan files.

26.    To address this knowledge gap, WMC made a series of representations and warranties about the Mortgage Loans' quality and characteristics and the borrowers' ability to repay their mortgages, PSA, Schedule IV ¶¶ (a)-(rrr), and accepted the risk that the loans it sold to the Trust would not conform to those representations and warranties.  The representations and warranties cover, among numerous factors, such basic issues as the absence of fraud, error, or negligence when originating the Mortgage Loans, and the Mortgage Loans' compliance with underwriting standards.  Those representations and warranties expressly survived the closing. PSA § 2.03(e).

27.    WMC made these representations and warranties to the Trustee for the benefit of the Trust and the Certificateholders.  Upon information and belief, the Certificateholders relied upon those representations as a crucial measure of the risk the Trust's Certificates carry.  Upon information and belief, without WMC's representations and warranties, investors would not have

been able to judge the risk and true value of the Certificates, and the 2007-HE6 Deal could not have happened.

### A.     WMC's Representation and Warranties

28.     WMC made 67 separate representations and warranties regarding the quality of the Mortgage Loans.  PSA, Schedule IV ¶¶ (a)-(rrr).  Those representations and warranties are incorporated in their entirety into the PSA.  PSA § 2.03(b).  They explicitly survive the closing of the 2007-HE6 Deal.  *Id.* § 2.03(e).

29.     Among other things, WMC represented that:

- The information set forth in the related Mortgage Loan Schedule was "true and correct,"[1] PSA, Schedule IV ¶ (a);

- "No payment required under [a] Mortgage Loan is 30 days or more delinquent nor has any payment under [a] Mortgage Loan been 30 days or more delinquent . . . at any time since the origination of the Mortgage Loan[s]," PSA, Schedule IV ¶ (b);

- "Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, disclosure and all predatory and abusive lending laws applicable to the Mortgage Loan . . . have been complied with," PSA, Schedule IV ¶ (g);

- "No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller in connection with the origination of the Mortgage Loan,"  PSA, Schedule IV ¶ (k);

- "No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place *on the part of any Person* . . . , including without limitation, the Mortgagor, any appraiser, any builder or developer, *or any other party involved in the origination of the Mortgage Loan* . . .," PSA, Schedule IV ¶ (k) (emphases added);

---

[1] The "Mortgage Loan Schedule" is a schedule delivered to the "Master Servicer" and "Sponsor" of the 2007-HE6 Deal at closing that contains data about the individual Mortgage Loans.  PSA, Art. I at 39; PSA, Schedule IV ¶ (a).

- No Mortgage Loan had a loan-to-value ("LTV") ratio of greater than 100%, PSA Schedule IV ¶ (o);

- "[T]here was no default, breach, violation or event which . . . would constitute a default, breach, violation or event that would permit acceleration," PSA, Schedule IV ¶ (q);

- All Mortgage Loans were underwritten in accordance with the underwriting guidelines, PSA, Schedule IV ¶ (v);

- "As of the related Closing Date the Mortgaged Property is lawfully occupied under applicable law," PSA, Schedule IV ¶ (w);

- "The origination, servicing and collection practices used by the Seller and the Interim Servicer with respect to the Mortgage Loan have been in all respects in compliance with Accepted Servicing Practices," PSA, Schedule IV ¶ (ii);

- "No predatory or deceptive lending practices, including . . . the extension of credit without regard to the ability of the Mortgagor to repay . . . were employed in the origination of the Mortgage Loan," PSA, Schedule IV ¶ (eee);

- "The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the related Mortgagor's income, assets, and liabilities," and "[s]uch underwriting methodology confirmed that at the time of origination (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan," PSA, Schedule IV ¶ (lll); and

- "With respect to each Second Lien Loan, the related Mortgaged Property was the Mortgagor's principal residence at the time of the origination of such Second Lien Loan," PSA, Schedule IV ¶ (rrr).

30.     The PSA expressly states that "it is the policy and intention of the Trust to acquire only Mortgage Loans meeting the requirements set forth in this Agreement, including without limitation, the representations and warranties" made by WMC.  PSA § 2.01(c).

## B.     WMC's Notice, Repurchase, and Indemnification Obligations

31.     As was common in securitizations of this nature, WMC agreed to straightforward measures to protect the Trust (and Certificateholders) and make it whole in cases where a

Mortgage Loan breached its representations and warranties. This remedial framework – a bargained-for protection for the Trust – ensures that WMC, and not the Trustee (or the Trust or the Certificateholders), retains the risk of Mortgage Loans being defective throughout the life of the securitization. The remedial framework comprises three main components: notice, repurchase, and indemnification.

### i.    Notice

32.    *First*, WMC is obligated to provide "prompt written notice" of a breach upon "discovery." PSA §§ 2.03(e), (f). WMC's duty applies regardless of whether the other parties to the securitization have any knowledge about that breach or any duty to cure it. It also applies whether or not the breaching Mortgage Loan is in default.

### ii.    Repurchase

33.    *Second*, WMC separately agreed to cure any defects in a Defective Mortgage Loan or to repurchase any Defective Mortgage Loan. Where there is a breach of WMC's representations and warranties with respect to any Mortgage Loan, and that breach "materially and adversely affects the value of any Mortgage Loan or the interests of the Trustee or the Certificateholders therein," WMC is obligated to cure the breach or repurchase the loan from the Trust within 60 days of notice or discovery of breach. PSA § 2.03(f).

34.    Certain representations and warranties of WMC are defined in the PSA as "Deemed Material and Adverse Representation[s]," such as the representations that WMC complied with all applicable laws, PSA, Schedule IV ¶ (g), that WMC applied objective underwriting methodologies to ensure that borrowers could repay their loans, PSA, Schedule IV ¶ (lll), or that any second-lien loan was the borrower's principal residence at the time such second-lien loan was originated, PSA, Schedule IV ¶ (rrr). If a Mortgage Loan is discovered to

be in breach of a Deemed Material and Adverse Representation, WMC is obligated to repurchase that loan within 60 days of notice or discovery of breach, without opportunity to cure the defect. PSA § 2.03(f).

35.    The obligation to cure or repurchase may be triggered by WMC's discovery of its own breaches.  PSA § 2.03(f).  In addition, the cure-or-repurchase obligation may be triggered by notice to WMC from the "Securities Administrator" (here, Wells Fargo Bank, N.A.) of any breach that materially and adversely affected that Mortgage Loan's value.  *Id*.  Thus, regardless of whether WMC itself or another party discovers a breach, the PSA makes clear that **WMC** is obliged to "cure such breach in all material respects," or to repurchase the Defective Mortgage Loan.

36.    The PSA establishes the amount of money the Trust is to receive in the event of a material breach.  That amount is the "Repurchase Price," defined as:

> an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan . . ., (iii) all unreimbursed Servicing Advances, (iv) all costs and expenses incurred by . . . the Trustee, as the case may be, arising out of or based upon such breach, including without limitation, costs and expenses relating to the . . . Trustee's enforcement of the repurchase obligation of [WMC] hereunder, and (v) any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory lending law or abusive lending law.  In addition to the Repurchase Price, the applicable Responsible Party is obligated to make certain payments for material breaches of representations and warranties as further set forth in Section 2.03(p) in this Agreement.

PSA, Art. I at 48.

37.    WMC agreed to this remedy of cure or repurchase regardless of whether or not it has any knowledge of the breach when it occurred.  PSA § 2.03(f).  That is a critical component

of the bargain the parties negotiated.  By contrast, WMC did *not* negotiate for, and did not receive, any contractual right to "rebut" notices of material breaches.

38.    WMC must cure or repurchase a Defective Mortgage Loan regardless of whether it had any knowledge – or reason to know – of breaches at the time they occurred.  For example, WMC promised to cure or repurchase a Defective Mortgage Loan tainted with borrower misrepresentations whether or not WMC knew or should have known of those misrepresentations at the time of the securitization.  In this regard, Defendants assumed the risk (among many other risks it assumed) that borrowers may provide false information in their loan applications.

39.    WMC must also cure or repurchase a Defective Mortgage Loan regardless of the Loan's performance.  The PSA makes clear that WMC's cure-or-repurchase obligation continues regardless of whether any Defective Mortgage Loan is modified, foreclosed, or liquidated. Indeed, the contractually defined "Repurchase Price" references the contractually defined term "Mortgage Loan," which is defined to include, without limitation:

> The Mortgage File, the Scheduled Payments, Principal Prepayments, *Liquidation Proceeds*, Condemnation Proceeds, Insurance Proceeds, *REO Disposition proceeds*,[2] Prepayment Charges, and all other rights, benefits, proceeds, and obligations arising from or in connection with such Mortgage Loan, excluding replaced or repurchased Mortgage Loans.

PSA, Art. I at 39 (emphasis added).  Thus, the definition of "Mortgage Loan" in the PSA explicitly *includes* liquidated Mortgage Loans.

40.    The "Prospectus Supplement," issued in connection with the Trust, further makes clear that the parties intended for WMC to repurchase liquidated Mortgage Loans affected by a

---

[2] An "REO Disposition" is the final sale of "REO Property," which the PSA defines as "[a] Mortgaged Property acquired by the Trust Fund through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan."  PSA, Art. I at 48.

material breach.  A copy of the Prospectus Supplement is attached to this Complaint as Exhibit B.  The Prospectus Supplement discloses numerous "risk factors" potentially relevant to an investor's decision whether to purchase certificates.  Those risk factors do not include the risk that certificates would lose value because breaching loans were liquidated and could not be repurchased.

41.     Accordingly, under the PSA, WMC must repurchase materially breaching Mortgage Loans, even if those loans have been liquidated.  A contrary understanding would allow WMC Capital to avoid its contractual obligations simply by "running out the clock" through refusals and litigation until circumstances require liquidation of the loans to protect the Trust's interests.  The remedy of damages for breach, repurchase of liquidated loans, the parties' intent, mutual understanding, and their course of dealing all show that the parties intended that the Trust would be entitled to recover from WMC on account of loan defects.

42.     In addition, within the residential mortgage-backed security ("RMBS") industry, "repurchase" obligations like those set forth in the PSA are generally understood to encompass a seller's broad and general duty to make a mortgage loan buyer whole regardless of whether the loan is performing or non-performing, active or liquidated.  Upon information and belief, even WMC has repurchased liquidated loans in other securitizations with which it was involved.  For example, in the MASTR Asset Backed Securities Trust 2006-WMC2 and the MASTR Asset Backed Securities Trust 2007-WMC1 securitizations, monthly reports made available to investors suggest that liquidated WMC loans have been repurchased.

43.     WMC's representations and warranties and corresponding cure-or-repurchase obligations in the PSA place the risk of error, fraud, and other defects in the Mortgage Loans

squarely on WMC.  Significantly, the PSA absolves the Trustee from "responsib[ility] for the accuracy or content of" any document or information given to it under the PSA.  *Id.* § 8.01.

44.     The PSA authorizes the Trustee to pursue legal remedies against WMC in the event that it fails to abide by its repurchase obligations.  *Id.* § 2.03(f).  The Trustee is acting here under direction of certain Certificateholders, who may instruct the Trustee to bring suit.  PSA §§ 8.01(c), 8.02(d).

### iii.     Indemnification

45.     *Third*, Section 2.03(p) of the PSA specifies that, in addition to the notice, cure, and repurchase remedies described above, WMC "shall indemnify" the Trust, the Trustee and other participants in the securitization.  The indemnification obligation provides that WMC must indemnify the Trust and the Trustee "against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and expenses and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of [WMC's] representations and warranties contained in this Agreement".  PSA Ex. O § 9.03.

## III.     The Basic Bargain

46.     Thus, the basic bargain of the parties was as follows:  WMC received in excess of $666 million.  In exchange, WMC conveyed 3,399 Mortgage Loans and the right to receive Mortgage Loan payments into the Trust; it made an extensive series of representations and warranties regarding the creditworthiness of the borrowers and the riskiness of the Mortgage Loans; it promised to notify the Trustee of breaches of representations and warranties; it promised to cure or repurchase Loans that breached the representations and warranties; and it

promised to indemnify the Trustee for costs and expenses resulting from any claim or demand relating to a breach of WMC's representations and warranties.

## IV.    WMC's Breaches of Its Representations and Warranties

47.     The pool of Mortgage Loans that WMC conveyed to the Trust is replete with material breaches of WMC's representations and warranties concerning the quality of the Mortgage Loans and the borrowers' creditworthiness.

48.     WMC's decision to sell thousands of Defective Mortgage Loans to the Trust – and its subsequent refusal to cure or repurchase those Loans – fundamentally upset the transaction contemplated by the parties and their agreements.  The sheer volume of Defective Mortgage Loans far exceeds the reasonable expectations of the parties.

49.     WMC's breaches of representations and warranties are not only a breach of the parties' contract; they are grossly negligent given WMC's failure to adhere to minimal underwriting standards or to verify basic and critical information about mortgage borrowers or the properties securing Mortgage Loans.  Upon information and belief, discovery will show still further evidence of WMC's gross negligence pervading the pool of the Mortgage Loans.

### A.    The Breach Notices And Repurchase Demands

#### i.    The March 26 Breach Notice And Repurchase Demand

50.     On March 26, 2013, Wells Fargo Bank, acting as Securities Administrator pursuant to the PSA, sent a letter to WMC enclosing a breach notice (the "March 26 Breach Notice").  The March 26 Breach Notice informed WMC of 1,308 material breaches affecting 711 separate Mortgage Loans.  It also demanded that WMC repurchase the Defective Mortgage Loans before May 25, 2013.  A copy of the March 26 Breach Notice is attached to this Complaint as Exhibit C.  As of the date of the filing of this Complaint, the 60-day cure period

required by the PSA has passed, and WMC has not cured or repurchased a single Defective Mortgage Loan.

51.     The Defective Mortgage Loans listed in the March 26 Breach Notice were identified through a careful forensic analysis that combined a review of mortgage-industry databases, credit records, bankruptcy filings, and tax records with the use of a proprietary, industry-standard automated valuation model ("AVM") to determine the true value of each mortgaged property as of the origination date (and thus the Trust's collateral in case of default).

52.     That forensic analysis identified multiple categories of breaches.  *First*, it identified at least 516 Mortgage Loans with estimated appraisal values that materially deviated from the appraisal value reported by WMC at the Closing Date.  An incorrect appraisal overstating the value of a Mortgage Loan harms the value of that Mortgage Loan and the interests of the Trustee and the Certificateholders therein because the mortgaged property (and the Trust's only collateral in case the borrower defaults) is less valuable than represented. Incorrect appraisals also distort the calculation of a loan's "loan-to-value" ("LTV") ratio, or the ratio of the amount of a loan to the value of the mortgaged property.  The LTV ratio is a crucial criterion for determining the likelihood that a borrower will repay his mortgage, because a higher LTV shows that the borrower has less equity in his home (and thus less incentive to repay the mortgage fully).  Loans with incorrect appraisals are thus in breach of WMC's representations that "no fraud, misrepresentation, or similar occurrence . . . with respect to a Mortgage Loan has taken place on the part of any Person . . . including . . . any appraiser," PSA, Schedule IV ¶ (k).

53.     *Second*, the March 26 Breach Notice identified at least 210 Mortgage Loans with LTV ratios in excess of 100%.  As described above, the LTV ratio is crucial to accurately determining whether a homeowner will repay his mortgage.  Homeowners have little to no

incentive to repay a loan with an LTV above 100% because that figure indicates that the loan is larger than the value of the mortgaged property. The inflated LTV ratios thus materially breach WMC's representation that no Mortgage Loan would have an LTV above 100%. PSA, Schedule IV ¶ (o). Loans with incorrect LTV ratios are also in breach of WMC's representation that information provided by WMC about its Mortgage Loans was "true and correct . . . as of the Closing Date." PSA, Schedule IV ¶ (a).

54. *Third*, the March 26 Breach Notice identified at least 247 Mortgage Loans for which the occupancy status of the underlying mortgaged property was inaccurate or misrepresented. Breaches arising from misrepresentations of occupancy materially and adversely affect the value of that Mortgage Loan and the interest therein of the Certificateholders and the Trustee because non-owner-occupied mortgages are inherently riskier than owner-occupied mortgages. A borrower is much less likely to default on, and walk away from, a mortgage secured by her primary residence than she is with respect to a loan secured by a second home or investment property. Loans with misrepresented or inaccurate occupancy status materially breach WMC's representations that the information WMC provided about the Mortgage Loans is complete and accurate, *see* PSA, Schedule IV ¶ (a), that no fraud, error, or misrepresentation has occurred with respect to any WMC Mortgage Loan, *see* PSA, Schedule IV ¶ (k), and that "[a]s of the related Closing Date the Mortgaged Property is lawfully occupied under applicable law," PSA, Schedule IV ¶ (w). For "second-lien" loans (loans taken out when the property is already mortgaged, such as home-equity loans), misrepresented occupancy status is a breach of a Deemed Material and Adverse Representation. PSA, Schedule IV ¶ (rrr).

### ii.     The March 28 Breach Notice And Repurchase Demands

55.     On March 28, 2013, the Securities Administrator sent a second letter to WMC enclosing further notice of breaches of WMC's representations and warranties (the "March 28 Breach Notice").  Using forensic analysis of publicly available records, the March 28 Breach Notice identified more than 4,300 breaches affecting 2,952 Defective Mortgage Loans and demanded repurchase of those loans before May 27, 2013.  A copy of the March 28 Breach Notice is attached as Exhibit D.  As of the date of the filing of this Complaint, the 60-day cure period required by the PSA has passed, and WMC has not cured or repurchased any of the Defective Mortgage Loans identified in the March 28 Breach Notice.

56.     The March 28 Breach Notice identified five categories of breaches plaguing the Defective Mortgage Loans.  *First*, the notice identified 2,973 Mortgage Loans where the borrower had either failed to make the ***very first loan payment*** or was already delinquent (*i.e.*, behind on loan payments) as of the Closing Date.  Such widespread occurrences of payment delinquencies materially and adversely affect the Trustee and Certificateholders.  The March 28 Breach Notice accordingly notified WMC that those 2,973 Mortgage Loans were in breach, among other things, of WMC's representation that, as of the "Cut-off Date" – *i.e.*, thirty days prior to the Closing Date[3] – "[n]o payment required under [a] Mortgage Loan is 30 days or more delinquent nor has any payment under [a] Mortgage Loan been 30 days or more delinquent . . . at any time since the origination of the Mortgage Loan[s]," *see* PSA, Schedule IV ¶ (b), or in default, *see* PSA, Schedule IV ¶ (q).  While WMC represented that the borrowers were not delinquent or in default as of the Cut-off Date, its representations were made as of the Closing Date, May 31, 2007.

---

[3] *See* PSA Art. I at 27 (defining the "Closing Date" as May 31, 2007), 30 (defining "Cut-off Date" as May 1, 2007).

57.     *Second*, the March 28 Breach Notice identified 23 second-lien Mortgage Loans for which the occupancy status of the mortgaged property was either inaccurate or misrepresented.  As stated above, inaccurate or misrepresented occupancy status for second-lien loans (*i.e.*, second mortgages) is a breach of a Deemed Material and Adverse Representation.  PSA, Schedule IV ¶ (rrr).

58.     *Third*, the March 28 Breach Notice identified 330 Mortgage Loans that violated applicable underwriting guidelines.  WMC represented in the PSA that its Mortgage Loans would be underwritten according to specific underwriting guidelines.  PSA, Schedule IV ¶ (v).  As described in the Prospectus Supplement, "[t]he WMC Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."  Ex. B at S-30.  Violations of underwriting guidelines materially harm the value of the Mortgage Loans and the interests of the Trustee and Certificateholders therein because Mortgage Loans that fail to meet minimum underwriting requirements are inherently riskier and more likely to default than Mortgage Loans that meet those guidelines.  The Trustee accordingly notified WMC that those 330 Mortgage Loans were in breach of WMC's representations in Sections (k), (v), and (lll) of Schedule IV to the PSA.  WMC's failure to apply an objective underwriting methodology to ensure the borrowers' ability to repay their loans is a breach of a Deemed Material and Adverse Representation.  PSA, Schedule IV ¶ (lll).

59.     *Fourth*, the March 28 Breach Notice identified 129 Mortgage Loans that WMC incorrectly represented to be first-lien loans.  A review of available data indicated that those 129 loans were, in fact, second-lien loans.  The fact that a second-lien loan is misrepresented as a

first-lien loan implies that correct title insurance has not been purchased for that misrepresented loan, given that the type of title policy to be issued depends on the loan's lien priority.  The Trustee therefore informed WMC that those 129 Mortgage Loans were in breach of WMC's representation that, except for specifically identified second-lien loans, each "[m]ortgage is a valid, subsisting and enforceable first lien" (PSA, Schedule IV ¶ (j)), and that a valid title insurance policy was issued for each Mortgage Loan (PSA, Schedule IV ¶ (p)).

60.     *Finally*, the March 28 Breach Notice identified 834 Mortgage Loans that were never eligible to be placed in the Trust in the first place.  WMC represented that borrower repayments of principal would begin no more than 70 days after funds on that mortgage were disbursed and that the mortgage note for each Mortgage Loan is, unless otherwise specified on the Mortgage Loan Schedule, "payable in equal monthly installments of principal and interest . . . with interest calculated and payable in arrears, sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than thirty years from commencement of amortization."  PSA, Schedule IV ¶ (t).  Forensic analysis revealed that those 834 Mortgage Loans either allowed repayment of principal to begin more than 70 days after funds were disbursed or did not require equal monthly installments for a term of no more than thirty years.  It is obvious that including ineligible loans in the Trust materially and adversely affects the value of the interests of the Trustee and Certificateholders in the Mortgage Loans because the Trust did not receive the assets it paid for.  Such ineligible loans where the borrower does not have to make principal payments at first (known as "interest-only loans") or where the borrower does not pay equal monthly installments (known as "balloon loans") carry higher risk of default, because such loans often require larger payments later on that the borrower cannot afford.  As a result, the Trust received riskier, less valuable loans than represented.

61.     In the aggregate, the March 26 and March 28 Breach Notices identified no less than 5,600 distinct breaches of WMC's representations and warranties that materially and adversely affect the value of at least 3,017 Defective Mortgage Loans and/or the interests of the Trustee or the Certificateholders therein.   The notices therefore specified that nearly ***ninety percent*** of the Mortgage Loans originated by WMC and conveyed into the Trust are in material breach.   The Repurchase Price for these 3,017 Defective Mortgage Loans exceeds $390 million.

62.     The March 26 and March 28 Breach Notices also warned WMC of likely pervasive problems with the Mortgage Loans beyond those specifically identified.   The March 26 Breach Notice, for example, notified WMC that Certificateholders had "commissioned an ongoing investigation of the Mortgage Loans to determine whether the representations and warranties WMC made in connection with the PSA represent the true quality and characteristics of the Mortgage Loans," and that the investigation was expected to "reveal a substantial number of additional material and adverse breaches of WMC's representations and warranties throughout the pool."   The two Breach Notices also observed that the enormous magnitude of the Trust's losses, combined with the significant number of breaches uncovered so far, "suggests that WMC committed additional breaches of its representations and warranties affecting most of the approximately 3,400 WMC Mortgage Loans conveyed into the Trust."

63.     As of the date of the filing of this Complaint, WMC has failed to cure any breach or repurchase any Defective Mortgage Loan.

**B.      The Re-Underwriting Review**

64.     In addition to the Breach Notices described above, an industry-recognized firm (the "Re-Underwriting Firm") performed a "re-underwriting" review on a random sample of 400 WMC Mortgage Loans to assess their compliance with applicable underwriting guidelines and

WMC's representations and warranties.  (The process by which a lender decides whether to make a loan is referred to as the "underwriting" of the loan; the process of reviewing existing loans to assess their compliance with applicable standards is known as "re-underwriting.")  The re-underwriting process involved a thorough analysis of Mortgage Loan files, including loan applications, documentation of the borrower's assets, and publicly available information such as bankruptcy records.  Of the 400 Mortgage Loans reviewed in that sample, the Re-Underwriting Firm found that 287 – or over seventy percent – are in breach of WMC's representations and warranties.

65.    The defects identified by the Re-Underwriting Firm are extensive.  The paragraphs below summarize several of the most common types of defects discovered, together with representative examples of each.

i.    **Income Misrepresentations**

66.    The Trust is replete with Defective Mortgage Loans where the borrowers reported incorrect incomes.  In most of these cases, the income misrepresentations were so flagrant that the originator must have known (or at least should have known) about them at the time the Mortgage Loans were originated.   Many of the borrowers' claimed incomes were wholly unreasonable given their asserted employment.   Frequently, borrowers claimed that their incomes were many times greater than the expected range of incomes for the borrower's stated profession, as determined by data published by the United States Bureau of Labor Statistics.

67.    A Mortgage Loan with inaccurate income information breaches numerous representations and warranties backed by WMC.  For example, if the borrower secured a Mortgage Loan he could not afford by misrepresenting income, then the loan would at least breach the representation that "there was no default, breach, violation or event which . . . would

constitute a default, breach, violation or event that would permit acceleration." PSA, Schedule IV ¶ (q). Borrower misrepresentation of income would also breach WMC's representation that that "no fraud, misrepresentation, or similar occurrence . . . with respect to a Mortgage Loan has taken place on the part of any Person . . . including . . . any appraiser," PSA, Schedule IV ¶ (k). And in many cases, Mortgage Loans with misrepresented income breach WMC's representation – a "Deemed Material and Adverse Representation" – that "[t]he methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles" and that "[s]uch underwriting methodology confirmed that at the time of origination (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan." PSA, Schedule IV ¶ (lll). These borrower misrepresentations and similar occurrences are defaults under the applicable Mortgage Loan documents.

68. Misrepresentation of income "materially and adversely" affects the value of the Mortgage Loans and the Trustee and the Certificateholders' interest therein for obvious reasons. Borrowers who take out mortgages by misrepresenting income are far less likely to pay those loans on time – if they can pay them at all – making the mortgages more risky than they appear. The following are a few of many examples of breaches relating to misrepresentation of income:

- **Loan A:**[4] The borrower claimed on the loan application to earn $6,000 per month as owner of an apparel company. However, the borrower's bankruptcy petition – filed the same year as origination – indicated that the borrower had had *no* employment or business income in the last three years before the loan closed. The only income reflected in the borrower's bankruptcy petition was $3,419 a month in government benefits for the borrower and her children.

---

[4] Loan numbers have been replaced with pseudonyms to protect borrower privacy. Detailed breach reports containing loan numbers have been provided to WMC. However, personally identifiable information about borrowers (such as addresses, employment status, or the like) cannot be included in the public record until the Court has issued an appropriate protective order.

- **Loan B**:  In the initial loan application, the borrower claimed to earn $8,500 a month as a truck driver.  However, the borrower claimed, without explanation, to earn $9,500 a month in the final loan application.  That unexplained discrepancy should have put any reasonable underwriter on notice of potential misrepresentation.  In addition, the borrower's claimed income is nearly twice the 90th percentile for truck drivers in the borrower's metropolitan area as measured by the Bureau of Labor Statistics, further indicating potential misrepresentation.  However, no evidence exists in the loan file that WMC attempted to verify the borrower's application.  Later paperwork submitted by the borrower in support of a loan modification indicated that, at the time of origination, the borrower actually earned $1,736 a month, or less than a *fifth* of that claimed on the final application.

- **Loan C**:  The borrower claimed on the loan application to earn $4,100 a month as a school cafeteria worker.  That figure is more than twice the 90th percentile of income for cafeteria workers in the borrower's geographic area as measured by the Bureau of Labor Statistics, and would have put any reasonable underwriter on notice of potential misrepresentation.  Tax returns later submitted by the borrower in support of a loan modification indicated that, in the year of origination, the borrower had actually made only $1,930.15 per month.

In each case, the Re-Underwriting Firm has discovered that the borrower provided false information, and that WMC's representations about the accuracy of the Mortgage Loan files (and other matters) were accordingly false when made.

### ii.    Misrepresentations of Debt Obligations

69.    The Re-Underwriting Firm also discovered numerous Mortgage Loans to borrowers with debt obligations that were not disclosed on the loan application.  Undisclosed debt obligations violate the no-default and no-fraud representations set forth above, among others.  In many cases, Mortgage Loans with misrepresented debt also breach the "Deemed Material and Adverse" representation that WMC applied objective underwriting methodologies to ensure each borrower's ability to repay her mortgage.  PSA, Schedule IV ¶ (lll).  Breaches arising from misrepresentation of debt obligations have a material and adverse effect on the value of the applicable Mortgage Loan for much the same reason that income misrepresentations

do:  they increase the possibility that the borrower did not have sufficient means to repay the loan.  The following are a few of the many examples of breaches relating to misrepresentation of debt obligations:

- **Loan D**:  The borrower failed to disclose on the loan application a mortgage for $230,000 taken out the same month as the loan included in the 2007-HE6 Deal.  That undisclosed mortgage should have been disclosed because the borrower would have applied for it long before the WMC mortgage closed.  WMC had actual knowledge of the undisclosed loan because it originated that loan.

- **Loan E**:  The borrower failed to disclose on the loan application a mortgage for $355,000 taken out the same month as the mortgage obtained from WMC.  There were 17 unexplained inquiries on the borrower's credit report, indicating that the borrower was seeking (or had obtained) additional debt beyond that disclosed to WMC.  Analysis of the 17 unexplained inquiries would have put any reasonable underwriter on notice of potential misrepresentation and undisclosed debt.  However, there is no evidence in the loan file that WMC requested or obtained an explanation from the borrower or performed any other investigation.

- **Loan F**:  The borrower took out ten mortgages either immediately prior to or immediately after the borrower's WMC Mortgage Loan closed, including five mortgages taken out prior to origination and five mortgages taken out in the first forty-five days after origination.  Those ten mortgages – with an unpaid principal balance of over $1,013,375 – were not disclosed on the borrower's loan application, even though the borrower would have applied for the undisclosed mortgages long before the WMC mortgage closed.  The origination credit report lists *seventy* inquiries in the three months preceding the report; that figure is so unusually high that it would put any reasonable underwriter on notice of potential misrepresentation of debt obligations.  But there is no evidence in the loan file that WMC requested or obtained any explanation from the borrower or performed any other investigation.

### iii.   Misrepresentations of Employment

70.     The Re-Underwriting Firm also discovered numerous Mortgage Loans where the borrowers misrepresented their employment status at origination, their employment history, or both.  Mortgage Loans containing misrepresentations about employment likewise breach the representations and warranties identified above, including, in many cases, the "Deemed Material

and Adverse" representation that WMC applied objective underwriting methodologies to ensure each borrower's ability to repay her mortgage. PSA, Schedule IV ¶ (lll). Such misrepresentations also have a "material and adverse" effect on the value of the applicable Mortgage Loan. A borrower's employment status is critical to his or her ability to repay the Loans, and misrepresentations concerning employment imply that the loan was far riskier than represented. Misrepresentations and errors in employment status may also indicate other misrepresentations, for example misrepresented income or debt. The following are a few of the many examples of breaches relating to misrepresentation of employment:

- **Loan G**:  The borrower claimed on her loan application to work as a manager of a Big Lots store.  WMC attempted to verify the borrower's employment through "The Work Number," a commercial third-party provider of employment verification services.  However, the Work Number report – a copy of which was included in the loan file – indicated that the borrower was merely a store associate, not a manager, and further that the borrower had worked at the Big Lots store for a shorter period than she had claimed.  WMC thus had actual knowledge that the borrower misrepresented her employment.  Regardless, WMC originated the loan.

- **Loan H**:  The borrower claimed on the loan application to have worked as an X-ray technician for over sixteen years.  However, a report from the Work Number – a copy of which was included in the loan file – indicated that the borrower's real employment was as a "clerk typist," and that the borrower had held her job as a typist for only seven years.  WMC thus had actual knowledge that the borrower was a typist, not an X-ray technician.  Regardless, WMC originated the loan.

- **Loan I**:  The borrower claimed on the loan application to have worked as an electrician for two years.  However, a verification form from the borrower's employer – a copy of which was included in the loan file – indicated that the borrower was an electrician's apprentice, not an electrician.  Further, the borrower had been employed for a shorter period than claimed on the loan application.  WMC thus had actual knowledge that the borrower misrepresented his employment as an electrician.  Regardless, WMC originated the loan.

71. The set of Mortgage Loans reviewed by the Re-Underwriting Firm also constituted a statistically valid random sample of all Mortgage Loans in the Trust that were

liquidated, modified, or seriously delinquent as of September 2012 (the "Non-Performing Mortgage Loans"). A nationally recognized consulting firm with expertise in statistical analysis chose a random sample of the Non-Performing Mortgage Loans large enough to accurately predict the breach rate of all Non-Performing Mortgage Loans in the Trust. That random sample did not significantly vary from the population of Non-Performing Mortgage Loans for such relevant variables as credit score, LTV, and the amount of documentation the borrower submitted in the loan application (such as verification of employment or income). Extrapolating from the valid random sample and the results of the Re-Underwriting Firm's analysis, the consulting firm estimated to a 95% degree of confidence that over 70% of the Non-Performing Mortgage Loans are in material breach of one or more of WMC's representations and warranties.

72.    The Breach Notices and the Re-Underwriting Firm's file review together identify breaches in 3,025 of the 3,339 WMC Mortgage Loans, indicating that there are pervasive breaches throughout the pool of WMC Mortgage Loans.[5]  As described above, each of those breaches individually materially and adversely affected (and still affects) the value of the Mortgage Loans and the Trustee's and Certificateholders' interests therein. Collectively, the breaches struck at the heart of the 2007-HE6 Deal. Upon information and belief, WMC's widespread breaches harmed investors' ability to evaluate and price the risks associated with investing in the Mortgage Loans. Because, upon information and belief, investors relied on WMC's representations and warranties to determine the value of the Certificates they buy, WMC's systematic noncompliance with those representations frustrated the essential purpose of this securitization.

---

[5] While the Breach Notices identified 3,017 Mortgage Loans as in breach, taken together the Breach Notices and the Re-Underwriting Firm's file review indicate that at least 3,025 WMC Mortgage Loans are in breach. That overlap between methods of identifying breaches indicates that there are multiple types of problems with the WMC Mortgage Loans.

V.      **WMC Breaches Its Notice and Repurchase Obligations**

A.      **WMC's Breaches of Its Notice Obligations**

73.     The foregoing breaches – and many others – throughout the Mortgage Loans are so pervasive, and their nature so flagrant, that WMC must have discovered and known of them long before it received notice from the Trustee.

74.     WMC, which originated or acquired the Mortgage Loans, had first-hand access to loan files for those loans containing detailed information about borrowers' creditworthiness and the value of mortgaged property.   WMC further detailed to investors in the Prospectus Supplement how it had underwritten or re-underwritten all loans sold to the Trust in accordance with its underwriting guidelines, including both loans WMC had originated itself and loans WMC had acquired from third parties.  *See* Ex. B at S-30.  In particular, WMC described for investors how, for each Mortgage Loan, among other things it "verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant," "determine[s] the applicant's ability to repay the loan," and appraises the mortgaged property "for compliance with the WMC Underwriting Guidelines."  *Id.* at S-31.

75.     Given the pervasiveness of WMC's breaches, WMC must necessarily have discovered problems with the Mortgage Loans when it underwrote them in accordance with its own guidelines.   Further, in multiple cases, re-underwriting reveals that WMC had actual knowledge of borrower misrepresentation or other breaches from evidence available in the loan files themselves.

76.     Certificateholders and the Trustee, by comparison, lack such first-hand experience with the loan files.  Nor did the parties to the 2007-HE6 Deal intend for the Trustee to actively

monitor WMC's compliance with its representations and warranties.  Rather, the PSA explicitly states that "the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document" such as WMC's representations and warranties or the Mortgage Loan files.  PSA § 8.02(d).

77.    Nevertheless, WMC has never issued written notification to the Trustee pursuant to Section 2.03 of the PSA indicating that it has discovered *any* breaches of its representations and warranties.

78.    WMC's breach of its notice duties is grossly negligent given that WMC had ample notice of pervasive problems with the Mortgage Loans.  Upon information and belief, discovery will show still further evidence of WMC's gross negligence regarding its failure to identify and notify other PSA parties of breaches of its representations and warranties.

**B.    WMC's Breaches of Its Repurchase Obligations**

79.    In an August 21, 2013 letter to the Trustee and the Securities Administrator, WMC claimed that it "has acknowledged and honored its repurchase obligations under Section 2.03 of the PSA."  Its actions show the opposite.  To date, WMC has failed to cure or repurchase *a single one* of the Defective Mortgage Loans identified by the Trustee, notwithstanding its knowledge of breaches and its clear obligation to remedy those breaches through cure or repurchase.  In particular, WMC has failed to repurchase even the Mortgage Loans in breach of a "Deemed Material and Adverse Representation," representations which, if breached, compel WMC to repurchase the affected Loan without being given *any* opportunity to cure.  Instead, WMC has responded with a litany of protests that the Trustee has not provided it with sufficient

- 29 -

information, despite the fact that the PSA contains no mechanism by which WMC can "rebut" or refuse to comply with the Trustee's repurchase demands.

80.     WMC's continuing failure to repurchase Defective Mortgage Loans, despite its longstanding knowledge of pervasive breaches, makes clear that WMC will not live up to its obligations under the contract.  Its failure to repurchase a single Defective Mortgage Loan despite its independent knowledge of widespread defects in the Mortgage Loans and the notice provided to it by the Trustee of those breaches also shows that providing notice to WMC would be futile.

81.     WMC's refusal to honor its notice, cure, and repurchase obligations has unjustifiably shifted the risk occasioned by the Defective Mortgage Loans onto the Trust and Certificateholders, in violation of the PSA's terms and the commercially reasonable expectations of the parties.

82.     The essential purpose of the repurchase remedy in Section 2.03 of the PSA is to secure for the Trust (on behalf of the Certificateholders) the economic benefit of the bargain and to place the risk of Defective Mortgage Loans upon WMC.  To the extent the repurchase remedy does not achieve that essential purpose, Plaintiff is entitled to alternative remedies, including an award of damages for any unremedied breaches of WMC's representations and warranties.

## VI.   WMC Is An Alter Ego of GE Capital

83.     WMC has operated as GE Capital's subprime lending arm and does not have an identity separate from GE Capital.  As WMC's CEO, Laurent Bossard, testified to the United States Senate Committee on Banking, Housing, and Urban Affairs on March 22, 2007, "GE Money made the decision post-acquisition to place WMC's mortgage operations under federal

regulation.  This was accomplished by bringing the mortgage business under GE Money's Federal Savings Bank."

84.    WMC shared offices in Burbank, California with GE Capital's consumer-finance division.  The two purportedly separate companies operated out of the same offices throughout the relevant period surrounding the facts alleged in this Complaint.  WMC's employees were also GE Capital employees.

85.    The fused identities of WMC and GE Capital carried through to the companies' product line.  On July 15, 2005, WMC launched a program called "WMC Select," which was said to allow "greater flexibility in qualifying the borrower for a loan since the borrower selects the loan features most important to him."  Notably, WMC stated in a June 29, 2007 SEC filing that "WMC Select is offered by GE Money Bank."

86.    WMC and GE Capital presented themselves to the world as one entity, with GE Capital providing financial backing for WMC.  For example, at an American Securitization Forum presentation in 2007, WMC distinguished itself from its competition by citing its "GE Support," which provided WMC access to GE Capital's "institutional resources and balance sheet."  WMC further pitched itself as having "GE purchase power."

87.    In particular, WMC and GE Capital presented themselves in the Prospectus Supplement as a single entity.  The Prospectus Supplement disclosed that, as of January 2007, WMC Mortgage Corp. (the predecessor in interest to WMC Mortgage, LLC, the defendant here) had assigned substantially all of its mortgage origination operations to WMC-GEMB Mortgage Corp., a subsidiary of GE Money Bank (which was itself a subsidiary of GE Capital).  Ex. B at S-30.  At that point, WMC-GEMB "commenced doing business as 'WMC Mortgage'" and began securitizing loans to be sold by GE Money Bank to WMC Mortgage Corp.  *Id.*  The

Prospectus Supplement even specified that, for the purpose of discussing WMC's underwriting guidelines, the terms "GE Money Bank" and "WMC Mortgage Corp." were interchangeable. *Id.*

88.    GE Capital's restructuring and reorganization of WMC resulted in the ostensible transfer of WMC's repurchase and indemnification obligations to the new, undercapitalized WMC Mortgage, L.L.C.

89.    The core strategic decisions concerning GE Capital's WMC business continued to be made by GE Capital.  For example, on a December 2010 investor conference call, Mark Begor (President and CEO, GE Capital Real Estate and GE Capital Restructuring Operations) discussed GE Capital's reserves for "potential future repurchases that may come from investors from loans that we have sold in the past."  Mr. Begor explained that GE Capital – controlling WMC's business – "put in a new leadership team," and was now "no longer underwriting to Wall Street guidelines," but "to our guidelines."

90.    Over the last few years, GE Capital's public statements have indicated that it is aware that GE Capital is ultimately responsible for WMC's repurchase and indemnification obligations arising out of WMC's subprime mortgage origination business.  Mr. Begor said to investors on the December 2010 conference call in regards to loan repurchase demands asserted against WMC that "[i]f you've seen some of our results you know that we refute every loan . . ."

91.    In addition, GE Capital stated in its SEC disclosures that soon after folding WMC into GE Money Bank, GE Capital sold its WMC mortgage business in the fourth quarter of 2007. In referring to this sale, GE Capital informed the SEC that "[u]pon sale, we retained contractual obligations to repurchase previously sold loans as to which there was an early payment default or with respect to which certain contractual representations and warranties were not met."

92.     When asked on an October 15, 2010 GE earnings call about indications on GE's 10-Ks that "you do actually retain some sort of obligation for liabilities or loans previously sold" by WMC, Keith S. Sherin, Vice Chairman and CFO of GE, did not dispute GE's retention of WMC's repurchase obligations.

93.     In recognition of Defendants' repurchase and indemnification obligations arising out of the WMC representations and warranties, GE Capital continues to record reserves on its consolidated balance sheet for repurchase requests based upon pending and estimated future loan repurchase requests.   In a July 2013 SEC disclosure, GE Capital reported repurchase reserves totaling $787 million as of June 30, 2013.   GE Capital revealed in the July 2013 filing that its repurchase reserves have increased by $154 million – or over twenty percent – in the last six months prior to June 30, indicating GE Capital's recognition of its large, and increasing, mortgage repurchase duties.

94.     Today, GE Capital's WMC mortgage business is being wound down, and Defendants are responsible for responding to repurchase demands.   The decision not to fulfill Defendants' repurchase and indemnification obligations was made by GE Capital from its Connecticut headquarters.

## VII.    The Certificateholders and Depositor Direct This Suit

95.     Sections 8.01(c), 8.02(d), and 12.08 of the PSA allow Certificateholders holding no less than 25% of the Certificates' voting rights to direct the Trustee to take action, including filing suit.   In March 2013, Certificateholders holding more than 25% of the Certificates' voting rights directed the Trustee to take appropriate legal action against WMC regarding its breach of its representations and warranties.

96.     Section 2.03(f) of the PSA also states that, in the event that WMC fails to cure or repurchase Defective Mortgage Loans, "[t]he Trustee shall pursue all legal remedies available to the Trustee against [WMC] under this Agreement as directed in writing by the Depositor."

97.     In a letter dated August 13, 2013, Morgan Stanley ABS Capital I, Inc., Depositor for the MSAC 2007-HE6 Deal, "direct[ed]" the Trustee "to pursue all legal remedies available to [the Trustee] against the Responsible Parties," *i.e.*, WMC, "with respect to any breaches of representations and warranties made . . . under the Agreement."   A copy of the August 13 direction letter is attached to this Complaint as Exhibit E.

## CLAIMS FOR RELIEF
### Count I
### (Breach of Contract—Breach of WMC Representations and Warranties)

98.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 97, inclusive, of this Complaint as if fully incorporated herein.

99.     The Trust is governed by the terms of the PSA, a valid and binding contract to which WMC and the Trustee are parties.

100.    WMC, in its capacity as a Responsible Party under the PSA, made certain representations and warranties concerning the condition of the Mortgage Loans in connection with their ultimate sale to the Trust in exchange for valid consideration paid.  WMC made these representations and warranties to the Trustee, which acts under the PSA for the benefit of the Certificateholders.

101.    WMC has breached its representations and warranties with respect to at least 3,025 Defective Mortgage Loans.

102.    WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders

therein.  Further, certain of the representations and warranties breached by WMC are "Deemed Material and Adverse Representations," the breach of which requires WMC to repurchase the breaching Mortgage Loan without being given any opportunity to cure such breach.

103.    Pursuant to the Breach Notices, WMC was given notice that all or nearly all of the Mortgage Loans are in breach of WMC's representations and warranties.  In addition, the Breach Notices have notified WMC of specific breaches of WMC's representations and warranties with respect to 3,017 Defective Mortgage Loans with an aggregate Repurchase Price in excess of $390 million.  Upon information and belief, WMC also discovered pervasive breaches in the Mortgage Loans.

104.    The Trustee has performed all of its obligations under the PSA required to be performed in connection with the matters described herein, and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.  The Trustee has substantially complied with any applicable notice requirements.  Compliance has also been excused and rendered futile by WMC's actions.

105.    As a direct and proximate result of WMC's breaches of its representations and warranties, the Trust has suffered and continues to suffer significant damages.  Accordingly, WMC should be required to pay compensatory damages for the harm it has caused the Trust by breaching its representations and warranties.

106.    Plaintiff is therefore entitled to damages caused to the Trust by WMC's conduct, in an amount to be proven at trial, but in no event less than $500 million.

107.    Plaintiff is also entitled to an order of specific performance requiring WMC to repurchase all Defective Mortgage Loans in the Trust.  The Trustee reserves the right to seek repurchase of additional Mortgage Loans (and to introduce evidence of additional breaches

affecting previously noticed Defective Mortgage Loans) based on discovery, investigation, and further forensic analysis and re-underwriting of loan files for other Mortgage Loans held in the Trust.

108.   The Trust is also entitled to rescission or rescissory damages.   Rescission is warranted because WMC is in willful and material breach of the PSA, as shown by its failure to repurchase Defective Mortgage Loans after explicit notice from the Trustee, and because, upon information and belief, WMC was aware before the Trustee's notices that the Defective Mortgage Loans were in breach.   WMC's breaches are so widespread as to defeat the purpose of the contract.   Allowing WMC to escape its contractual repurchase obligations at the Trust's expense would be inequitable.   To the extent rescission itself is impractical, or would not achieve its essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

109.   To the extent that WMC cannot satisfy a judgment against it, WMC does not have a genuine and separate corporate existence apart from GE Capital.   GE Capital, as the alter ego of WMC, has been exercising complete dominion and control over WMC with respect to the Trustee's cause of action, for the improper purpose and inequitable effect of attempting to shield itself from prospective liability.   GE Capital and WMC are therefore jointly and severally liable to Plaintiff for the relief requested.

<u>Count II</u>
**(Breach of Contract—Breach of WMC Repurchase Obligations)**

110.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 97, inclusive, of this Complaint as if fully incorporated herein.

111.   The Trust is governed by the terms of the PSA, a valid and binding contract to which WMC and the Trustee are parties.

112.    WMC, in its capacity as a Responsible Party under the PSA, made certain representations and warranties concerning the condition of the Mortgage Loans in connection with their ultimate sale to the Trust in exchange for valid consideration paid.  WMC made these representations and warranties to the Trustee, which acts under the PSA for the benefit of the Certificateholders.

113.    WMC has breached its representations and warranties with respect to at least 3,025 Defective Mortgage Loans.

114.    WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders therein.  Further, certain of the representations and warranties breached by WMC are "Deemed Material and Adverse Representations," the breach of which requires WMC to repurchase the breaching Mortgage Loan without being given any opportunity to cure such breach.

115.    Pursuant to the Breach Notices, WMC was given notice that all or nearly all of the Mortgage Loans are in breach of WMC's representations and warranties.  In addition, the Breach Notices have notified WMC of specific breaches of WMC's representations and warranties with respect to 3,017 Defective Mortgage Loans with an aggregate Repurchase Price in excess of $390 million.  Upon information and belief, WMC also discovered pervasive breaches in the Mortgage Loans.

116.    The Trustee has performed all of its obligations under the PSA required to be performed in connection with the matters described herein, and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.  The Trustee has substantially complied with any applicable notice requirements.  Compliance has also been excused and rendered futile by WMC's actions.

117.    WMC has failed to cure any of its breaches of representations and warranties and has failed to repurchase any breaching loan.  Those failures constitute further breaches of WMC's obligations under the PSA.

118.    As a direct and proximate cause of WMC's breaches of its repurchase obligation, the Trust has suffered and continues to suffer significant damages.  Accordingly, WMC should be required to pay compensatory damages for the harm it has caused the Trust by breaching its representations and warranties.

119.    Plaintiff is therefore entitled to damages caused to the Trust by WMC's conduct, in an amount to be proven at trial, but in no event less than $500 million.

120.    Plaintiff is also entitled to an order of specific performance requiring WMC to repurchase all Defective Mortgage Loans at the Repurchase Price.  The Trustee reserves the right to seek repurchase of additional Mortgage Loans (and to introduce evidence of additional breaches affecting previously noticed Defective Mortgage Loans) based on discovery, investigation, and further forensic analysis and re-underwriting of loan files for other Mortgage Loans held in the Trust.

121.    The Trust is also entitled to rescission or rescissory damages.  Rescission is warranted because WMC is in willful and material breach of the PSA, as shown by its failure to repurchase Defective Mortgage Loans after explicit notice from the Trustee, and because, upon information and belief, WMC was aware before the Trustee's notices that the Defective Mortgage Loans were in breach.  WMC's breaches are so widespread as to defeat the purpose of the contract.  Allowing WMC to escape its contractual repurchase obligations at the Trust's expense would be inequitable.  To the extent rescission itself is impractical, or would not achieve

its essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

122.    To the extent that WMC cannot satisfy a judgment against it, WMC does not have a genuine and separate corporate existence apart from GE Capital.  GE Capital, as the alter ego of WMC, has been exercising complete dominion and control over WMC with respect to the Trustee's cause of action, for the improper purpose and inequitable effect of attempting to shield itself from prospective liability.  GE Capital and WMC are therefore jointly and severally liable to Plaintiff for the relief requested.

## Count III
### (Breach of Contract—Breach of WMC Obligation to Notify)

123.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 97, inclusive, of this Complaint as if fully incorporated herein.

124.    The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

125.    WMC, in its capacity as a Responsible Party under the PSA, made certain representations and warranties concerning the condition of the Mortgage Loans in connection with their ultimate sale to the Trust in exchange for valid consideration paid.  WMC made these representations and warranties to the Trustee, which acts under the PSA for the benefit of the Certificateholders.

126.    Under Sections 2.03(e) and (f) of the PSA, WMC, as Responsible Party, was required to give prompt written notice to the Trustee upon discovery of a breach of any of those representations and warranties which materially and adversely affects the value of any Mortgage Loan or the interests of the Trustee and the Certificateholders therein.

127.    WMC has breached its representations and warranties with respect to at least 3,025 Defective Mortgage Loans.

128.    WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders therein.  Further, certain of the representations and warranties breached by WMC are "Deemed Material and Adverse Representations," the breach of which requires WMC to repurchase the breaching Mortgage Loan without being given any opportunity to cure such breach.

129.    Upon information and belief, WMC discovered that the Mortgage Loans breached WMC's representations and warranties, but failed to give prompt written notice of any breaches to the Trustee.  WMC thereby breached its obligations to the Trustee under the PSA.

130.    The Trustee has performed all of its obligations under the PSA required to be performed in connection with the matters described herein, and has not breached any obligation or excused the performance by WMC of any of its obligations under the PSA.  The Trustee has substantially complied with any applicable notice requirements.  Compliance has also been excused and rendered futile by WMC's actions.

131.    The Trust has been injured and suffered damages by WMC's breaches. Accordingly, WMC should be required to pay compensatory damages for the harm it has caused the Trust by its failure to notify the Trustee and other parties to the PSA of WMC's breaches of its representations and warranties.

132.    Plaintiff is therefore entitled to damages caused to the Trust by WMC's conduct, in an amount to be proven at trial, but in no event less than $500 million.

133.    Plaintiff is also entitled to an order of specific performance requiring WMC to specifically perform its obligations under the PSA and give prompt written notice to the parties to the PSA of any breaches of WMC's representations and warranties.

134.    To the extent that WMC cannot satisfy a judgment against it, WMC does not have a genuine and separate corporate existence apart from GE Capital.  GE Capital, as the alter ego of WMC, has been exercising complete dominion and control over WMC with respect to the Trustee's cause of action, for the improper purpose and inequitable effect of attempting to shield itself from prospective liability.  GE Capital and WMC are therefore jointly and severally liable to Plaintiff for the relief requested.

### Count IV
### (Breach of Contract—Breach of WMC Indemnification Obligations)

135.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 97, inclusive, of this Complaint as if fully incorporated herein.

136.    The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

137.    WMC has breached its representations and warranties with respect to at least 3,025 Defective Mortgage Loans.

138.    WMC's breaches of representations and warranties have materially and adversely affected the value of the Mortgage Loans and the interests of the Trustee and Certificateholders therein.  Further, certain of the representations and warranties breached by WMC are "Deemed Material and Adverse Representations," the breach of which requires WMC to repurchase the breaching Mortgage Loan without being given any opportunity to cure such breach.

139.     Pursuant to PSA Section 2.03(p), WMC agreed to indemnify and hold harmless the Trust and the Trustee against any losses, including damages, resulting from any claim or demand resulting from a breach of WMC's representations and warranties.

140.     Defendants have failed to indemnify the Trustee or the Trust for expenses arising or resulting from the claims and demands resulting from WMC's breaches of its repurchase obligation, its representations and warranties, and its notification obligation.

141.     The Trust has suffered losses as a direct result of the claims and demands resulting from WMC's breaches.  Accordingly, the Trustee is entitled to indemnity for such losses to the Trust in an amount to be determined at trial.

142.     To the extent that WMC cannot satisfy a judgment against it, WMC does not have a genuine and separate corporate existence apart from GE Capital.  GE Capital, as the alter ego of WMC, has been exercising complete dominion and control over WMC with respect to the Trustee's cause of action, for the improper purpose and inequitable effect of attempting to shield itself from prospective liability.  GE Capital and WMC are therefore jointly and severally liable to Plaintiff for the relief requested.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trust, acting through the Trustee, respectfully requests that the Court enter judgment in its favor and against WMC as follows:

(1)     Declare that WMC has breached its representations and warranties, its notice obligations, and its cure and repurchase obligations with respect to each of the Defective Mortgage Loans, including but not limited to each of the Defective Mortgage Loans specifically identified in the Breach Notices;

(2)     Declare that WMC is the alter ego of GE Capital and that WMC and GE Capital are jointly and severally liable for the relief requested herein;

(3)     Declare that WMC's duty to cure or repurchase Mortgage Loans found to have breached its representations and warranties survives even where those Mortgage Loans have been liquidated;

(4)      Enter an order of specific performance requiring WMC to repurchase all Defective Mortgage Loans including, but not limited to, each of the Defective Mortgage Loans specifically identified in the March 26 and March 28 Breach Notices, at the contractually defined Repurchase Price;

(5)     Award damages against WMC in an amount to be proven at trial, but in no event less than $500 million;

(6)     Award indemnification for costs and expenses incurred by the Trust and the Trustee as a result of the claims and demands resulting from WMC's breaches, including attorneys' fees and costs;

(7)     Award attorneys' fees, costs, and other related expenses;

(8)     Award pre-judgment and post-judgment interest; and

(9)     Award such further relief as this Court deems just and proper.

Respectfully submitted,

PLAINTIFF,
DEUTSCHE BANK NATIONAL TRUST
COMPANY, solely as Trustee for the Morgan
Stanley ABS Capital I Inc. Trust, Series 2007-HE6

By: /s/ Kathryn G. Newman
    Thomas D. Goldberg (ct04386)
    Kathryn G. Newman (ct28708)
    **DAY PITNEY LLP**
    One Canterbury Green
    Stamford, Connecticut 06901
    Tel: (203) 977-7300
    Fax: (203) 977-7301
    Email: tgoldberg@daypitney.com
    Email: knewman@daypitney.com

    *Of Counsel*

    Steven F. Molo
    Justin V. Shur
    David P. Jang
    Justin M. Ellis
    **MOLO LAMKEN LLP**
    540 Madison Avenue
    New York, NY 10022
    Tel: (212) 607-8160
    Fax: (212) 607-8161
    Email: smolo@mololamken.com
    Email: jshur@mololamken.com
    Email: djang@mololamken.com
    Email: jellis@mololamken.com

    *Its Attorneys*