# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

DEUTSCHE BANK NATIONAL TRUST
COMPANY, Solely as Trustee for Morgan
Stanley ABS Capital I Inc. Trust 2006-
WMC2,

               Plaintiff,

v.

WMC MORTGAGE, LLC,

               Defendant.

CIVIL ACTION
NO. 3:12 - CV- 00933 (CSH)

**MARCH 31, 2014**

## RULING ON DEFENDANT'S MOTIONS FOR PARTIAL
## DISMISSAL OF COMPLAINT

**HAIGHT, Senior District Judge:**

    This diversity action alleges breaches of contract. The contract in suit was generated by securitized residential mortgage loans. WMC Mortgage L.L.C. ("WMC"), the Defendant, is charged by the Plaintiff Trustee with having breached promises and representations contained in the contract. Defendant now moves to dismiss the complaint in part.

    Three other cases, involving for the most part the same parties and forms of contract, were assigned to this Court as related cases. They are identified *infra.* WMC made comparable motions to dismiss in each of these cases. The Court heard consolidated oral arguments on all four cases. This Ruling is made in the captioned, first-filed case. It will resolve all four motions.

## I.  INTRODUCTION

WMC originated or acquired thousands upon thousands of residential mortgages, each collateralized by the residential property covered by the loan.

WMC did not play the role of the old-fashioned home lender, waiting for each borrower to make timely mortgage payments.  Instead, WMC "grouped" or "bundled" thousands of mortgages into a single "pool" (to use the industry's mixed metaphors).  Each pool of mortgages passed through the hands of two other entities (a "sponsor" and a "depositor") and eventually came to rest in the hands of a Trust, which issued residential mortgage-backed securities ("RMBS") certificates and sold them to investors (hereinafter "the Certificateholders").  The certificates entitled the Certificateholders to shares of the mortgage payments made by borrowers on the underlying loans.

If everything went well, the borrowers faithfully performed the underlying mortgages, and every entity and individual in the mortgage-securitization chain made a great deal of money.  As economist Paul Krugman recently wrote in *The New York Times*, each participant in such a multi-tiered investment structure takes a cut "as the money sloshes by."  However, the well-publicized bursting of the housing bubble and resulting profusion of foreclosed or nonperforming home loans have caused substantial losses, principally to Certificateholders who purchased certificates from the Trusts which issued them.  The four cases involved in this Ruling were filed by trustees on behalf of certificateholders against WMC.  The Trustees allege that WMC breached a number of obligations placed upon WMC by the contracts between the parties.

Of the four cases with which this Ruling is concerned, in three of them Plaintiff Deutsche Bank National Trust Company ("Deutsche Bank") sues solely in its capacity as Trustee for Certificateholders who invested in a particular designated pool of securitized mortgages.  In the

fourth case, Plaintiff Law Debenture Trust Company of New York ("Law Debenture") sues solely in its capacity as substitute Trustee on behalf of Certificateholders in a fourth pool of securitized mortgages. These cases may be summarized as follows:

**No. 3:12-cv-933:** Deutsche Bank is Plaintiff on behalf of Certificateholders in Morgan Stanley ABS Capital I Inc. Trust 2006 - WMC2 ("MSAC 2006 - WMC2").

**No. 3:12-cv-969:** Deutsche Bank is Plaintiff on behalf of Certificateholders in HSI Asset Securitization Corporation Trust 2006 - WMC1 ("HSI 2006 - WMC1").

**No. 3:12-cv-1538:** Law Debenture is Plaintiff on behalf of Certificateholders in Securitized Asset Backed Receivables L.L.C. Trust 2006 - WMC2 ("SABR 2006 - WMC2").

**No. 3:12-cv-1699:** Deutsche Bank is Plaintiff on behalf of Certificateholders in Securitized Backed Receivables L.L.C. Trust 2006 - WM3 ("SABR 2006 - WMC3").

WMC, the named Defendant in each case, is described as the "successor-by-merger to WMC Mortgage Corp." General Electric Capital Corporation was named as a co-Defendant and described in the complaint as the "sole member" of WMC. Plaintiff thereafter voluntarily dismissed the action against General Electric.

In each case, WMC has moved under Rule 12(b)(6), Fed. R. Civ. P., to dismiss certain aspects of the Plaintiffs' complaints. That is to say: These motions to dismiss are partial in nature. Each case will go forward beyond the pleading stage; the present question is whether the pleaded claims should be substantially reduced. WMG contends that the terms of the contracts and the governing law preclude certain claims, so that, in the language of Rule 12(b)(6), such aspects of the complaints fail "to state a claim upon which relief can be granted." The Plaintiff Trusts reject these partial and limiting challenges to the claims asserted in the complaints. They oppose WMC's

motions in all respects.

This Ruling resolves the present motions. Because the parties significantly overlap, and the contracts at issue are essentially the same, the Court consolidated these four cases for the limited purposes of hearing and deciding WMC's motions. Each motion has been elaborately briefed. They were argued together in a consolidated hearing by skilled and articulate counsel. Counsel for the Trustees and for WMC have supplemented their submissions at that time with a series of post-hearing letter briefs, the most recent dated January 14, 2014, whose purpose is to call this Court's attention to new decisions by other courts, state and federal, which counsel for one side say support their position, and counsel for the other say have nothing to do with the case.

## II.  BACKGROUND

The securitized residential mortgage loans lying at the heart of these cases were created by a chain of interlocking written agreements comprising hundreds of pages of densely packed single-spaced prose: not the stuff of poetry. The contracts in suit are the work product of JDs, MBAs, and seeming professionals in the worlds of real estate, investment and finance.

Out of the welter of relevant documents, counsel for the Trusts and WMC agree in identifying the core contract to the disputes, and the two determinative provisions in that contract. The core contract is called the Pooling and Service Agreement ("PSA"). Each of the four Trusts for which the Plaintiffs act as Trustees was created by a PSA. The principal parties to the PSA are the Trust in question and WMC as "Responsible Party": an appropriate adjective in law and common usage, since the litigation turns upon WMC's responsibilities concerning representations and warranties binding upon it under the contractual scheme. Each PSA contains two provisions central

4

to the disputes between the parties.  One provision deals with *notices* to be given in the event of breach or non-performance of underlying mortgage obligations by borrowers whose mortgages form part of the Trust's securitized assets.  The other provision deals with *remedies* available to Trust Certificateholders against WMC if WMC breaches its representations or warranties contained in the PSA.  WMC relies upon these provisions to preclude or limit claims asserted by the Plaintiff Trustees in their complaints.  I will consider those provisions and the disputes they engender separately: *Notices* in Part IV.A., and *Remedies* in Part IV.B., *infra*.

On these motions by WMC for partial dismissal under Rule 12(b)(6), the viability of the Trustees' complaints depends principally upon the well-pleaded factual allegations of the pleadings.  According to those allegations, the four Trusts in suit vary to some degree: but the structures of these mortgage-backed securitizations are so similar that for the purpose of this Background exposition, they may be described in generic terms.  For the most part, what follows in this Part is undisputed.

The securitization process begins with the "pooling" of a large number of loans, usually of a similar type, into a collateralized pool, the loans being the collateral.  The originator of the loans sells a pool of loans (directly or indirectly) to a special-purpose entity known as a "Depositor," which in turn sells the mortgage loans to a Trust created specially for the purpose of administering the securitization process.  Under the securitization process, the Trust directly or indirectly purchases the loans from the originator, using funds raised by the selling of residential mortgage backed securities ("RMBS"), or "certificates," to investors, who by virtue of their investments become "Certificateholders" of the Trust.  Certificateholders acquire the right to receive monies from the cash flows of the underlying mortgage loans or their proceeds (such as loan principal and interest or the proceeds from the liquidation of loan collateral).  These cash flows are paid to Certificateholders

over time, pursuant to a contractually specified distribution plan and schedule.

A Trust of the sort involved in the cases at bar springs into life on what the industry paradoxically refers to as the "Closing Date"    (a term to which the Broadway theatre gives a different meaning).   In the present context, the phrase indicates that the complex multi-tiered transaction has *closed* successfully and all parties are bound accordingly.   The PSA,  dated as of the Closing Date, created the Trust.   The parties to the PSA are the Trustee, WMC as "Responsible Party," and certain intermediary  entities (the Sponsor, the Depositor, the Servicer).   The underlying mortgage loans, originated by WMC, had previously been conveyed to the Depositor in contemplation of the Trust's formation; with the closing of the transaction, the Depositor conveyed the loans to the Trust.   The Trust thereupon issued Certificates to the investor-Certificateholders, and transferred the millions of dollars thus invested to WMC.   The bargained-for benefit to the Certificateholders was participation in the income stream created as the borrowers made payments of the principal and interest called for by each loan.

WMC, as the Responsible Party, made in the PSA a series of representations and warranties that the Trustees now seek to enforce in these actions.   Those representations and warranties covered the mortgage loans' quality and characteristics; the borrowers' ability to repay their mortgages; the absence of fraud, error or negligence when originating the mortgage loans; and the loans' compliance with underwriting standards.   WMC also bound itself in the PSA to a remedial framework, should during the securitization's life a particular mortgage loan prove defective or fail to perform.

The four Trusts in suit involved large numbers of loans and vast amounts of money.   Trust MSAC 2006 - WMC2 (No. 3:12-cv-933) contained 12,898 loans and paid $2.6 billion to WMC for the loans.   Trust HSI 2006 - WMC1 (No. 3:12-cv-969) contained 4,447 loans and paid $820 million

to WMC.  The complaint describing Trust SABR 2006 - WMC2 (No. 3:12-cv-1538) does not indicate the total number of loans contained in the loan pool, but alleges that the Trust paid WMC approximately $1 billion for them.  Trust SABR 2006 - WMC3 (No. 3:12-cv-1699) contained 4,780 loans and paid $999 million to WMC.

These considerable sums passed from the Trusts to WMC.  The Certificateholders awaited receipt of their shares of the borrowers' payments on the loans.  Things did not work out well.  Mr. Molo, counsel for Deutsche Bank, put it succinctly during oral argument:

> And the three Deutsche Bank transactions here, which are my client in these three cases, involved almost four and a half billion dollars. And in each deal WMC told investors and told the Trustee that they carefully diligenced the loans, that the borrowers could repay, and then they also promised to buy back the loans if there were any breaches in the representations and warranties about the quality of the loans.
>
> It turns out that what they sold us was garbage.

Doc. 101, Hearing Transcript ("Tr."), at 68-69.  That unflattering characterization stems principally from independent forensic analyses of a number of loans made at the behest of increasingly concerned Certificateholders in all four Trusts.  These analysts took a number of individual loan files, subjected them to "re-underwriting" (*i.e.*, examining the economic qualifications of the borrower, his ability to repay the loan, and related factors), and concluded that a substantial number of loans had been made in near-total disregard of generally accepted underwriting principles, with the inevitable result, as stated by counsel, that: "Between 41 and 63 percent of the loans in the three Deutsche Bank deals are nonperforming loans."  *Id.*, Tr., at 69.

Each of the four Trustees acting as Plaintiffs in these action gave WMC specific notice of the widespread non-performance of hundreds of mortgage loans documented by the re-underwriting

exercises performed by the forensic analysts.  The Trustees allege that the failures of specific borrowers evidenced breaches by WMC of representations and warranties WMC gave to Trust investors in the PSA.  The Trustees gave "Breach Notices" to WMC alleging such breaches, and demanding that WMC repurchase the identified non-performing loans in accordance with WMC's obligations under the PSA.

WMC has not repurchased any loan covered by the Trusts in question.  The Trustees' complaints in these actions allege that WMC's violations of their warranties and representations are so pervasive throughout the loan pools that the Trustees are entitled at this time to legal and equitable remedies in respect of any present or future non-performing or foreclosed mortgage loan in the loan pool of the Trust, whether or not a particular loan was included in a prior Breach Notice.

WMC rejects major aspects of the Trustees' claims, on the ground that under governing law they fail to state a claim upon which relief can be granted.  In consequence, WMC's motions for partial dismissal of the complaints fall under Rule 12(b)(6), Fed. R. Civ. P.

### III.   STANDARD OF REVIEW

The criteria for granting or denying a motion to dismiss under Rule 12(b)(6) are well established.

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader.  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v Rhodes*, 416 U.S. 232,

235-36 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). In ruling on such a motion, "the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir. 2005). "Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Maniolos v. United States*, 741 F.Supp.2d 555, 567 (S.D.N.Y. 2010) (citing *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008)), *aff'd*, 469 F. App'x 56 (2d Cir. 2012).

This recitation of principles is adapted from Judge Sweet's opinion in *Deutsche Alt-A Securities Mortgage Loan Trust  v. DB Structured Products, Inc., 958 F.Supp.2d 488, 493-94 (S.D.N.Y.* 2013), which I will refer to as "*Series 2006 - OA1.*" Judge Sweet was ruling on a Rule 12(b)(6) motion by defendant to dismiss an action for breach of contract brought by investors who purchased residential mortgage-backed securities certificates issued by a securitization trust. The securities transaction and borrowers' defaults closely resemble those in the cases at bar.

Judge Sweet's opinion in *Series 2006 - OA1* is instructive in these WMC cases at bar because

Judge Sweet held explicitly that the Supreme Court's most recently articulated Rule 12(b)(6) criteria, in *Twombly* and *Iqbal*, apply to cases construing securitized residential mortgages, such as those in the cases presently before me. That holding is clearly correct. There is no discernible reason why the *Twombly* and *Iqbal* protocols would *not* apply to cases of this nature. In consequence, the decisive question posed by WMC's motions to dismiss certain of the Trustees' claims may be stated thus:

With respect to the challenged claims, do the Trustees' complaints allege facts sufficient to state plausible claims which, if proven at trial, would entitle the Trustees, on behalf of Certificateholders, to legal or equitable relief from WMC? This opinion focuses upon that core question.

## IV.  DISCUSSION

On these motions for partial dismissal, WMC makes two principal arguments. First, WMC contends that certain of the Trustees' claims are precluded by provisions in the PSA with respect to the giving of notice of defaults in the underlying mortgages. Second, WMC contends that certain of the Trustees' claims are limited by provisions in the PSA with respect to remedies in the event of default. I consider these contentions in order.

## A.    <u>Notice</u>

WMC's contentions with respect to the giving of notice are based upon §§ 2.03(e) and 2.03(f) of the PSA. In WMC's perception, those sections constitute conditions precedent to the  Trustees' ability to sue WMC on most of the mortgage loans referred to in the complaints. WMC contends: "Count I should be dismissed as to Plaintiff's claims concerning '99.7 percent of the Subject Loans'

(3,930.974 loans) because Plaintiff has failed to satisfy the agreed upon conditions precedent of providing WMC with notice of and an opportunity to cure any alleged breaches before bringing suit." WMC Main Brief in Docket No. 3:12-cv-933 [Doc. 39-1] at 9 (footnote omitted).

I will quote the provisions in the PSA that are relevant to notice. In the language that follows, the phrase "the Responsible Party" is a reference to WMC. WMC qualified for that designation by making, in § 2.03(b) of the PSA and attached schedules, a number of representations and warranties with respect to the underlying loans' quality and characteristics. The notice provisions are as follows:

**§ 2.03(e)**

It is understood and agreed by the parties hereto that the representations and warranties set forth in this Section 2.03 shall survive the transfer of the Mortgage Loans by the Depositor to the Trustee, and shall inure to the benefit of the parties to whom the representations and warranties were made notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Mortgage File. Upon discovery by any of the Responsible Party, the Depositor, the Trustee or the Servicer of a breach of any of the foregoing representations and warranties that materially and adversely affect the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the party discovering such breach shall give prompt written notice to the other parties.

**§ 2.03(f)**

Within 30 days of the earlier of either discovery by or notice to the Responsible Party that any Mortgage Loan does not conform to the requirements as determined in the Custodian's review of the related Custodial File or within 60 days of the earlier of either discovery by or notice to the Responsible Party of any breach of a representation or warranty, set forth in Section 2.03(b), that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the Responsible Party shall use commercially reasonable efforts to cause to be remedied a

11

material defect in a document constituting part of a Mortgage File or promptly to cure such breach in all material respects and, if such defect or breach cannot be remedied, the Responsible Party shall, at the Depositor's option as specified in writing and provided to the Responsible Party and the Trustee, (i) if such 30 or 60 day period, as applicable, expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section 2.03; or (ii) repurchase such Mortgage Loan at the Repurchase Price; . . . . In the event that the Trustee receives notice of a breach by the Responsible Party of any of the representations and warranties set forth in clause (43), (44), (46), (48), (50), (52), (53), (54), (55), (56), (57), (58), (59) or (69) of Schedule III, the Trustee shall give notice of such breach to the Responsible Party and the Depositor, and shall request the Responsible Party to repurchase the Mortgage Loan at the Repurchase Price within sixty (60) days of the Responsible Party [*sic*] receipt of such notice.  If, by the end of such sixty (60) day period, the Responsible Party fails to repurchase such Mortgage Loan, the Securities Administrator shall notify the Depositor and the Trustee of such failure.  The Trustee shall pursue all legal remedies against the Responsible Party under this agreement, if the Trustee has received written notice from the Depositor directing the Trustee to pursue such remedies.

PSA [Doc. 1-2], at 2-3.

On this aspect of the case, WMC contends that the Trustee failed to comply with these provisions for the Trustee giving WMC notice of breaches of representations or warranties *given by WMC* with respect to underlying mortgage loans.  The Trustee's failure to give that notice, WMC asserts in its brief, deprived AMC of "an opportunity to cure any alleged breaches" before the Trustee brought suit.

WMC urges the Trustee's failure to give notice as a ground for dismissing much of the Complaint.  It follows that, under *Twombly* and *Iqbal*, primary consideration must be given to the well-pleaded factual allegations of the Complaint with respect to the Trustee's giving of notice to

WMC of the latter's breaches of representations or warranties.

The Complaint in No. 933 [Doc. 1] alleges in ¶ 2 that the Trust in question received a conveyance of a pool of mortgage loans "with an unpaid principal balance of more than $2.6 billion." Counsel for the Trustee stated at the hearing, without seeming contradiction, that the pool was comprised of 12,898 separate loans. The Pooling and Service Agreement ("PSA") naming WMC as the Responsible Party was dated as of June 1, 2006. The specified closing date was June 28, 2006. PSA, Ex. A to Complaint [Doc. 1-1 to 1-6].

The Complaint alleges in ¶ 6 that in January 2012, "[a]t the direction of an investor in the Trust," the Trustee "commissioned a review into whether certain mortgage loans owned by the Trust breached WMC's representations and warranties" in a manner adversely affecting the value of any loan or the interest of the Trustee or Certificateholders therein. Doc. 1 ("Complaint"), ¶ 6. An "independent expert statistician" was retained for that purpose. *Id.*, ¶ 7. The expert randomly selected a representative sample of over 400 loans from a pool of 5,342 non-performing loans with an original principal balance of over $1.2 billion. *Id.*, ¶ 8. The 400-plus sample loans were "re-underwritten and reviewed on a loan-by-loan basis." *Id.* ("Re-underwritten," counsel clarified at the hearing, means examining all documents in the original loan file to see if the loan should be made). ¶ 7 alleges that of the 400-plus sample of non-performing loans, 99.7 percent evidenced breaches of WMC's representations and warranties, with material and adverse effects upon the value of the loan and the interests of Trustee and Certificateholders. ¶ 8 of the Complaint alleges that thereafter, a group of 1,000 additional mortgage loans was selected from the same pool of 5,342 non-performing loans and re-underwritten and reviewed on a loan-by-loan basis, which produced a "breach rate on this group of loans in excess of 99.7 percent." *Id.*, ¶ 8.

13

At ¶¶ 44-64, the Complaint contains further detail with respect to this forensic assessment of non-performing loans.  It is there alleged that the first representative sample taken from the population of 5,342 non-performing loans consisted of 402 separate "unique" loans, of which 401 revealed material and adverse breaches of representations or warranties given by WMC in the PSA. *Id.*, ¶¶ 44-52.   The Complaint refers to this initial group as "the Sample Loans." *Id.*, ¶ 48.  ¶ 54 alleges that "Out of an abundance of caution and without prejudice to the population-wide repurchase demands based on the Sample Loans, additional loan reviews were performed  on a 1,000-loan subset of the 5,342 Non-Performing Loans," which revealed that 994 loans in that subset breached WMC representations or warranties in adverse and material manners.  *Id.*, ¶¶ 54-56. The complaint refers to this second group as "the Additional Loans." *Id.*, ¶¶ 54.   The Sample Loans and the Additional Loans are collectively referred to as "the Reviewed Loans." *Id.*, ¶ 57.

According to the Complaint at ¶¶ 57-60, the forensic  re-underwriting and examination of the Reviewed Loans focused upon the Mortgage Loan Schedule ("MLS"), which is prepared by the loan originator  "and contains information about the mortgage loans that are contained in a securitization," including "data such as the loan amount, documentation type and occupancy status, among other things." *Id.*, ¶ 59(a).  An MLS is shown to prospective investors in the securitization. The document is intended to reassure investors about the validity of each loan.  The forensic examiners concluded that "over 90 percent of the Reviewed Loans were materially misstated by WMC on the MLS, thereby misleading investors about the quality and content of the mortgage loans in which they were investing," in breach of the representations and warranties WMC gave in the schedules to the PSA.  *Id*.  The forensic experts examined the full original file for each Reviewed Loan, and found the following: in over 54 percent of them, the borrower's debt-to-income ratio

exceeded the limits provided for in recognized Underwriting Guidelines, *id.*, ¶ 59(b); in over 29 percent, the borrower misrepresented his or her income in the loan application, *id.*, ¶ 59(c); and in over 18 percent, the borrowers failed to disclose existing or pending debt obligations, *id.*, ¶ 59(d). Accepting these allegations as true, as I am bound to do on this motion to dismiss, then to the extent WMC (designated in the PSA as the "Responsible Party") originated these loans, it is over-qualified for designation as an Irresponsible Lender.

In these circumstances, ¶¶ 65-69 of the Complaint allege that by a series of letters dated April 16, 25, 26 and 27, 2012, the Trustee sent to WMC "Repurchase Demand Letters" which demanded, in substance, that WMC repurchase at the PSA Repurchase Price the 401 "breaching loans" in the first sample; the 994 loans in the second sample; and 99.7 percent of the remaining non-performing loans in the non-performing pool of 5,342 loans.  Count I of the Complaint, sounding in breach of contract, alleges that WMC breached its representations and warranties with respect to the underlying mortgage loans, with resulting money damages to the Trust (solely in its capacity as Trustee, and for the benefit of the Certificateholders).  Count I does not allege an amount of damages.  ¶ 11 of the Complaint alleges: "As a result of WMC's breach of its representations and warranties, as well as Defendants' breach of their independent contractual obligations to repurchase and indemnify the Trustee and Trust, the Trust has been injured in an amount  that  exceeds $650 million."  *Id.*, ¶ 11.

The Complaint alleges at ¶¶ 65-69 that when the Trustee sent its Repurchase Demand Letters to WMC in April of 2012, it forwarded to AMC "multiple charts containing thousands of rows of detailed descriptions of the breaches of WMC Representations and Warranties identified in the Sample Loans," together with, for each breaching mortgage loan, a document "containing

documentation supporting the breaches, amounting to thousands of pages of additional material."
*Id.*, ¶ 67.  In like manner, the Repurchase Demand Letters relating to the Additional Loans were accompanied by "the same level of detailed notice that was provided to WMC in connection with the Sample Loans in the April 16 Repurchase Demand Letter."  *Id.*, ¶ 68.   ¶ 69 of the Complaint, summing all this up, alleges:

> The Repurchase Demand Letters were sent to WMC promptly upon discovery of the breaches.  Altogether, the Loan Review entailed a review of over 830,000 pages of Mortgage Loan Files and provided loan-by-loan bases for demanding repurchase of the loans.

*Id.*, ¶ 69.

On this giving-of-notice aspect of the case, the brief for WMC appears to accept that the Trustee gave WMC proper notice, in compliance with the PSA, in respect of the 402 loans the Trustee referred to as the "Sample Loans," and the 1,000 loans referred to as the "Additional Loans": together, collectively, the "Reviewed Loans."  As noted *supra,* the Trustee's forensic experts culled these 1,402 Reviewed Loans by random sampling from a greater number of 5,342 non-performing loans, a group WMC calls "the Subject Loans."  WMC's motion to dismiss, based on the Trustee's asserted failure to give notice, focuses upon the 3,940 Subject Loans that were not included among the Reviewed Loans (5,342 loans less 402 loans and less 1,000 loans).  As to those 3,940 loans, the Trustee's Complaint alleges a claim based upon a forensically calculated breach rate of 99.7, or 3,930.974 loans.  WMC contends that portion of the Complaint must be dismissed.  Its argument is expressed in WMC's Main Brief [Doc. 39-1], at 18-19:

> Plaintiff alleges that it used an unexplained sampling procedure to identify 402 loans, which it reviewed, and asserts that 401 of them were Breaching Loans.  Thereafter, Plaintiff reviewed another 1,000 Subject Loans, and claims that 994 of them were Breaching Loans.

Plaintiff candidly calls these 1,402 loans the "Reviewed Loans"; by its own admission, Plaintiff has not reviewed any of the other 3,940 Subject Loans. Instead, for the 3,930.974 unidentified Subject Loans, Plaintiff simply presumes the existence of a breach without bothering to determine if one exists, and, if so, identifying it *for WMC to evaluate and attempt to cure*.

Plaintiff has simply bypassed the protections it agreed to provide WMC, and brought suit on loans in a manner the PSA expressly bars. Plaintiff has not given WMC the proper notice *and an opportunity to evaluate and cure* for which WMC bargained (and obtained in the PSA) as protection against unwarranted litigation.

WMC Main Brief [Doc. 39-1], at 18-19 (internal citations omitted and emphases added).

In the emphasized portions of this argument, WMC represents to the Court though counsel that if the Trustee had identified to WMC the 3,930.974 "unidentified Subject Loans," WMC would have "evaluate[d] and attempt[ed] to cure" those loans. WMC expands upon that theme in earlier pages of its brief. It characterizes the PSA's notice provisions as "conditions precedent," and professes:

Satisfaction of these conditions ensures that before any litigation commences, WMC has a meaningful opportunity to evaluate and attempt to cure the alleged breaches. Without specific notice, it is impossible for WMC to know which defects it should attempt to cure for which loans. Some alleged defects may not be valid, such as those based upon a misstatement of WMC's underwriting guidelines. Some loan defects can be cured quite simply, for example, by supplying an allegedly missing document. Other potential breaches might require additional investigation into, for example, a borrower's statements or underwriting mitigants considered when the loan was underwritten six years ago. However, without notice of the alleged deficiency as to a particular loan as required by the PSA, WMC is deprived of any opportunity to evaluate and possibly cure the alleged breach.

*Id.*, at 16-17.

Reflecting upon this passage, one conjures up a mental picture of platoons of experienced,

17

highly motivated WMC employees, each one ready, able and eager at the drop of a seemingly troubled mortgage loan file to examine the file, evaluate any discernible potential deficiencies, and by the laying on of healing hands, cure any deficiencies that could be remedied, to the benefit of all concerned, or have WMC repurchase any mortgage beyond salvation.  It is a reassuring, even a comforting, vision.  But its relationship to reality may plausibly be questioned.  The Complaint alleges – and I am bound to accept as true – that with respect to each of the 1,402 "Reviewed Loans," in April 2012 the Trustee gave WMC specific notice that WMC had breached one or several of its warranties or representations, a description of each breach, and documentation showing the nature and fundamental materiality of that breach: documentary support that ran into the hundreds of thousands of pages.  It is common ground that since April 2012 and the present day, WMC has not repurchased any of these 1,402 loans – *not a single one*.  WMC does not seem to deny that for almost two years, it has had with respect to each of these 1,402 challenged loans the "opportunity to evaluate and cure" the breaches of which the Trustee gave WMC detailed and supported notice.  Where were the platoons of WMC evaluators and healers, arrayed in ranks in the mind's eye?  What have they been doing since April 2012?

These questions are legitimate, given the alleged circumstances, but the present record does not reveal the answers.  The present record does not reveal what efforts WMC made to evaluate or cure the 1,402 reviewed loans of which the Trustee gave WMC notice; or whether, after careful and good-faith use of that bargained-for opportunity, WMC concluded that it was not obligated by the PSA to repurchase a single one of those 1,402 mortgages.  However, these rather stark circumstances give rise to the legitimate suspicion – for this early stage of the case I put it no higher – that the grief WMC professes in its brief over a lost opportunity to evaluate and cure the *other* 3,930 loans  is not

genuinely felt: rather, that purported lost opportunity is a fiction, fashioned for the sake of advocacy. That disillusioned conclusion could perhaps be reached by the Court if discovery and trial evidence showed that WMC never intended to evaluate and attempt to cure either the 1,402 reviewed and identified loans *or* the 3,930 unidentified loans. If those were shown to be the facts, the giving by the Trustee to WMC of detailed and specific notice with respect to the other 3,930 loans would have been utterly futile, and WMC cannot turn it to its litigation advantage. On a fair reading of the Trustee's Complaint, that is the gravamen of its claim against WMC. Accepting the truth of the Complaint's factual allegations, that claim is *plausible*, in the sense that *Twombly* and *Iqbal* use the word. Whether a *plausible* claim ultimately attains the state of grace of a *proven* one will depend, of course, upon the proof to be elicited, during discovery or at trial.

What is clear on the present record is that the fact the Trustee did not give more notice than it did cannot be used by WMC as the basis for dismissing any part of the Complaint. Judge Sweet's opinion in *Series 2006 - OA1* addresses that point. The defendant DBSP, a sponsor of a mortgage loan securitization comparable in function to WMC in the case at bar, was sued by the trustee for multiple breaches of representations and warranties ("RWs," in Judge Sweet's parlance) concerning the value of the loams. The trustee in that case did what the Trustee in this case has done. It gave DBSP specific notice of 323 "Breaching Loans," attaching "thousands of pages of material which supported these conclusions." 958 F.Supp. 2d at 496. In addition, plaintiff's complaint alleged on information and belief that DBSP, through its own due diligence efforts and prior to the securitization closing date, "discovered numerous breaches not specifically listed in the Breach Notices," and that DBSP's obligation to repurchase would have been triggered upon its own discovery and does not require notice by Plaintiff. *Id*. at 497. That is the theory of the case alleged

by the Trustee at bar.  DBSP in *Series 2006 - OA1* made the same argument WMC does in this case:

"Defendant asserts that should Plaintiff's breach of contract claims survive, Plaintiff is only entitled

to bring claims regarding loans for which it has previously been given of RW breaches."  958

F.Supp.2d at 496.  Judge Sweet rejected that argument:

> Whether these [additional] loans did, in fact, breach the RWs and
> whether DBSP know, or should have known, of these breaches at the
> time of its review, is a question of fact.  It would therefore be
> premature to dismiss Plaintiff's claims as to loans which are not the
> subject of any Breach Notices at this stage.

*Id*. at 497.  I reach the same conclusion in the case at bar.[1]

WMC's arguments are critical and dismissive of the random loan-sampling methods used by

the Trustee's forensic experts, as described in the Complaint.  If  WMC intends that criticism to be

a basis for dismissing the major portion of Count I, it must persuade the Court that, in any

conceivable circumstances and as a matter of law, the sampling of loans engaged in by the Trustee's

forensic experts cannot function as viable notices of breaches in any loans other than those

specifically identified in the breach notices.   I am unable to accept that proposition.

In *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F.Supp.2d 475 (S.D.N.Y.

2013), plaintiff Assured, an insurance company, had paid insurance claims that arose when many of

---

[1]  In *Series 2006 - OA1* the defendant securitizor also challenged the validity of the breach notices the plaintiff trustee actually gave.  Judge Sweet also held that this argument could not sustain a motion to dismiss the complaint: "Independently, even if the provisions in the MLPA or PSA dictated notice requirements which Plaintiff may have violated, the sufficiency of the Breach Notices is an issue of fact not appropriate for resolution at this stage. . . . sufficiency of notice presents factual issues that cannot be resolved on a motion to dismiss, and . . . the meaning-and-intent of the notice-and-cure provisions may be illuminated during discovery."  958 F.Supp.2d at 496 (citations and internal quotation marks omitted).  In the case at bar, I do not understand WMC to contend that the notices the Trustee gave with respect to the 1,402 reviewed loans were deficient under the PSA.  But if WMC does challenge the notices' sufficiency, a motion to dismiss could not be based upon the challenge, for the reasons Judge Sweet gave in *Series 2006 - OA1*.

the underlying securitized home equity loans ("HELOCs"] had defaulted.  Assured sued defendant

Flagstar for reimbursement of those payments.  Flagstar was the originator of the loans, and had

given to the trust, investors, and Assured as third-party beneficiary the same sort of representations

and warranties about the loans' integrity that WMC gave to the Trustee and investors in the case at

bar.  District Judge Rakoff denied Flagstar's motion to dismiss Assured's Complaint, No. 11 Civ.

2375 (JSR), 2011 WL 5335566 (S.D.N.Y. Oct. 3, 2011), and its motion for summary judgment, 892

F.Supp.2d 596  (S.D.N.Y. 2012).  Judge Rakoff then conducted a bench trial and filed an opinion

reported at 920 F.Supp.2d  475 (S.D.N.Y. 2013).  During a trial that in the Judge's  phrase "reduce[d]

to resolution of conflicting expert testimony," 920 F.Supp.2d at 486, the two  principal witnesses for

plaintiff Assured were Lipshutz, "an expert on statistical sampling, " and Walzak, a "mortgage

origination and underwriting expert."  *Id*. at 486, 487.  Two trusts were involved in the case.  The

first trust "was collateralized by approximately 10,000 individual HELOC loans," and the second

trust "was backed by over 5,000 HELOC loans."  *Id.* at 478.  Assured's statistical sampling expert

"created a random sample of 400 loans from each of the two securitization pools," which he testified

was sufficient "to obtain a representative sample for each pool."  *Id.* at 486.  The mortgage

origination and underwriting expert examined these 800 sample loans, and concluded that "606 of

the 800 loans in the sample contained material breaches of Flagstar's representations and warranties."

*Id*. at 487.  Giving judgment in favor of plaintiff Assured, Judge Rakoff said at 920 F.Supp.2d 512:

> Because the Court accepts sampling as an appropriate method of
> proof in this case and because it largely adopts Walzak's findings of
> material defects, the Court finds that the loans underlying the Trusts
> here   at   issue   *pervasively*   breached   Flagstar's   contractual
> representations and warranties.

(emphasis added).  During trial, counsel for Flagstar objected to the admissibility of Assured's expert

witness testimony and opinions.  Judge Rakoff rejected those objections, in language I quote because his reasoning is persuasive:

> The Court has considered Flagstar's other objections to Walzak's conclusions and finds them sufficiently without merit as to not warrant further discussion with one exception that merits brief mention, to wit, Flagstar's challenge to the use of statistical sampling to prove liability in this case.  Sampling is a widely accepted method of proof in cases brought under New York law, including in cases relating to RMBS [residential mortgage backed securities] and involving repurchase claims [citing cases].  Although Flagstar argues that the fact determination of material breach in any given instance requires consideration of an entire loan file renders the loans ill-suited to proof by statistical sampling, this argument is unpersuasive.  The very purpose of creating a representative sample of sufficient size is so that, despite the unique characteristics of the individual members populating the underlying pool, the sample is nonetheless reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic.

*Id*. at 512 (internal citations omitted).[2]

Judge Rakoff's reasoned approval of sampling as a source of probative evidence in *Flagstar* is instructive in liability aspects of the case at bar; *see* further discussion of his opinion *infra*.  For present purposes, it is sufficient to say that the opinion following bench trial in *Flagstar* is contrary to WMC's contention that the forensic sampling employed by the Trustee in fashioning its Repurchase Demand Letters is  precluded as a matter of law from giving notice under the PSA with respect to defects in any mortgages other than those specifically reviewed and identified by name.  Indeed: If forensic sampling of this sort is acceptable proof at trial in establishing the liability of a securitizor like WMC, *a fortiori* that sampling is acceptable in pleading a plausible claim.

---

[2]  WMC seeks to distinguish *Flagstar* from the case at bar on the ground that the *Flagstar* plaintiff was an insurer of securitized mortgages rather than an investor in mortgages or a trustee on behalf of investors.  That difference may be material with respect to other aspects of the case, but *Flagstar*'s appraisal of sampling is fully applicable to the notice aspect of this case.

Two recent decisions in the Southern District of New York support the proposition that the Trustee in the case at bar gave adequate and timely notice to WMC with respect to WMC's alleged breaches of contract: sufficient notice, at least, to allow the complaints to survive a motion to dismiss. Those cases are Judge Sweet's opinion in *Deutsche Alt.-A Securities Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.,* 958 F.Supp.2d 488 (S.D.N.Y. 2013) ("*Series 2006-OA1*"), and Judge Nathan's very recent and comprehensive opinion in *ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Prods., Inc.,* No. 13 Civ. 1869 (AJN), __F.Supp.2d __, 2014 WL 1116758 (S.D.N.Y. March 20, 2014) *("Series 2007-HE3*"). The salient facts in *Series 2006-OA1* and *Series 2007-HE3* are virtually identical to those in the case at bar. Trusts were created by pooling home mortgage loans. The pooled loans were securitized and sold to investors in the form of certificates. The plaintiff in each of the cited cases was the trustee of one of those trusts. An entity called DB Structured Products, Inc. ("DBSP") was the defendant in each cited case. DBSP performed the same functions as WMC in the case at bar: selecting the loans; organizing them in a trust; giving representations and warranties ("RWs") with respect to the safety and validity of each underlying mortgage. Each trust and its accompanying agreements (such as the PSA) closed. Presumably, all concerned then sat back and waited for the mortgage borrowers to make their periodic payments under the loans. Many failed to do so. Myriad breaches of the representations and warranties given by DBSP involving the loans became manifest. The trustee in each case sued DBSP.

In *Series 2006-OA1*, Judge Sweet summarized the trustee's complaint as follows:

> The Complaint alleges breaches of contract by DBSP at two distinct points in time: First, when DBSP discovered the underlying breaches of RWs at the time of the securitization and therefore had an

23

> immediate obligation to replace, cure or repurchase the Breaching
> loans; and, second, when the Trustee put DBSP on notice of these
> same breaches several years later, which again triggered DBSP's
> obligation to cure or repurchase.  DBSP has, to date, refused to
> repurchase or cure any Breaching Loan.

958 F.Supp.2d at 494.  When read in context, it is apparent that Judge Sweet's phrase "Breaching

Loan" refers to 323 loans specifically identified by the trustee in a series of "Breach Notices" the

trustee sent to DBSP in December 2011 and June 2012 (the trust had closed in December 2006).  *See*

958 F.Supp.2d at 492-93.  The "Breach Notices" sent by the trustee in *Series 2006-OA1* are

analogous to the "Repurchase Demand Letters" given by the Trustee in the case at bar to WMC.

However, it is also apparent that the *Series 2006-OA1* complaint, and Judge Sweet's opinion,

extend beyond the loans specifically identified in the Breach Notices.  The complaint also alleged,

in a fashion similar to the instant case, that a "subsequent Forensic Review uncovered pervasive

breaches, including patently unreasonable stated borrower incomes and violations of applicable

underwriting requirements, which allegedly existed at the time of closing and are observable within

the four corners of the Loan Files."  *Id.* at 494.  In those circumstances, Judge Sweet explicitly held

that the trustee's complaint "sufficiently alleges breach of contract even with respect to loans not the

subject of breach notices."  958 F.Supp.2d at 496.  On that aspect of the case, Judge Sweet rejected

the defendant's contention that "Plaintiff is only entitled to bring claims regarding loans for which

it has previously been given notice of RW breaches."  *Id.*  He reasoned that under the terms of the

agreement "DBSP is obligated to repurchase breaching loans upon either notice or discovery."  *Id*.

(internal quotations omitted).  Plaintiff alleged that "through its own due diligence efforts and

therefore on or prior to December 29, 2006 [the closing date], DBSP discovered numerous breaches,

including breaches not specifically listed in the Breach Notices."  *Id.* at 497 (internal quotations

omitted).  "As such, DBSP's obligation to repurchase would have been triggered upon its own discovery and does not require notice by Plaintiff."  *Id*.

Of particular significance to WMC's present effort to base its motion to dismiss upon asserted shortcomings in the Trustee's notices of breaches by WMC, Judge Sweet then said:

> Whether these loans did, in fact, breach the RWs and whether DBSP knew, or should have known, of these breaches at the time of its review, is a question of fact.  It would therefore be premature to dismiss plaintiff's claims as to loans which are not the subject of any Breach Notices at this stage.

Judge Nathan's opinion in *Series 2007 - HE3* is to the same effect.  That opinion dealt with four separate breach-of-contract actions against DBSP, brought by the trustee of four residential mortgage securitization trusts.  DBSP moved to dismiss all four actions.  Judge Nathan, who had drawn the case with the lowest docket number, accepted the other three cases as related to hers, and consolidated the four cases for purposes of deciding the motions to dismiss.

At the outset of her opinion, Judge Nathan noted: "These actions are materially similar, in terms of the parties and their claims, to two parallel cases, one before Judge Sweet in this district and one in New York state court."  2014 WL 1116758, at *1 (citations omitted).  Judge Sweet's case, to which Judge Nathan referred, is *Series 2006 - OA1*, which I have just discussed in *this* opinion.  The issues presented by DBSP's motions to dismiss the cases before Judge Nathan were the same as in the case before Judge Sweet.  I should add that the actions are materially similar to the case at bar, in respect of the Plaintiff Trustee's claims against WMC and WMC's motion to dismiss those claims. In each of these cases, widespread breaches of representations and warranties are alleged, notices of breach were given by the trustees, voluminous supporting documentation of breaches were furnished by the trustee to the defendant, together with forensic evidence of sampling and pervasive breaches

during the lifetime of the trust.  This also mirrors, it will be recalled, the evidence placed before

Judge Rakoff during the bench trial in *Flagstar.*

As did  Judge Sweet in *Series 2006 - OA1*,  Judge Nathan in *Series 2007-HE3* held that the

notice provisions in the PSA did not entitle DBSP to dismiss the complaints.  DPSB contended that

the notice provisions in section 2.03(a) of the PSA constituted conditions precedent to suit.  In the

case at bar, WMC makes the same contention, based upon the same PSA provisions.  Judge Nathan

rejected the argument in the cases before her.  She reasoned:

> DBSP's argument that pre-suit notice is required centers on section
> 2.03(a) of the PSA.  That section provides that if the Trustee
> discovers or receives notice of a breach, it must promptly notify
> DBSP and ask it to cure the breach or repurchase the loan within 60
> days. . . . However, under the Agreements' terms, notice does not
> operate as an express condition precedent. . . . Of course, if DBSP had
> not initially discovered the breaches, its repurchase obligation would
> not be triggered in the first place without the Trustee's notice.  But
> with respect to breaches that DBSP did discover, in the absence of
> explicit contractual language to the contrary, the Trustee's duty to
> provide notice of breaches is simply a promise, not an express
> condition that must be literally performed. . . . Therefore, Plaintiff's
> nonperformance would have to be "material" to bar its claims.

2014 WL 1116758, at *15.  I need not quote Judge Nathan's ensuing discussion of the materiality

contractual nonperformance.  However, the analysis I have quoted resonates in the case at bar,

because the Trustee in this case, just like the trustee in *Series 2007 - HE3*, claims that WMC (just

like DBSP) conducted due diligence and must have discovered deficiencies in borrowers at the time

the loans were being pooled and securitized.  It follows, on this view of the facts, that the

representations and warranties DBSP (and WMC) gave to potential trust investors with respect to

the validity of the loans were breached even as they were uttered.  With respect to notice, Judge

Nathan said this:

> To summarize, because Plaintiff adequately alleges that DBSP
> discovered breaches and failed to repurchase the defective loans, and
> because its entitlement to sue to enforce DBSP's repurchase
> obligation with respect to those loans does not require prior notice,
> the Court need not address the parties' arguments concerning the
> timing and adequacy of the notices that Plaintiff provided. Discovery
> may reveal that DBSP was, in fact, unaware of certain breaches,
> meaning that its obligation to cure them or repurchase the defective
> loans would be triggered only upon notice. If so, the adequacy and
> timing of Plaintiff's notices would remain relevant.

2014 WL 1116758, at *17. Judge Nathan concluded her discussion of the PSA's notice provisions

and the parties' relevant conduct as alleged in the complaints by stressing the importance of "the

pervasiveness of the breaches discovered during the forensic review." *Id.* She added:

> If that review had uncovered only a few breached loans, for instance,
> Plaintiff's allegations that DBSP conducted industry-standard due
> diligence on the loan pools might not "nudge [ ] [its] claims across
> line from conceivable to plausible." *Twombly*, 550 U.S. at 570. But
> the Court is required to accept Plaintiff's allegations of widespread
> breaches as true.

*Id.* By the same token, I am required to accept as true the complaint's allegations based on the

results of the forensic review conducted in this case: results which demonstrate loan breaches so

widespread that they merit (if that is the right word) the characterization of "pervasive."

Three able S.D.N.Y. judges have held, in cases materially indistinguishable from the case at

bar, that the notice provisions in the mortgage securitization agreements do not support motions to

dismiss the complaints, in whole or in part. I agree with those holdings, and consider the reasoning

leading to them persuasive. I make the same holding in respect of the notice provisions in the PSA

in the instant case. Those provisions, and the Trustee's relevant conduct, do not furnish a basis for

WMC's motion to dismiss the complaint, in whole or in part.

B.     **Remedies**

On this aspect of the case, WMC contends that "because Counts I and II [of the Trustee's complaint] impermissibly seek money damages, they should be dismissed." WMC's argument is that those counts should be dismissed "because, as a matter of contract, Plaintiff is not entitled to the relief it seeks."  WMC Main Brief [Doc. 39-1], at 20.

The contractual provisions upon which WMC relies in making that argument appear in § 2.03(n) of the PSA,  which reads in pertinent part:

> It is understood and agreed by the parties hereto that the obligation of the Depositor or the Responsible Party [WMC] under this Agreement to cure, repurchase or substitute any Mortgage Loan as to which a breach of a representation and warranty has occurred and is continuing, together with any related indemnification obligations of the Responsible Party set forth in Section 2.03(h) [*sic*, should read 2.03(l)], shall constitute the sole remedies against such Person respecting such breach available to Certificateholders, the Depositor (if applicable), the Servicer or the Trustee.

PSA [Doc. 1-2], at 5.  This provision, WMC contends, precludes the relief the Trustee seeks in Counts I and II of the complaint.  Those Counts, appearing on pages 25 and 26 of the complaint, are preceded by 89 paragraphs of detailed and mostly factual allegations, some of which are quoted or summarized *supra*.

Count I is captioned "Breach of Contract – Breach of WMC Representations and Warranties."  It alleges that "WMC has breached the WMC Representations and Warranties as set forth in the Repurchase Demand Letters," Doc. 1, ¶ 92, and that "[a]s a direct and proximate cause of WMC's breaches of the WMC Representations and Warranties, the Trust  has suffered and

continues to suffer significant damages." *Id.*, ¶ 94.[3]

Count II is captioned "Breach of Contract – Failure to Repurchase Mortgage Loans." It alleges that "WMC has breached its Repurchase Obligation by failing to cure the breaches of the WMC Representations and Warranties identified in the Repurchase Demand Letters in all material respects or repurchase the Mortgage Loans at the specified repurchase price," *id.*, ¶ 97, and that "[a]s a direct and proximate cause of WMC's breach of its Repurchase Obligation, the Trust has suffered and continues to suffer significant damages." *Id.*, ¶ 99.[4]

The complaint concludes with the prayer that "the Court enter a judgment in its favor against Defendants, in an amount to be determined at trial."[5]

These issues have been elaborately briefed and argued. A principal contention made by the Trustee is that the "sole remedies" provision in the PSA does not apply to the Trustee's claim for breach of WMC's repurchase obligations, which for this purpose the Trustee characterizes as entirely separate and independent. Thus the Trustee argues in its Main Brief [Doc. 62], at 31:

> The Complaint separately alleges both breaches of the representations and warranties (Count I) and breaches of WMC's repurchase obligations (Count II). At most, the sole-remedies provision applies to the former, not to the latter.

---

[3]  A grammatical purist could make the nitpicking criticism that the wording of this latter allegation suggests the damages were the "cause of WMC's breaches." The intended meaning, of course, is the reverse, and I read the complaint that way.

[4]  *See* footnote 3, *supra*.

[5]  "Defendants" is stated in the plural because the complaint listed WMC's corporate parent, General Electric Capital Corporation, as a separate party defendant. Plaintiff thereafter voluntarily dismissed General Electric from the case without prejudice, and General Electric's motion to dismiss the complaint was denied as moot. [Doc. 61]. The caption of this Ruling lists WMC as the sole defendant.

WMC does not accept that proposition.  In its interpretation, the sole-remedies provision applies to, and consequently precludes or limits, any conceivable claim the Trustee may have for any damage caused by any breach by WMC of any obligation imposed upon WMC by the agreements.

To resort to the vernacular, this Court's conclusions on this dispute contain good news and bad news for WMC.  The good news is that I agree with WMC that the "sole remedies" provision in the PSA precludes the Trustee from pleading a claim for general damages at large (Count I) or a separate and independent claim for breach of the repurchase obligation (Count II).  The bad news is that on the ultimate issue of WMC's potential liability to the Trustee, this good news may not make much difference.

Of the three S.D.N.Y. cases discussed in Part IV.A., the most relevant to these issues are *Series 2006 - OA1*, 958 F.Supp.2d 488 (Sweet, *J.*) and *Series 2007 - HE3*, 2014 WL 1116758 (Nathan, *J.*).  These cases involve suits by trustees against securitized loan originators, and present mirror images of the case at bar.  Judge Rakoff's opinions in *Flagstar* refer to the sole remedies provision in a trust agreement, but in the context of a suit by an insurance company on a separate (albeit accompanying) contract of insurance, which complicates the analysis somewhat.  In *Series 2006 - OA1*, Judge Sweet neatly summed up the issue:

> The parties disagree as to whether these [sole remedy] provisions bar Plaintiff from seeking monetary relief entirely, or whether, as Plaintiff contends, DBSP's breach of its repurchase obligation is an independent breach allowing separate monetary damages.

958 F.Supp.2d at 498.  To resolve that dispute, Judge Sweet reviewed New York cases, an appropriate exercise since the pertinent agreements specified (as do those at bar) that New York law controlled the parties' rights and obligations.  Having done so, he rejected the plaintiff's contention

and decided the issue in favor of defendant.  Among others, Judge Sweet cited a New York case

"holding that the repurchase obligation in this case is merely a remedy.  It is not a duty independent

of the Mortgage Representation breach of contract claims." *Id.* (citation and internal quotation marks

omitted).  Judge Sweet added:

> New York law, moreover, does not recognize pre-suit remedial
> provisions as constituting separate promises which can serve as the
> basis for independent causes of action.  Rather, under New York law,
> claims which are subject to pre-suit cure or demand requirements
> accrue when the underlying breach occurs, not when the demand is
> subsequently made or refused.

*Id.* at 499 (citations omitted).  These and other considerations led Judge Sweet to conclude that under

New York law "Defendant's failure to repurchase is thus not an independent breach sufficient to

invalidate the 'sole remedy' provision."  *Id.* at 500.

Judge Nathan reached the same conclusion in *Series 2007 - HE3*, 2014 WL 1116758.  I quote

her perceptive analysis at *6-7, based on a review of New York cases::

> [D]efendant's alleged failure to comply with its cure or repurchase
> obligations does not give rise to a separate breach of contract at the
> time of refusal. . . .  True, courts have often approached this issue in
> the context of determining when a statute of limitations began
> running, but that question is inextricably intertwined with Plaintiff's
> theory that it may bring separate contract claims based on DBSP's
> failure to repurchase breached loans.  To sanction Plaintiff's theory
> would effectively allow a plaintiff to extend the statute of limitations
> for breach of warranty claims.
>
> Accordingly, the Court rejects Plaintiff's argument that the sole
> remedy provisions are inapplicable simply because it has pleaded
> "independent" failure-to-repurchase claims.  Because such claims are
> not independently actionable, the question of whether Plaintiff's
> damages claims survive depends on whether the Agreements' sole
> remedy provisions are enforceable and, if they are, whether they bar
> damages for Plaintiff's repurchase claims.

2014 WL 1116758, at * 6-7 (citations and internal quotation marks omitted).

Judge Nathan agreed with the principal contention WMC makes in the case at bar: that "the clear contractual limitations on Plaintiff's remedies do not dissolve simply because it must bring suit to enforce those remedies; in other words, the only remedy available to Plaintiff remains the cure or repurchase of defective loans." *Id.*, at *8. But at this moment in the analysis the good news for WMC began to shift to bad. Judge Nathan went on at once to say:

> Thus, by their terms, the Agreements limit Plaintiff to seeking an order of specific performance compelling DBSP to repurchase loans at the Purchase Price.
>
> However, specific performance is an equitable remedy, and where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy.

*Id.* (internal quotations and citation omitted). In conjuring up the power of equity, Judge Nathan prepared to deal with an additional argument defendant made in the case before her; WMC also makes it in the case before me. Judge Nathan summarized that argument:

> In DBSP's view, the repurchase of many breached loans is impossible, since under its interpretation of the Agreements, loans that have been foreclosed upon and liquidated cannot be repurchased. With respect to such loans, DBSP would have the Court award Plaintiff no remedy at all.

*Id.*, at *8. To that singularly unappealing contention, Judge Nathan gave a deservedly short shrift:

> But even assuming that DBSP's interpretation of the Agreements is correct, and that some loans can no longer be repurchased, a number of courts have been willing – in the face of sole remedy provisions like the ones in the Agreements – to award money damages equivalent to what the defendant would pay were performance possible. DBSP cites only one case that actually holds to the contrary, and the Court will decline to follow it in light of persuasive in-Circuit precedent permitting money damages where repurchase is or may be impossible. DBSP suggests that damages will amount to

> a windfall for Plaintiff because the Agreements specifically
> contemplate its being unable to recover for liquidated loans, but that
> argument is doubly circular: it assumes both DBSP's position that
> liquidated loans cannot be repurchased and that the parties expected
> courts not to grant damages in lieu of specific performance with
> respect to liquidated loans.

*Id.* (citations omitted).[6]

The plaintiff trustee in *Series 2007 - HE3* contended, as does the Trustee in the case at bar,

that the PSA's sole remedy provisions were not enforceable "in light of DBSP's alleged gross

negligence and willful misconduct." *Id.*, at *9. As Judge Nathan observed, also at *9, in *Series 2006

- OA1,* "Judge Sweet cited allegations of gross negligence and willful misconduct as one ground for

holding that Plaintiff's damages claims against DBSP could survive. *Id.* at *9 (citing 958 F.Supp.2d

at 500-01). In Judge Nathan's view, the New York cases on that point are somewhat in conflict. She

decided to defer further consideration of the point, and summed up her conclusions on the sole

remedy aspect of the case by saying:

> At this stage, however, these questions do not require definitive
> resolution. The fact that the sole remedy provisions do not bar
> Plaintiff from seeking damages where repurchase is impossible
> dispenses with DBSP's theory that specific performance is the only
> remedy available in these actions. As a result, even if the sole remedy
> provisions are enforceable, Plaintiff's failure to allege which loans are
> actually subject to repurchase is not fatal to its claims. The Court
> therefore need not decide whether the sole remedy provisions are

---

[6]   Among the cases Judge Nathan cited as expressing a willingness "to award money damages equivalent to what the defendant would pay were performance possible," we find Judge Sweet's opinion in *Series 2006 - OA1* and Judge Rakoff's opinions in *Flagstar.* Judge Nathan expressed the same willingness in *Series 2007 - HE3*, and so again we have these three S.D.N.Y. judges concurring on a point also at issue in the case at bar. The out-of-Circuit case Judge Nathan declined to follow in the quoted passage is *MASTR Asset Backed Sec. Trust 2006 - HE3 ex. Rel. U.S. Bank Nat'l Ass'n v. WMC Mort. Corp.,* 843 F.Supp.2d 996 (D.Minn. 2012), heavily relied on by WMC in the instant case. My disinclination to follow that Minnesota district court case, albeit respectful, matches that of Judge Nathan.

> enforceable.   Nor must the Court address the parties' arguments
> regarding whether liquidated loans are, in fact, subject to repurchase.

2014 WL 1116758, at *10.  Judge Nathan also declined to dismiss, on a motion to dismiss, the

plaintiff's claim for rescissory damages, an equitable remedy whose availability derives from the

"strong tradition in American law that holds that contracts may not insulate a party from damages

or *rescission* resulting from the party's fraudulent conduct."  *Id.* (emphasis in original; citation

omitted).

In *Series 2006 - OA1*, Judge Sweet dealt in general terms with the question of remedy in

cases of this nature:

> Here, unlike the cases Defendant cites, if Plaintiff's allegations are
> found to be true, DBSP willfully knew of material breaches of loans
> and failed to cure these breaches for more than five years, rendering
> the entire purpose of the cure-or-repurchase obligation meaningless.
> In such circumstances, whether the Trustee's remedy is characterized
> as "compensatory damages," "rescissory damages," or "specific
> performance," thus has little practical significance given that the form
> of the relief (if not necessarily the quantum) is the same in each case:
> the payment of money to make Plaintiff whole. . . . The payment of
> the liquidation price of a loan is payment of an amount of money,
> which is completely fungible. . . . There is thus no practical difference
> between this "repurchase" remedy and compensatory damages. . . .
> Dismissal of compensatory damages at this stage is thus premature.

958 F.Supp.2d at 501 (citations, brackets, and some internal quotation marks omitted).

I agree with the conclusions and reasoning of the district judges cited and quoted in Part

IV.B. of this Ruling.

## V.  CONCLUSION

Based upon my consideration of the pleadings, the undisputed facts, and the governing law,

and having received significance guidance from the cases I have quoted and whose holdings and

reasoning I agree with and accept, I conclude that WMC's motion to dismiss the Trustee's complaint in part must be denied.

Accepting the Trustee's allegations as true, they plausibly plead claims against WMC for a variety of legal and equitable remedies. The case will proceed to discovery. Following completion of discovery, the future may hold motions for summary disposition or a trial. Time will tell.

That conclusion extends to Count III in the complaint, for indemnification. The briefs of counsel debate whether that remedy is available to the Trustee. Dismissal of the claim would be premature, pending a more complete record of the pertinent facts and circumstances.

For the foregoing reasons, Defendant's motion to dismiss the complaint in part is DENIED.

It is SO ORDERED.

Dated:   New Haven, Connecticut
            March 31, 2014

                                          _/s/Charles S. Haight, Jr._____
                                          CHARLES S. HAIGHT, JR.
                                          Senior United States District Judge