### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, solely in its capacity as Trustee, | CIVIL ACTION NOS. |
| Plaintiff, | 3:12 - CV - 933  (CSH) |
| v. | 3:12 - CV - 969  (CSH) |
| | 3:12 - CV - 1699 (CSH) |
| WMC MORTGAGE, LLC, | 3:13 - CV - 1347 (CSH) |
| Defendant. | **APRIL 14,  2015** |

### OMNIBUS RULING  ON DISCOVERY ISSUES

**HAIGHT, Senior District Judge:**

These energetically litigated consolidated cases, arising out of the ashes of multi-billion-dollar failures of residential mortgage-backed securities ("RMBS"), have generated a number of pre-trial discovery disputes.  Counsel for the parties briefed some discovery issues, the Court conducted a hearing on the discovery disputes then identified, and thereafter counsel submitted post-hearing briefs accompanied by voluminous additional documents which expanded upon the initial discovery issues and raised new ones.

This Ruling resolves all discovery disputes currently presented by the records in these cases.

### I

The Plaintiff in each of these four cases is Deutsche Bank National Trust Company ("DBNTC").  The Defendant is WMC Mortgage, LLC ("WMC").   DBNTC's lead counsel is the firm of Molo Lamken LLP.  WMC's lead counsel is the firm of Jenner & Block.

In each case DBNTC claims that WMC is liable for breach of contract.  The contracts in suit

1

("Pooling and Service Agreements" or "PSAs") were generated by securitized residential mortgage loans, each loan collateralized by the residential property covered by the loan. Thousands of mortgages would be bundled into a single "pool" which eventually came into the hands of a Trust entity like DBNTC. A pool of mortgages was "securitized" by issuing residential mortgage-backed securities certificates (hence the acronym "RMBS") and selling them to investors, who became in the parlance of such transactions "the Certificateholders." The certificates entitled the Certificateholders to shares of the mortgage payments made by the borrowers on the underlying loans. DBNTC commenced these actions as Trustee for and on behalf of certificateholders in four separate RMBS trusts.

The success of such a venture (and at the time they were Legion) depended upon the faithful payment by the borrowers of all payments called for by the mortgages. If a borrower defaulted in making those payments, the mortgage in question became known by the pejorative phrase "non-performing loan." When the history of the first decade of the 21st century comes to be written, prominent mention will be made of the epidemic of non-performing residential mortgage loans and the resulting losses to RMBS investors. DBNTC sues in each case as the Trustee of investors who purchased certificates in a particular Trust.

The core of DBNTC's breach of contract claims against WMC is that WMC breached representations and warranties WMC gave to investors with respect to the reliability of the underlying borrowers and the soundness of the loans. WMC's representations and warranties ("R&Ws") are contained in the complex interlocking contracts that set up each RMBS Trust. Those contracts further provided that if WMC discovered or was notified of any breaches by borrowers of mortgage obligations, which might in turn constitute breaches of representations or warranties WMC

2

had given to certificateholders, WMC was obligated to cure or repurchase the breaching loan within

a set period of time.  WMC's "cure or repurchase" promise was important to  trust investors because

if WMC kept its promise in case of need, the financial loss caused by a non-performing mortgage

would be borne by WMC, not by the investors.

The gravamen of DBNTC's complaints is that WMC did not keep those promises.  A typical

charge DBNTC makes against WMC appears in its brief in support of a motion to compel discovery

[Doc. 131-1], at 3:

> Beginning in 2012, the Trustee sent WMC breach notices covering
> thousands of loans.  Those demands showed pervasive breaches
> throughout WMC's mortgage loans, including breaches in most, if not
> all, of the "non-performing" loans in each trust.  However –  in line
> with the claims of its corporate parent, GE Capital Corp., that WMC
> "refute[s] every loan," – WMC has not repurchased a single noticed
> loan.  The Trustee alleges that WMC is grossly negligent because
> WMC has had ample knowledge of breaches but has failed to honor
> its contractual notice, cure and repurchase duties.

(citations and footnote omitted).

## II

The Court has previously entered two substantive Rulings in these cases, familiarity with

which is assumed.  The first, reported at 2014 WL 1289234 (D.Conn. March 31, 2014) ("*DBNTC

I*"), denied WMC's motions to dismiss the complaints.  In the second Ruling, reported at 2014 WL

3824333 (D.Conn. Aug. 4, 2014) ("*DBNTC II*"),  the Court consolidated the four DBNTC cases for

all purposes but declined to consolidate those cases with a fifth case, brought by a different plaintiff

and counsel; considered the question of sampling as a means of proving WMC's liability for the

alleged breaches of contract; and concluded with a Scheduling Order pursuant to Rule 16(b), Fed.

R. Civ. P., which the Court entered after resolving a flurry of disputes between counsel.  These

Rulings set forth the factual background of the cases in detail.  Those facts are recounted in this Ruling only to the extent necessary to explicate the Court's resolution of the presently pending motions.

The entry of a Scheduling Order, preceded by the Court's Confidentiality Order which resolved counsel's seemingly inevitable disputes, appeared to clear the channel for an orderly if somewhat lengthy voyage to possible summary judgment practice or bench trial.  The cases have in fact made progress, but it cannot be said that they progressed apace, because discovery disputes promptly surfaced.  The first of these led to DBNTC's motion to compel discovery [Doc. 131]. Specifically, DBNTC sought an order compelling WMC "to produce all repurchase analyses it created after September 2007, which WMC has withheld based on meritless privilege and work-product objections."  DBNTC brief [Doc. 131-1], at 1.

The seeds for this particular discord were sown when, in August 2007, WMC regarded itself as threatened by RMBS investors other than those involved in the cases at bar with litigation alleging WMC had breached representations and warranties comparable to those DBNTC alleges WMC breached in these cases.  "On August 31, 2007, WMC received its first letter threatening repurchase litigation."  WMC Brief [Doc. 133], at 7.  In September 2007, WMC retained the Jenner & Block firm to advise WMC about this issue.  WMC's obligations of cure-or-repurchase were contained in a number of RMBS contracts, including those with DBNTC.  One learns without surprise that Jenner & Block's entrance on stage generated or contributed to the formation of a number of documents relating to repurchases of possibly non-performing loans.  WMC contends that its "post-August 31, 2007 repurchase analyses" are protected from discovery "by the work-product doctrine because the repurchase analyses exist in their current form only because of litigation."  WMC Brief, at 15.

Additionally, WMC contends that "the attorney-client privilege protects from disclosure any repurchase analyses that reflect requests for or the provision of legal advice." *Id.*, at 22.

Invoking these privileges,  WMC refuses to produce to DBNTC in discovery documents relevant to any loan repurchase DBNTC requested or demanded subsequent to Jenner & Block's retention, which is to say, subsequent to August 31, 2007.  DBNTC contends that WMC's claims of privilege are without foundation, and moves to compel production of all repurchase analyses after September 1, 2007.

### III

DBNTC's motion to compel discovery of WMC's repurchase analyses was elaborately and formally briefed by counsel for the parties.  Counsel presented oral arguments on that issue at a hearing on October 15, 2014.  Additional letter briefs on behalf of both parties were submitted just before the hearing, on the day of the hearing, and shortly thereafter.

It appeared from these supplemental submissions that there were additional discovery-related disputes between the parties.  The Court directed further briefing, so that these additional issues could be identified with precision and the parties' opposing contentions be made known.  Counsel responded with lengthy letter briefs putting forward their contentions and equally lengthy letters quarreling with those of their adversaries.  Most letter briefs were accompanied by voluminous documentary exhibits.   A list of the letter briefs follows, each identified by the initials of the firm ("ML" for Molo Lamken, "JB" for Jenner & Block, instead of the name of the individual attorney-author), and the date of the letter:

ML     10/13/2014

JB      10/15/2014

ML     11/07/2014

JB     11/07/2014

JB     11/18/2014

ML     12/08/2014

ML     12/12/2014

JB     12/12/2014

JB     12/16/2014

ML     12/23/2014

ML     01/09/2015

JB     01/09/2015

These submissions reveal the existence of the following discovery-related disputes:

(a)  **Attorney-Client Privilege and Attorney Work Product Rule.**  WMC relies on these principles in opposing discovery into its loan repurchase analyses.  The origin of this dispute is described in Part II.

(b)  Documents regarding **WMC's knowledge of systematic problems and fraud affecting its loan origination business,** in addition to the WMC loans involved in the Trusts in suit. DBNTC seeks discovery in this area.  WMC opposes discovery in this area.

(c)  DBNTC seeks discovery concerning **the scope and circumstances of WMC's destruction of electronic data** relating to certain WMC employees.  WMC opposes discovery in this area.

(d)  WMC seeks discovery concerning **DBNTC's modification or liquidation of the loans at issue; identification of and DBNTC's communications with certificate holders of the Trusts;**

**and an expansion of the time for interrogatory responses.**  DBNTC opposes discovery in these areas.

(e)  Scattered throughout the letter briefs discussing these contested areas of discovery are various ancillary or satellite disputes with respect to a party's obligation to respond to particular interrogatories or document production demands.

The Court will consider these disputes in order.

## IV

The case for WMC is that the attorney-client privilege and the attorney work product doctrine protect WMC from producing any documents relating to WMC's analyses of loan repurchases.  In point of fact, it would be more accurate to refer to WMC's "repurchases or non-repurchases."  The Court's opinion in *DBNTC I* noted that of the 1,402 loans where "the Trustee gave WMC specific notice that WMC had breached one or several of its warranties or representations," it was undisputed that "WMC has not repurchased any of these 1,402 loans – *not a single one.*"  2014 WL 1289234, at *10 (emphasis in original).  WMC's seeming decision not to repurchase residential mortgage loans bundled into these Trusts is a recurring theme in this litigation.

This particular dispute was initiated by Request No. 7 in DBNTC's First Request for Production.  That Request, expressed with the prolixity of phrase characteristic of attorneys, calls upon WMC to produce:

> All documents and communications concerning any actions taken by WMC to respond to, address, handle, access, evaluate, investigate, review, resolve or consider the Trustee's request(s) that WMC repurchase the Mortgage Loans.

WMC contends that any and all documents and communications responsive to this Request are

protected from discovery by the attorney-client privilege and by the attorney work product doctrine (sometimes, less accurately, also referred to as a "privilege").

The attorney-client privilege is a creation of the common law.  The attorney work product doctrine is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure.  The standards of law which define and govern the privilege and the rule are familiar.  The more difficult question is the proper application of those principles to the facts of a particular case.  In modern jurisprudence, that question of application permits opposing contentions of counsel and requires the decisions of courts. I begin this Ruling with summaries of the legal standards for each of the two privileges.

A

**Attorney-Client Privilege**

"The attorney-client privilege is among the oldest common law privileges dating back to the 16th Century." *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987) (citation omitted).  "The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance."  *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007).  The Second Circuit added in *Erie*:

> [W]e construe the privilege narrowly because it renders relevant information undiscoverable; we apply it only when necessary to achieve its purpose.  The burden of establishing the applicability of the privilege rests with the party invoking it.

*Id*. (citations and internal quotation marks omitted).

Chief Judge Jacobs's opinion in *Erie* says: "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice.  At

issue here is the third consideration: whether the communications were made for the purpose of obtaining or providing legal advice, as opposed to advice on policy." 473 F.3d at 419 (citation and footnote omitted). That distinction, the *Erie* decision continues, is an implementation of "[t]he rule that a confidential communication between client and counsel is privileged only if it is generated for the purpose of obtaining or providing legal assistance." *Id.* The question that frequently arises is "whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice." *Id.* (citation omitted). *See also In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("As the district court recognized, the privilege is triggered only by a client's request for legal, as contrasted with business, advice.") (citation omitted).

The rule in this Circuit, declared in *Erie*, is that the applicability of the attorney-client privilege to a particular communication depends upon "whether the predominant purpose of the communication is to render or solicit legal advice." *Erie*, 473 F.3d at 420.[1] In *Federal Housing Agency v. UBS Americas, Inc.*, No. 11-Civ-5201, 2013 WL 1700923 (S.D.N.Y. April 16, 2013), a case involving residential mortgages, District Judge Cote characterized *Erie* as requiring a "purpose determination," and went on to say: "Even if it is true, as UBS argues, that the memoranda at issue were created for the 'predominant purpose' of rendering legal advice, that does not relieve UBS of the obligation to show that the entirety of each document is privileged." 2013 WL 1700923, at *1-2. The Court directed UBS, the counterpart to WMC in the cases at bar, to submit redacted versions of the documents in question, the redactions intended to include the sentences "which may constitute

---

[1]   There is no doubt that in *Erie* the Second Circuit regarded itself as declaring a rule. Footnote 7, dropped from the text at 473 F.3d 420, says: "As discussed in the accompanying text, however, we think *the predominant-purpose rule* is the correct one." (emphasis added).

a business assessment rather than a legal analysis." *Id.,* at *2.

**B**

**Attorney Work Product Rule**

Rule 26(b)(3)(A), Fed. R. Civ. P., provides in pertinent part:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).

The Second Circuit has said that this Rule "codified for the federal courts" the "work-product doctrine," which "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (citation and internal quotation marks omitted). The Rule allows a limited and conditional intrusion: Rule 26(b)(3)(A)(ii) permits discovery of otherwise discoverable materials if the party seeking discovery "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."

In *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180 (2d Cir. 2007), the Second Circuit held:

> The attorney work product doctrine provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial. The party invoking the privilege bears the heavy burden of establishing its applicability.

510 F.3d at 183 (citations and internal quotation marks omitted). Judge Wesley's decision explained: "There are two types of work product, ordinary or fact and opinion." Fact work "may encompass factual material, including the result of a factual investigation." *Id.* "In contrast, opinion work

10

product reveals the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative, and is entitled to greater protection than fact work product.." *Id*. (citation and internal quotation marks omitted).

The producing party in *Subpoena Dated July 6, 2005,* whose documents were subpoenaed by the government, appealed from the district court's ruling that the recordings in question were fact work product, but had to be produced because the government had demonstrated substantial need for information that could not be obtained through other means, thereby satisfying the conditions for discovery contained in Rule 26(b)(3)(A)(ii).  In Appellant's view, the material in question constituted opinion work product, entitled to a greater degree of protection from production.  The Second Circuit rejected that appeal, reasoning in part:

> Since Appellant's arguments and the affirmation are merely conclusory or ipse dixit assertions, he did not carry his heavy burden of demonstrating the applicability of the privilege; consequently, the district court did not err in concluding that he failed to prove that the recordings were opinion work product.  Furthermore, Appellant did not produce the recordings, either to the district court or this Court, for *in camera* review.  Making an *in camera* submission of materials that counsel contends are privileged is a practice both long-standing and routine in cases involving claims of privilege.  Such a submission would have permitted the district court, in the first instance, to assess whether disclosure of the materials would have, indeed, revealed counsel's legal strategies. . . . Because the burden of showing entitlement to a privilege is on the party asserting that privilege, Appellant bears the consequences of not submitting his recordings for *in camera* review.

510 F.3d at 184 (citations and internal quotation marks omitted).

## V

In the case at bar, WMC invokes the protection of both the privilege and the rule, on the basis of services rendered to it by the outside law firm of Jenner & Block.  WMC undertakes to show the

facts and circumstances of its  retention of the Jenner & Block law firm by submitting three declarations.  The declarants are Megan B. Poetzel, a JB partner [Doc. 134]; Rosie Nguyencuu, a non-lawyer and the "Repurchase Leader" at WMC [Doc. 135]; and Eric Berkowitz, an in-house attorney within the WMC legal department from June 2006 to March 2010,  when he left the company [Doc. 136].

Poetzel says that in September 2007 she "began working with others from Jenner & Block on an engagement for WMC."  Poetzel Declaration [Doc. 134] ("Poetzel. Decl."), ¶ 3.  Poetzel understood at that time that "WMC anticipated litigation arising from alleged breaches of its representations and warranties (the 'R&Ws') concerning mortgage loans sold to third parties."  *Id.* "I also understood," Poetzel continues, "that WMC had retained Jenner & Block as outside litigation counsel to provide it with legal advice with respect to that anticipated litigation."  *Id.*

Poetzel describes Jenner & Block's services to WMC by saying that "[a]s part of our engagement," the firm "provided WMC with legal advice evaluating the claims and defenses likely to be asserted in R&W repurchase litigation, and we prepared litigation strategies to defend any suits that were filed."  *Id.*, ¶ 4.  The firm "also reviewed WMC's processes and procedures for evaluating and responding to R&W repurchase requests, and we recommended that WMC make changes to those processes and procedures in light of the anticipated litigation and to obtain information concerning the repurchase requests that Jenner & Block required in order to conduct its litigation evaluation, preparation and defense."  *Id.*

Poetzel sums up the nature and effect of Jenner & Block's services to WMC in ¶ 5 of her declaration, which I will quote in full:

> As of the time that WMC adopted the changes to its repurchase

> processes and procedures recommended by Jenner & Block, which
> occurred in approximately the third and fourth quarters of 2007,
> WMC's repurchase analyses reflect Jenner & Block's legal advice
> regarding the requirements of WMC's contracts, its assessment of the
> legal sufficiency of alleged R&W breaches and evidence that was
> submitted therewith, and its litigation strategies for the defense of
> anticipated litigation.  Since the end of 2007, Jenner & Block has
> remained involved in WMC's repurchase analysis process, in that we
> have periodically recommended additional changes to WMC's
> processes and procedures as new developments, such as new types of
> alleged breaches, developments in the case, or refinements of our
> litigation strategies, warrant.

*Id.*, ¶ 5.  Poetzel concludes this portion of her declaration by saying at ¶ 6 that "[s]ince approximately

September 2007, Jenner & Block has relied on the information collected and analyses prepared by

WMC's repurchase group in defending WMC in pending and anticipated litigation." *Id.*, ¶ 6.

The next declaration, Doc. 135, is that of Rosie Nguyencuu, who identifies herself as "the

Repurchase Leader" at WMC and says that since March 2007, with the exception of an 11-month

period during 2010-2011, she has been "the head of the repurchase group at WMC Mortgage, LLC"

or its corporate predecessor.  Nguyencuu Declaration [Doc. 135] ("Nguyencuu Decl.") , ¶ 1.  Upon

joining WMC's repurchase group as its new leader in March 2007, Nguyencuu familiarized herself

with WMC's "processes and procedures for addressing R&W repurchase requests." *Id.*, ¶ 3.

Nguyencuu says that "from 2005 through approximately August 2007, WMC's repurchase group

primarily served the business function of responding to allegations made in R&W repurchase

requests." *Id.*, ¶ 4 (parentheses omitted).  "WMC's repurchase analysts generally prepared these

responses based upon their own experience and judgment without the involvement of attorneys."

*Id.*  During this time period, WMC's attorneys "were consulted on an *ad hoc* basis with respect to

repurchase requests." *Id.*  Sometimes, WMC repurchase analysts were able to "cure" alleged

mortgage breaches by, for example, obtaining a missing document.  In other instances, repurchase requests were rescinded as the result of Nguyencuu's discussion with the requesting party.  "In general, R&W repurchase requests that were not resolved through such loan-level discussions ultimately were resolved through negotiations between WMC's secondary markets department and the requesting party, with whom WMC often maintained an ongoing business relationship."  *Id.*, ¶¶ 5-6.

Nguyencuu says that "[p]rior to the fourth quarter of 2006, WMC received very few R&W repurchase requests, and the R&W repurchase requests WMC received involved a small number of mortgage loans – often concerning a handful of loans at a time."  *Id.*, ¶ 7.  That circumstance changed, according to Nguyencuu, when "[b]y approximately the third quarter of 2007, WMC began receiving requests of larger groups of loans, which we referred to a 'bulk' requests."  *Id.*  It seemed to Nguyencuu that while she was "engaged in loan-level discussions of repurchase requests with requesting parties," WMC and the requestors "were working together to reach a reasonable negotiated business resolution of any disputes regarding R&W repurchase requests." *Id.*, ¶ 8.  That circumstance changed: "Towards the end of 2007, however, WMC's discussions with parties making R&W repurchase requests became more challenging, particularly with respect to parties who were asserting 'bulk' requests."  *Id.*

Nguyencuu states in her declaration at ¶ 9 that on August 31, 2007, WMC received a letter threatening litigation from purchasers, unrelated to these cases, of pools of loans that WMC had sold: Barclays Bank PLC ("Barclays") and Securitized Asset Backed Receivables LLC ("SABR").  The Barclays-SABR  letter, Ex. A to the Nguyencuu Declaration, called upon WMC to repurchase the mortgage loans in question within 60 days, failing which, the letter's authors proclaimed, they "will

be forced to seek all legal remedies at their disposal" – the traditional circumlocution for the vernacular "we'll sue you." Doc. 135-1, at 3. The case for WMC is that this threatening letter prompted WMC to retain Jenner & Block. Nguyencuu's understanding was that "WMC asked Jenner & Block to assist WMC in preparing for litigation related to WMC's pending and potential future R&W repurchase requests." Doc. 135, ¶ 10.

Beginning with ¶ 12, Nguyencuu's declaration describes events transpiring after WMC's retention of Jenner & Block. That section of the declaration is preceded by a caption whose wording, one suspects, Ms. Nguyencuu fashioned with some assistance from an attorney; it reads: "WMC Analyzed Post-August 31, 2007 Repurchase Requests in Anticipation of Litigation Based Upon Legal Advice Received From Jenner & Block." Nguyencuu says that "after Jenner & Block's initial review of WMC's R&W repurchase policies and procedures, the repurchase group relied upon Jenner & Block's legal advice regarding how to evaluate and respond to R&W repurchase claims," and "WMC implemented changes to its practices based upon Jenner & Block's legal advice, to assist WMC and Jenner & Block in preparing for anticipated litigation." *Id.*, ¶¶ 12-13. Nguyencuu says that "as a result of legal advice provided by Jenner & Block, WMC's analysts broadened their investigations to search for and consider, based upon parameters provided by Jenner & Block, a wider range of information and defenses in assessing the validity of a repurchase claim." *Id.,* ¶ 13. Jenner & Block also recommended that "WMC adopt changes to its repurchase policies and procedures aimed at evaluating whether WMC had received prompt written notice of each alleged request," a process WMC implemented with legal analyses, suggested inquiries and advice furnished by Jenner & Block, including "a legal framework to evaluate the degree to which that information indicated whether or not the party requesting repurchase had provided prompt notice." *Id.*, ¶ 14.

Further guided by Jenner & Block's "legal and litigation advice," WMC fashioned requests for

information to determine whether a particular repurchase request "alleges a 'material' breach that

'materially and adversely affects the value' of a loan and whether the request was made prior to the

running of the applicable statute of limitations." *Id*., ¶ 16.

Summing all this up, Nguyencuu says at ¶ 17 of her declaration:

> Since September of 2007, the repurchase group at WMC has
> evaluated repurchase requests for the purpose of defending existing
> and anticipated litigation based on the changes implemented based on
> Jenner & Block's legal advice.

*Id.*, ¶ 17.  Nguyencuu's declaration concludes with Exhibit B [Doc. 135-2], which is comprised of

copies of DBNTC's repurchase requests addressed to WMC from 2012 until these actions were filed,

and WMC's responses to those requests.

The third declaration, Doc. 136, is that of Eric Berkowitz.  Berkowitz worked as an in-house

attorney at WMC from June 2006 to March 2010.  Berkowitz Declaration ("Berkowitz Decl.") [Doc.

136], ¶ 1.  He was "responsible for overseeing WMC's significant litigation matters." *Id.*  According

to Berkowitz , "[b]y the end of April 2007, WMC had substantially stopped originating or acquiring

mortgage loans." *Id.*, ¶ 3.  Berkowitz describes the Barclays-SABR letter to WMC at the end of

August 2007 and WMC's retention of the Jenner & Block firm in much the same way as Nguyencuu

did in her declaration.  Berkowitz's descriptions of the advise Jenner & Block gave and WMC's

conduct in implementing that advice also mirror that of Nguyencuu.  Berkowitz sums up the

situation by saying:

> 7.  Because WMC believed that the threat of R&W-related
> litigation was not limited to the specific claims at issue in the
> Barclays and SABR letter, WMC asked Jenner & Block to prepare
> WMC for anticipated litigation with any party to whom WMC could

have liability stemming from the R&Ws.

    8.  Beginning in the third and fourth quarters of 2007, WMC, anticipating the need to defend litigation and based on legal advice provided by Jenner & Block, changed its processes for evaluating and responding to requests for loan repurchases based upon alleged breaches of the R&Ws.

    9.  From approximately September 2007 to when I left WMC, WMC's repurchase group analyzed R&W repurchase requests utilizing processes and procedures that incorporated changes Jenner & Block recommended for the purpose of preparing for litigation against WMC.

*Id.*, ¶¶ 7-9.

## VI

WMC contends that as a result of the events described in these declarations, from the moment Jenner & Block was retained in September 2007 and issued its first piece of advice about R&Ws, discovery into WMC's repurchase analyses is barred by the attorney work product doctrine and by the attorney-client privilege.  WMC's theory of the case, if sound, precludes DBNTC's discovery in this area entirely,  because DBNTC did not request WMC to repurchase loans until 2012.  Of these two asserted bars to discovery, I will consider attorney work product first, because WMC's submissions tend to emphasize it.

## A

**Attorney Work Product Rule**

WMC contends that the attorney work product doctrine rule (or "doctrine") requires a total preclusion of DBNTC's discovery into the subject of DBNTC's requested loan repurchases: a result WMC argues is mandated by the Second Circuit's opinion in *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998).  DBNTC responds that *Adlman* has nothing to do with the cases at bar.  These

contrasting perceptions require this Court's consideration of the facts and circumstances in *Adlman*.

The facts and circumstances in *Adlman* are that a large corporation called Sequa Corporation was engaged in the business of manufacturing products for the aerospace industry.[2]  Sequa owned two subsidiary corporations, ARC and Chromalloy.  Sequa's management began to consider a plan to combine ARC with Chromalloy, and in 1989 asked Arthur Anderson ("AA"), Sequa's independent accountant and auditor, to assess the likely tax consequences of combining those subsidiaries. Discussions on that question ensued between Monroe Adlman, an attorney and Sequa's vice-president for taxes, and Paul Sheahen, an AA partner who specialized in evaluating the tax implications of corporate reorganizations.  Eventually Sheahen prepared and sent to Adlman a draft memorandum, followed by a 58-page memorandum in final form which contained a detailed technical analysis of the tax implications of the proposed reorganization.

Sequa consummated the combination of ARC and Chromalloy.  "The transaction occurred in essentially the manner recommended by AA and was consummated by the end of 1989." *Adlman I*, 68 F.3d at 1497.  On December 12, 1989, Sequa sold 93% of its holding in ARC to Chromalloy. In opinion letters dated April 20, 1990, "AA evaluated the reorganization in light of the federal tax code and concluded that the reorganization should result in a substantial capital loss for Sequa." *Id*. On its 1989 tax return, Sequa claimed a tax loss of approximately $290 million from the transaction, carried it back to offset capital gains from 1986 forward, and sought a large tax refund.  The Internal Revenue Service ("IRS") audited Sequa's returns from 1986 to 1989, and requested (among other documents) the draft and final versions of Sheahen's 58-page memo to Adlman.  Sequa refused to

---

[2]    The description in text of the facts in *Adlman* is based primarily upon the Second Circuit's opinion when it first considered the case. *United States v. Adlman*, 68 F.3d 1495, 1497-98 (2d Cir. 1995) ("*Adlman I*").

produce the two versions of that memo, claiming that "they were protected from disclosure by the attorney-client privilege and the work product doctrine." 68 F.3d at 1498.  The IRS subpoenaed the AA memos, Sequa refused to comply, the IRS sued in the Southern District of New York to compel disclosure, and the case came before District Judge Knapp.

In a seemingly unreported order, Judge Knapp "enforced the summons, ruling that the memoranda were protected by neither attorney-client privilege, nor the work product rule." *Adlman I*, 68 F.3d at 1497.  In *Adlman I* the Second Circuit affirmed the district court's ruling that the AA memos were not protected by the attorney-client privilege.  As for the attorney work product rule, the Second Circuit remanded the case to Judge Knapp "for a determination whether the protection of Rule 26(b)(3) should apply." *Id.* at 1502.  In that regard, Judge Leval wrote for the court of appeals that "the district court will need to consider whether, within the meaning of the rule, the AA memoranda were 'prepared in anticipation of litigation,' and if so, whether the government has shown 'substantial need of the materials.'" *Id.* (citing Fed. R. Civ. P. 26(b)(3)).

Judge Knapp held further hearings, expanded the record, and again held that the AA memos did not fall within the scope of Rule 26(b)(3).  He ordered their production.  Sequa appealed again. The Second Circuit reversed and remanded again, with further instructions for further proceedings, reasoning that "we cannot determine whether the district court used the correct standard in reaching its decision." *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998) ("*Adlman II*").  Circuit Judge Kearse dissented: "It does not appear to me that the district court applied an erroneous standard in this case.  Accordingly, I would affirm." *Id.* at 1205.

That is the end of the reported trail in *Adlman*.  We do not know if, on the second remand, Judge Knapp did anything to Sequa or the IRS: specifically, whether he held that the AA

memorandum must be produced, or that it was protected.  All we know is that neither party complained in a third appeal that Judge Knapp was still doing something wrong.

Not surprisingly, in the cases at bar, where WMC contends that the attorney-client privilege also bars production of these documents, WMC places no reliance on the Second Circuit's opinion in *Adlman I,* where the Second Circuit rejected a protection claim based on the privilege.  WMC contends that the court of appeals's  reasoning in *Adlman II* requires this Court to hold that the attorney work product rule protects from disclosure all the repurchase-analysis documents falling within DBNTC's request for production.  *Adlman II* is the only case qualifying for the citation "*passim*" in the Tale of Authorities in WMC's brief [Doc. 133]; and WMC's counsel, in an exchange with the Court during the hearing, made the point explicit.  The Court preceded the exchange by reading this passage from the opinion in *Adlman II*, 134 F.3d at 1205:

> In short, the enforceability of the IRS summons for the Memorandum will turn on whether it (or substantially the same document) would have been prepared irrespective of the anticipated litigation and therefore was not prepared because of it.

This exchange then occurred:

> THE COURT [to counsel for WMC]: How do you parse that language, and which side of the case does that favor, in your view?
>
> MR. DOORNWEERD [counsel for WMC]: Well, I think it *disposes of the motion* and informs the Court to deny it.

Transcript of hearing ("Tr.") [Doc. 139], at 53-54 (emphasis added).  I interpret the verb "informs" as a discreet substitute for "instructs."  While counsel expanded upon his answer, this quotation adequately conveys the blunt-force effect WMC contends *Adlman II* has upon DBNTC's motion for discovery of repurchase request documents: namely, that the attorney work product rule, as

20

interpreted by the Second Circuit in *Adlman II*, bars that discovery entirely.

DBNTC contends that since WMC's contractual obligation to repurchase defaulting loans lies at the heart of the business WMC was conducting, the attorney work product rule has no legitimate office to perform.  Mr. Molo, counsel for DBNTC, put it this way at the hearing:

> I think if you were to accept Jenner & Block's analysis and application of the work-product doctrine here, it may be part of a big marketing ploy because they can go out and tell all of their clients, let us come in and tell you about what you're doing and whether or not it complies with the law, and if there's any whiff of a government investigation or a potential litigation around this you'll never have to produce any of the documents.

Tr., at  76-77.

Laying aside for a time able counsel's differing interpretations of what the Second Circuit meant in *Adlman II*, I turn to what Judge Leval actually said in his majority opinion.  Judge Leval regarded the case as involving

> a question of first impression in this circuit: whether Rule 26(b)(3) is inapplicable to a litigation analysis prepared by a party or its representative in order to inform a business decision which turns on the party's assessment of the likely outcome of litigation expected to result from the transaction. Answering that question requires that we determine the proper interpretation of Rule 26(b)(3)'s requirement that documents be prepared "in anticipation of litigation" in order to qualify for work-product protection.

134 F.3d at 1197.  Judge Leval preceded the opinion's analysis of its reasoning by summarizing the decision reached by the *Adlman II* majority (over Judge Kearse's dissent):

> We hold that a document created because of anticipated litigation, which tends to reveal mental impressions, conclusions, opinions or theories concerning the litigation, does not lose work-product protection merely because it is intended to assist in the making of a business decision influenced by the likely outcome of the anticipated litigation. Where a document was created because of anticipated

> litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3).

*Id*. at 1195.

Judge Leval began his analysis in *Adlman II* by restating and defining the core problem presented, in language so trenchant that I quote it here:

> The first problem we face is to determine the meaning of the phrase prepared "in anticipation of litigation." The phrase has never been interpreted by our circuit; furthermore, courts and commentators have expressed a range of views as to its meaning. It is universally agreed that a document whose purpose is to assist in preparation for litigation is within the scope of the Rule and thus eligible to receive protection if the other conditions of protection prescribed by the Rule are met. The issue is less clear, however, as to documents which, although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of the litigation.

134 F.3d at 1197- 98.  [I have the temerity to interrupt Judge Leval at this point in order to observe that this second category of documents would, on the basis of the declarations of Ms. Poetzel, Ms. Nguyencuu and Mr. Berkowitz, seem to include the repurchase request documents at issue in the cases at bar].  Judge Leval resumes:

> The formulation applied by some courts in determining whether documents are protected by work-product privilege is whether they are prepared "primarily or exclusively to assist in litigation" – a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision. Others ask whether the documents were prepared "because of" existing or expected litigation – a formulation that would include such documents, despite the fact that their purpose is not to "assist in" litigation. Because we believe that protection of documents of this type is more consistent with both the literal terms and the purposes of the Rule, we adopt the latter formulation.

*Id*.

Which is to say: Under *Adlman II*, the phrase "because of" trumps "assist in" as the talisman by which a document's eligibility for attorney work product protection will be evaluated.  Toward the end of a comprehensive analysis, Judge Leval quotes  the Wright and Miller treatise, 8 *Federal Practice & Procedure* § 2024, at 343 (1994), where those authors say that documents should be deemed prepared "in anticipation of litigation," and thus within the scope of the Rule, if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." (emphasis in the Wright & Miller text added by Judge Leval).  134 F.3d at 1202.  The *Adlman II* opinion continues:

> The Wright & Miller "because of" formulation accords with the plain language of Rule 26(b)(3) and the purposes underlying the work-product doctrine. Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation merely because it is created in order to assist with a business decision.

*Id*.  But what of a document created in order to further or facilitate a party's regular course of business?  The distinction is critical.  *Adlman II* goes on to say:

> Conversely, it should be emphasized that the "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. It is well established that work-product privilege does not apply to such documents. Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation. *See* Wright & Miller § 2024, at 346 ("even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation").

*Id*. (some citations and internal quotation marks omitted).

We do not know how the game played out with respect to the Arthur Anderson memorandum

at issue in the *Adlman* cases.   *Adlman II* held that District Judge Knapp's opinion directing Sequa

to produce the AA memo did not make clear which standard he applied, which was problematic

because of indications that "the district court may have followed the 'primarily to assist in litigation'

test, which we here reject."   The case was remanded to the district court for further consideration in

the light of the court of appeals's opinion, and here the trail disappears.   But it is instructive to quote

the Second Circuit's thinly veiled instructions to Judge Knapp on the second remand:

> If the district court concludes that substantially the same
> Memorandum would have been prepared in any event – as part of the
> ordinary course of business of undertaking the restructuring – then the
> court should conclude the Memorandum was not prepared because of
> the expected litigation and should adhere to its prior ruling denying
> the protection of the Rule.

> On the other hand, if the court finds the Memorandum would not
> have been prepared but for Sequa's anticipation of litigation with the
> IRS over the losses generated by the restructuring, then judgment
> should be entered in favor of Sequa.

134 F.3d at 1204.

The careful reader will have noted that under *Adlman II*, the Second Circuit extends work

product protection to a document created "because of litigation," while under *County of Erie*, 473

F.3d 413 at 422, the Second Circuit extends attorney-client privilege protection to a document

created "for the predominant purpose of soliciting or rendering legal advice."   The two formulations

are  different, and it is recognized that in a given case the attorney-client privilege might not bar

production but the work product rule would do so.   The Second Circuit observed in *Adlman II*, 134

F.3d at 1200-01 n.4:

> The attorney-client privilege and the work product rule serve different
> objectives. The fact that a document does not come within the
> attorney-client privilege should not result in the deprivation of the

24

protection accorded by Rule 26(b)(3).

In *In re Grand Jury Subpoenas Dated March and August, 2002,* 318 F.3d 379, 383 (2d Cir. 2003), the Second Circuit described the attorney work product doctrine as both "distinct from and broader than the attorney-client privilege" (citing and quoting *United States v. Nobles,* 422 U.S. 225, 238 n. 11 (1975)).

In the cases at bar, I am asked by WMC to protect from discovery under Rule 26(b)(3)  all documents "concerning any actions taken by WMC to respond to . . . or consider" requests by DBNTC as Trustee "that WMC repurchase the Mortgage Loans," since those documents were created beginning in and after September 2007, when Jenner & Block was retained to advise and assist WMC in connection with anticipated residential mortgage loan pool R&W litigation, and DBNTC did not request loan repurchases until 2012.  WMC asks the Court to make that blanket ruling on the strength of the three declarations discussed *supra*, without submitting any exemplars of the documents at issue.  In that regard, these cases differ from *Adlman*, where the Arthur Anderson memorandum was the sole document at issue, and the district judge and the three court of appeals judges (reinforced, one assumes, by law clerks) examined it *in camera* before writing their opinions.

I have difficulty equating the memorandum created by Anderson for Sequa in *Adlman* with documents created by WMC's responses to or consideration of  DBNTC's requests that WMC repurchase some underlying mortgages.  Fine art experts, seeking to determine the age and authenticity of a painting, speak of determining the painting's *provenance,* that is, "the chronology of the ownership, custody or location" of the painting, a practice having "a particular value in helping

authenticate objects."[3]   If one may allow the analogy, the *provenance* of the AA memorandum in *Adlman* is quite different from that of whatever documents WMC seeks to protect from discovery.

That difference lies in this.  AA created its memorandum in response to Sequa's request that AA assess the tax consequences of Sequa's combining two of its subsidiaries: a business decision that Sequa's principals were considering.  Sequa was not obligated by a contract with another party to combine the subsidiaries: the possibility of doing so was simply a business option Sequa could implement or abandon, as it chose.  That the subsidiary restructuring might result in tax benefits to Sequa was in the minds of the Sequa officers, who were also sophisticated enough to predict the unwelcome interest of that ubiquitous spoilsport, the IRS.  Sequa asked for Anderson's opinion on the tax consequences of restructuring the subsidiaries.  Anderson responded by composing the memorandum that the IRS subsequently subpoenaed.  That is the provenance, one might say, of the document at issue in *Adlman*.  Anderson created the document to advise Sequa with respect to one aspect of a business step that Sequa was under no obligation to take.

In contrast, WMC was obligated by its contracts with DBNTC to respond to DBNTC's requests  that WMC repurchase troubled underlying mortgages.  And to respond, moreover, not as politicians sometimes do – "Ford to City: Drop Dead"[4]  – but in obedience to the implied covenant in all contracts, that of good faith and fair dealing.  "Under New York law, the implied covenant of

---

[3]   Wikipedia, the "Free Encyclopedia," http://en.wikipedia.org/wiki/Provenance  (visited March 10, 2015).

[4]  This is the famous *New York Daily News* headline  (of October 30, 1975) at the time when Gerald Ford was President of the United States and New York City, facing financial difficulties, sought federal assistance.  Historians now accept that President Ford never spoke those actual words, but he had given a speech on the previous day which justified the newspaper's paraphrase.

good faith and fair dealing inheres in every contract." *Travelers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir. 1994).[5]  The Poetzel, Nguyencuu and Berkowitz declarations show that a principal service the Jenner & Block firm rendered to WMC was to advise  WMC about how to respond to repurchase requests.  That is, in practical effect, giving WMC advice about how to conduct the ordinary course of its business.

The ordinary course of WMC's business, while created by a densely worded collection of interlocking documents, is perfectly easy to understand.  The business of WMC consisted of originating or acquiring residential mortgages, which were bundled together into pools, securitized, and sold (as certificates) to investors (certificateholders), to the very considerable profit of WMC.  As part of the ordinary course of that business, WMC gave representations and warranties for the benefit of certificateholders with respect to the quality and characteristics of the underlying mortgages.  WMC also promised, as part of the regular course of its business, to respond to notices of breaches of those representations or warranties by curing a notified existing breach or repurchasing the loan in question.  The relevant provisions in the core contract, the Pooling and Service Agreement ("PSA"), are quoted in *DBNTC I*, 2014 WL 1289234, at *6-7.

Undisputedly, WMC's mortgage "cure or repurchase" obligation, as well as its performance of that obligation, were of central importance to the ordinary and regular course of WMC's RMBS business.  If WMC had not given to investors its representations and warranties with respect to the

---

        [5]    More recently, the Second Circuit has said that to prove breach of the covenant, a plaintiff "must show substantially more than evidence that the defendant's actions were negligent or inept. . . . The plaintiff must instead demonstrate something more, such as the defendant acted arbitrarily or irrationally in exercising the discretion afforded to it under the contract." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817-818 (2d Cir. 2014) (citing New York cases) (internal quotation marks omitted).  Whether in the cases at bar DBNTC presses a claim against WMC for breach of the covenant, and the merits of such a claim if made, are for another day.

underlying mortgages and provided for their enforcement by means of the contractual notice, cure and repurchase obligations, WMC would not have been able to participate in the burgeoning residential mortgage-backed securities business.

In these circumstances, we learn without surprise from Ms. Nguyencuu's declaration that her position at WMC was "the head of the repurchase group," which "primarily served *the business function* of responding to allegations made in R&W repurchase requests." Doc. 135, ¶ 4 (emphasis added). When WMC brought the Jenner & Block team on board in September 2007, those able attorneys provided the WMC repurchase group with advice  as a result of which, in Nguyencuu's words, among other things "WMC analysts broadened their investigations to search for and consider, based upon the parameters provided by Jenner & Block, a wider range of information and defenses *in assessing the validity of a repurchase claim*."  *Id.*, ¶ 13 (emphasis added).  Since the primary responsibility of the WMC repurchase group had always been the business function of assessing the validity of a repurchase claim, it is apparent that the purpose of Jenner & Block's input was to modify the manner in which WMC conducted itself in the regular course of its RMBS business.

It is equally apparent that Jenner & Block's modifications of the manner in which WMC conducted the repurchase-request aspect of its business were influenced by litigation strategies and tactics.  The Jenner & Block team was not another layer of business people.  They were trial lawyers, retained by WMC in contemplation of the gathering storm clouds and falling barometer presented by the August 2007   Barclays-SABR letter.   Eric Berkowitz, the WMC in-house attorney, summarizes the situation in his declaration by saying that "WMC, anticipating the need to defend litigation and based on legal advice provided by Jenner & Block, changed its processes for evaluating and responding to requests for loan repurchases based on alleged breaches of the R&Ws." Doc. 136,

¶ 8. From the time of Jenner & Block's retention, Berkowitz continues, "WMC's repurchase group analyzed R&W repurchase requests utilizing processes and procedures that incorporated changes Jenner & Block recommended for the purpose of preparing for litigation against WMC." *Id*., ¶ 9.

In these factual circumstances, I must decide whether, as WMC contends, the Second Circuit's decision in *Adlman II* mandates a holding in this case that the mortgage repurchase request documents amassed by WMC with reference to DBNTC's repurchase requests are protected in their entirety from disclosure by the attorney work product rule; or whether, as DBNTC contends, the rule does not apply because the documents were created in the ordinary course of WMC's business.

I begin by observing that Judge Leval's opinion in *Adlman II* did not hold that the Arthur Anderson memorandum at issue in that case was or was not protected by the attorney work product rule. That ultimate question was posed for District Judge Knapp to answer on the second remand. Instead, the  Second Circuit's decision in *Adlman II* undertakes to lay down guidelines for a district court's granting or denial of work product protection to a particular document – the establishment, one might say, of aids to navigation to assist a district judge in steering a course to the correct conclusion without running aground.

A central contention in WMC's argument is that because, beginning in September 2007, the form of documents issued by the WMC repurchase group changed as the result of Jenner & Block's advice and recommendations, all WMC repurchase request documents and communications after that date must constitute attorney work product, immune from discovery.  WMC's assertion in that regard is akin to a *per se* rule requiring work product protection if the documents in question were changed in any way.  However, that is a questionable reading of *Adlman II*.  To reiterate: in *Adlman*

*II* the Second Circuit said:

> Conversely, it should be emphasized that the "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business *or* that would have been created in essentially similar form irrespective of the litigation.

134 F.3d at 1202 (emphasis added).  The use of the disjunctive "or" suggests that there is a difference between documents "prepared in the ordinary course of business" and documents that do not fall within that category, with the "essentially similar form" element applying only to that latter category, *viz*, documents *not* prepared in the ordinary course of business.

That is a sensible distinction.  It is inherent in the nature of documents "prepared in the ordinary course of business" that their forms will change from time to time, with the ebb and flow and competitive pressures of the business involved.  These considerations are relevant to the case at bar because, as demonstrated *supra*, WMC's responses to DBNTC's repurchase requests were made in the ordinary course of WMC's business.  It is not at all clear that under Second Circuit authority, including *Adlman II*, the base metal of discoverable course-of-business documents is transformed into the gold of protected attorney work product by the alchemy of a lawyer's presence and participation.  In *Federal Housing Finance Agency v. HSBC North America Holdings, Inc.*, No. 11 Civ. 6189, 2014 WL 1327952 (S.D.N.Y. April 3, 2014), another RMBS case where discovery into loan repurchase documentation was at issue, District Judge Cote quoted the above language from *Adlman II* and then said, at *2:

> To the extent that the Nomura documents are the kinds of documents that were routinely prepared before April 2011 by business personnel for use by business personnel in connection with decisions about the repurchase of loans and to negotiate repurchase

> requests with business partners, then they would not be protected by
> the work-product privilege simply because that task was transferred
> to personnel within the legal department.

In *Adlman II*, the Second Circuit quoted with approval Wright & Miller's statement that "even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of litigation." 134 F.3d at 1202. Documents concerning WMC's responses to DBNTC's loan repurchase requests would seem to have been prepared "in the regular course of [WMC's] business" rather than "for purposes of litigation," and that is so whether or not lawyers suggested changes to the forms the WMC repurchase group used in performing their business function. I have also quoted *supra* Judge Leval's closing instruction to Judge Knapp on the second remand in *Adlman II*:

> On the other hand, if the [district] court finds the Memorandum
> would not have been prepared but for Sequa's anticipation of
> litigation with the IRS over the losses generated by the restructuring,
> then judgment [of protection against disclosure] should be entered in
> favor of Sequa.

134 F.3d at 1204. Applying that reasoning to the cases at bar, it cannot be said that every document generated by WMC's course-of-business need to respond to DBNTC's repurchase requests after August 2007 "would not have been prepared *but for* " WMC's anticipation of litigation with RMBS investors.

Other courts have rejected the efforts of RMBS entrepreneurs such as WMC to shield repurchase documents from discovery. In *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 93 A.D. 3d, 941 N.Y.S.2d 56 (1st Dep't 2012), the Appellate Division affirmed a trial court order which "granted plaintiff's motion to compel disclosure of documents and information concerning

defendants' repurchase review, and denied defendants' cross motion for a protective order preventing such disclosure." 93 A.D.3d at 574. The appellate court explained its reasoning for these conclusions:

> The motion court properly held that documents and information concerning defendants' repurchase review, generated in response to plaintiff's repurchase requests, are discoverable. Plaintiff proved that its repurchase analysis was not a part of its ordinary business. By contrast, the record shows that processing repurchase requests was an inherent and long-standing part of defendants' business. That a new division was created to respond to plaintiff's repurchase requests, or that litigation appeared imminent, is of no moment; defendants were, and always had been, contractually obligated to conduct repurchase reviews and such reviews were, and always had been, conducted by defendants' own staff of underwriters and auditors

*Id.* at 575 (citations omitted). This discussion is illustrative, because *MBIA* arises out of facts closely similar to those in the cases at bar.

It should be noted that under New York law, which governed *MBIA,* the party seeking work product protection is required to show that the documents were created *primarily* for the purpose of litigation, whereas the Second Circuit requires under *Adlman II* that the documents be created *because of* anticipated litigation, a standard that "affords broader protection" against disclosure. *See Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 1579 (HB) (JCF), 2013 WL 1195545, at *8 n.6 (S.D.N.Y. March 25, 2013).

Magistrate Judge Francis of the Southern District of New York has authored a number of thoughtful opinions concerning discovery in RMBS cases. One of these is the decision just cited, *Assured Guaranty Municipal Corp. v. UBS,* 2013 WL 1195545. Assured, a bond insurer, wrote financial guarantee policies on three RMBS pools sponsored by UBS. Having been required to pay

losses incurred by the RMBSs, Assured sued UBS, alleging *inter alia* that "UBS breached contractual representations and warranties as to the credit quality of the mortgage loans underlying the agreements," *id*., at *1, the same charge that DBNTC makes against WMC in the instant cases. Assured had preceded its suit with requests that UBS repurchase defaulting mortgages (just as DBNTC requested WMC to repurchase mortgages). UBS created a group called the "Repurchase Custodians" to evaluate those requests (the counterpart to WMC's previously existing "repurchase group" headed by Ms. Nguyencuu). UBS retained the outside law firm of Williams & Connolly to advise it, a firm cast in the role Jenner & Block plays in these cases. In the litigation, Assured sought discovery of documents generated by the Repurchase Custodians. UBS opposed that discovery: "UBS now asserts that the vast majority of the documents are protected by the attorney-client privilege and the work product doctrine because they were allegedly created at the direction of outside counsel, Williams & Connolly, in anticipation of litigation." *Id*., at *6. These are the assertions WMC makes, in precisely the same circumstances.

Judge Francis rejected UBS's blanket reliance upon the work product doctrine as a bar to all discovery of repurchase request documents. He cited and quoted *Adlman II* as the leading Second Circuit case on the work product doctrine, and then dealt with this contention: "Because the Repurchase Custodians began their work after Assured had expressly agreed to litigate in April 2010, UBS contends that the work product doctrine protects subsequent actions taken by or at the direction of counsel." *Id.*, at *7 (document citations omitted). Judge Francis's reasoning in rejecting that contention is persuasive:

> However, the fact that UBS reasonably anticipated litigation and
> retained Williams & Connolly does not automatically bring these

documents within the scope of the work product doctrine. If the materials at issue would have been prepared in substantially similar form regardless of litigation, they are not afforded the protection. [citing and quoting *Adlman II* and *MBIA*].

Here, UBS was contractually obligated to conduct repurchase reviews under the PSAs governing the Transactions. Thus, UBS would have performed the repurchase analyses even had there been no threat of litigation. [citation omitted]. . . .

. . .

UBS is in essentially the same position as Countrywide, the sponsor-bank in *MBIA*. Like Countrywide, UBS is an RMBS sponsor-bank which was contractually obligated to conduct repurchase reviews under the PSAs governing the Transactions. And, like Countrywide, UBS had undertaken repurchase analyses in the ordinary course of business, well before Assured made the repurchase demands.

Thus, UBS has failed to demonstrate that the work performed by the Repurchase Custodians was *because of* litigation, and that the repurchase documents would reveal the mental impressions, conclusions, opinions or theories of attorneys in preparation of litigation. The mere fact that outside counsel and consultants were retained to assist the repurchase review is insufficient to shield all of the repurchase documents from discovery. The fact that these repurchase demands were "unprecedented" in size and scope does not place these materials outside the ordinary course of business for the purposes of work product protection. What is dispositive is that UBS would have prepared these analyses absent any threat of litigation because *they were obligated to do so as part of their ordinary business, pursuant to a contract*.

2013 WL 1195545, at *7-8 (emphasis added) (document citations, internal quotation marks, and brackets omitted).

What legitimate role, then, does the work product doctrine play in such a set of circumstances? Judge Francis turned to that question in *Assured*:

34

> If UBS can point to any documents authored by Williams & Connolly or its agents that were specifically directed to litigation strategy or possible litigation defenses[,] under *Adlman*, these [documents] would fall within work product protection, because they would not have been produced in the form irrespective of the threat of litigation. It may produce a privilege log for such documents as described below.

> If UBS can point to any documents authored by Williams & Connolly or its agents that were specifically directed to litigation strategy or possible litigation defenses[,] under *Adlman*, these [documents] would fall within work product protection, because they would not have been produced in the form irrespective of the threat of litigation.  It may produce a privilege log for such documents as described below.

2013 WL 1195545, at *8 (citation and internal quotation marks omitted).

Judge Francis concluded:

> Assured's motion to compel is granted to the extent that UBS shall produce relevant documents from the Repurchase Custodians.  UBS's motion is granted to the extent that it may provide a categorical privileged log for the documents from the Repurchase Custodians.

*Id.*, at *10 (document citations omitted).

In a later opinion, Judge Francis summarized the rulings I have just quoted:

> Because they were created in accordance with a contractual obligation, such analyses are not protected by the work product doctrine unless UBS can show that they were specifically directed to litigation strategy or defenses and were therefore created in a form significantly different than they otherwise would have been.

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Secs., Inc.,* No. 12 Civ.

7322 (HB)(JCF), 2013 WL 6405047, at *1 (S.D.N.Y. Dec. 6, 2013) (citing *Assured Guar. Mun.*

*Corp.*, 2013 WL 1195545, at *8).

The  rulings in *Assured* steer a middle course between the Scylla of total production and the

Charybdis of total protection.  In the companion RMBS case, *MASTR Adjustable Rate Mortgage Trust 2006-OA2 v. UBS Real Estate Sec., Inc.*, No. 12 Civ. 7322 (HB) (JCF), 2013 WL 5437354 (S.D.N.Y. Sept. 27, 2013), counsel for the plaintiff cited *Assured* for the proposition that "the fact that the analysis in these documents might be used to assess 'litigation risk' does not alter the fact that it was indeed analysis of repurchase demands."  *Id*., at *1.  Judge Francis did not accept that paraphrase of his ruling in *Assured*.  He said in *MASTR*:

> That is an oversimplification.  Analysis of repurchase demands would not be privileged if it were done in the normal course of business. [citing *Assured Guaranty,* 2013 WL 1195545, at *7].  However, it is perfectly plausible that additional analyses of repurchase demands would not have been done in the normal course, but only because of the threat of litigation, which is what UBS asserts here.

*Id*.

Judge Francis's reasoning in the cited cases led to a balanced decision with respect to the amount of protection the attorney work product rule gives to an RMBS sponsor who retains counsel for advice when litigation clouds darken the horizon.  His reasoning correctly understands the Second Circuit's holdings in *Adlman II,* and applies them appropriately to RMBS cases.  I agree with Judge Francis's reasoning and rulings, and adopt them in the cases at bar.

It follows that the extreme positions taken by both parties are rejected.  DBNTC contends that the work product doctrine is inapplicable and it is entitled to discovery of all WMC's repurchase documents solely because repurchase analysis was a part of WMC's ordinary course of business. WMC contends that the work product doctrine entitles it to shield all its DBNTC-related repurchase documents solely because Jenner & Block was advising them on the matter.  Neither contention is tenable.

In the light of the cases cited in this Part, and using the orders in *Assured Guaranty* as a model, the Court will direct that WMC must produce all existing documents responsive to Request No. 7 in DBNTC's First Request for Production, with the exception of documents WMC lists in a privilege log compiled in a manner consistent with this Ruling.  That requires WMC, in such a log, to identify with particularity documents authored by Jenner & Block that are specifically directed to litigation strategy or possible litigation defenses.  Documents that lack those characteristics are not eligible for protection under the work product doctrine.

WMC is required to make those showings of eligibility because "the party invoking a privilege bears the burden of establishing its applicability to the case at hand" and "bears the burden of establishing all of its elements." *In re Grand Jury Proceedings Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003) (citations and internal quotation marks omitted) (discussing applicability of work product doctrine).  "The burden is a heavy one, because privileges are neither lightly created nor expansively construed," given "the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.*

A party applying for protection from production does not sustain its burden of distinguishing between legal (protected) and business (unprotected) advice by doing no more than presenting a district judge with facts that "are subject to competing interpretations," particularly where the applicant's "interpretation was suggested primarily by litigation affidavits prepared by interested persons four years after the fact and lacking any support in contemporaneous documentation," *Adlman I*, 68 F.3d at 1500, a characterization that bears at least some resemblance to WMC's situation on these cross motions.  The additional step of a privilege log is necessary in order to strike the proper balance between DBNTC's need for the production of relevant factual evidence and

WMC's need to protect legal advice for which a legitimate basis for non-production can be shown.

B

**Attorney-Client Privilege**

WMC contends that the repurchase documents generated after Jenner & Block's retention are also shielded from discovery by the attorney-client privilege. That alternative ground for protection causes us to revisit the *Adlman* litigation, in which Sequa Corporation, resisting the IRS's subpoena of the Arthur Anderson memorandum, relied upon the attorney-client privilege as well as the attorney work product rule. The district court rejected both grounds and ordered production of the memorandum. In *Adlman II,* 134 F.3d 1194, discussed in Part VI.A. *supra*, the Second Circuit reversed District Judge Knapp and remanded the case for further proceedings on the work product issue. In *Adlman I,* 68 F.3d 1495, the court of appeals affirmed the district court's rejection of the attorney-client privilege.

The circumstances surrounding the creation of the memorandum in *Adlman* are described in Part VI.A. and not restated. Sequa argued that "AA's advice came within the attorney client privilege" because "it was rendered to Adlman [an attorney and Sequa vice-president] to assist him in giving legal advice to his client Sequa." 68 F.3d at 1498. Judge Knapp held that on the record before him, "Sequa had failed to demonstrate that it came within" the privilege. *Id*. at 1500. The Second Circuit affirmed, stating: "The district court did not abuse its discretion or make clearly erroneous findings when it concluded that Sequa had failed to sustain its burden of showing that the facts came within" the attorney-client privilege. *Id.* (citation omitted). Judge Leval, who also wrote the opinion in *Adlman I*, made no order of remand in that case. The attorney-client privilege was simply eliminated from further litigation.

38

In the cases at bar, this Court could without difficulty reach the same conclusion as did Judge Knapp in *Adlman I*, and hold that WMC has not sustained its burden of showing that the repurchase documents at issue come within the attorney-client privilege.  In the more recent case of *County of Erie*, 473 F.3d 413 (2d Cir. 2007), Chief Judge Jacobs's opinion says:

> The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance. . . .
>
> . . .
>
> [W]e construe the privilege narrowly because it renders relevant information undiscoverable; we apply it only where necessary to achieve its purpose.  The burden of establishing the applicability of the privilege rests with the party invoking it. . . . . . .
>
> . . . At issue here is the third consideration: whether the communications were made for the purpose of obtaining or providing legal advice, as opposed to advice on policy. . . .
>
> . . .
>
> . . . [T]he question usually is whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice.

473 F.3d at 418-19.  That question turns, *Erie* goes on to hold, on "whether the predominant purpose of the communication is to render or solicit legal advice."  *Id*. at 420.

WMC does not dispute  – on the contrary, Ms. Nguyencuu's declaration explicitly proclaims – that an important purpose of Jenner & Block's advice was to assist WMC in the quintessential "business function" of responding to loan repurchase requests.  The Court could not conclude, on the present record, that WMC had  sustained its burden of showing that the "predominant purpose" of Jenner & Block's communications to WMC was "providing legal advice as opposed to business advice." If I rejected WMC's invocation of the attorney-client privilege without more, I would have the presumption to expect that the court of appeals would affirm my ruling on the authority of *Adlman I.*

39

However, I think the better course is to treat this issue in the same manner the Ruling does with respect to the attorney work product issue.   DBNTC's motion to compel discovery will be granted, with the proviso that WMC, instead of producing a particular document, may refer to the document in a log purporting to show that the document falls within the attorney-client privilege, which is to say, that the predominant purpose of the document was to render or solicit legal advice (in accordance with the *Erie* rule).

## VII

The remaining discovery disputes are dealt with in this Part.

### A

DBNTC demands that WMC produce an eclectic collection of documents which counsel describe as documents "regarding WMC's knowledge of systematic problems and fraud relating to its loan origination business, including WMC's knowledge of the poor underwriting, fraud and predatory lending that caused breaches of representations and warranties associated with the specific loans at issue in these cases."  ML letter dated 11/07/2014, at 1.

The attentive reader might suspect that this general category includes documents which have no direct connection to "the specific loans at issues in these cases."  That suspicion is well founded. WMC objects to this discovery on the principal ground that the documents DBNTC seeks are for the most part irrelevant to the issues to be litigated.

The contentions of counsel with respect to the documents at issue implicate the Federal Rules of Civil Procedure and of Evidence.

Federal Rule of Civil Procedure 26 (b)(1) provides:

> Parties may obtain discovery regarding any nonprivileged matter that

> is relevant to any party's claim or defense . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Rule 26(b)(2)(C) provides:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: . . .

> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Discovery under Federal Civil Procedure Rule 26 is conducted in contemplation of and preparation for a full plenary trial.  The trial process informs and shapes the scope and limits of discovery.  Thus Rule 26(b)(1) provides that while to be discoverable, *relevant* information need not be *admissible* at trial, it must appear reasonably calculated to lead to the discovery of admissible evidence.  The relevance and admissibility of evidence at trial are of central importance to the discovery rules.  However, those rules do not define those concepts.  The Federal Rules of Evidence govern the relevance and admissibility of evidence at trial.  Those rules regard the concepts of relevance and admissibility as operating in tandem with each other.

Thus, Rule of Evidence 401 defines "relevant evidence":

> Evidence is relevant if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

> (b) the fact is of consequence in determining the action.

41

Rule 402 provides:

> Relevant evidence is admissible unless any of the following provides otherwise:
>
> > * the United States Constitution;
> > * a federal statute;
> > * these rules; or
> > *other rules prescribed by the Supreme Court.
>
> Irrelevant evidence is not admissible.

The Advisory Committee Notes to the 1972 Proposed Rules say of Rule 402:

> The provisions that all relevant evidence is admissible, with certain exceptions, and that evidence which is not relevant is not admissible are a presupposition involved in the very conception of a rational system of evidence.  They constitute the foundation upon which the structure of admission and exclusion rests.

(citation and internal quotation marks omitted).

The relationship between relevance and admissibility is further considered in Rule 403, which provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Discovery is limited by relevance.  In *Surety Association of America v. Republic Insurance Co.*, 388 F.2d 412, 414 (2d Cir. 1967), affirming the district court's refusal to compel production of certain communications because they were not relevant, the Second Circuit summarized the interaction between the two elements: "The only restriction placed upon the matters that may be gone into upon discovery examinations is that they be relevant."  Judge Moore's opinion goes on to say:

> Relevancy, in this context, is tested by a rather liberal standard.  Thus it is relevancy to the subject matter which is the test and subject

> matter is broader than the precise issues presented by the pleadings.
> But practical considerations dictate that the parties should not be
> permitted to roam in shadow zones of relevancy and to explore matter
> which does not presently appear germane on the theory that it might
> conceivably become so.

388 F.2d at 414 (citations and internal quotation marks omitted).

The interaction of the quoted Rules of Civil Procedure and Evidence results in the following formula, set forth in boldface for the sake of emphasis:

**To make a particular matter subject to discovery, the party seeking discovery must show (1) that the matter sought to be discovered will be admissible at trial and will have the effect of making a fact of consequence to any party's claim or defense more or less probable than it would be without the evidence of that matter; or (2) that the matter sought to be discovered, while not itself admissible at trial, is nonetheless reasonably calculated to lead to the discovery of admissible evidence which would have the described effect. The Court will compel discovery of matters that comply with these criteria, unless to do so would in the circumstances of the case violate the strictures of Civil Rule 26(b)(2)(C).**

This formulation will be applied to all the discovery demands of both parties which form the subject matter of this Ruling.

The letter briefs for DBNTC (principally ML 11/07/2014 and ML 01/09/2015) argue that the documents generically described as documents regarding "WMC's knowledge of systematic problems and fraud relating to its loan origination business," ML 11/07/2014, at 1, are discoverable because "WMC's knowledge is plainly relevant to two key allegations [by DBNTC] in these cases," *id*. The first of these allegations is that "WMC's knowledge of systemic problems gave WMC (at a minimum) inquiry notice of breaches [of WMC's representations and warranties], triggering its

repurchase duties." ML 11/07/2014, at 1. The second is DBNTC's allegation that "WMC's intentional scheme to loosen underwriting standards and tolerate fraud by its employees, borrowers, and affiliated brokers shows WMC's gross negligence, rendering the sole-remedies clauses in these cases unenforceable." *Id*., at 2.

The first of these allegations may be characterized as relating to a claim asserted by DBNTC, and the second as relating to an anticipated defense on behalf of WMC. Discovery into both aspects of the cases is permissible, since Civil Rule 26(b)(1) allows discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." The particular discovery demands at issue appear in DBNTC's Second Request for the Production of Documents, dated August 11, 2014 (Ex. A to ML 11/07/2014). Specifically, the present disputes arise out of Request No. 30; Request Nos. 41 and 42; and Request Nos. 6 and 31 (to follow the order adopted by the letter briefs). DBNTC demands that these requests be fully complied with. WMC opposes these requests in their entirety. Continuing to follow that order, I will summarize each request, the parties contentions' with respect to the documents specified in the request, and the Court's ruling on whether WMC must produce the documents in discovery.

**B**

**Request No. 30**

This Request calls upon WMC to produce: "Documents, communications, and electronic data relating to changes in WMC underwriting and quality-controlled standards from 2004 to 2008, including, but not limited to: . . . . " Request No. 30 then lists and indicates the contents of 12 separate documents generated by WMC. Each document bears the caption "Credit Policy Memorandum." They are listed in chronological order, the earliest dated December 6, 2004 and the

44

most recent December 14, 2006.  Each "Credit Policy Memorandum" addresses a different specific topic.  For example: the first-listed document, dated December 6, 2004, is described as "The decision to change requirements for credit score, LTV ratios, and CLTV ratios for stated-income borrowers," and the fourth, dated October 10, 2005, is described as "The decision to allow borrowers with fixed income to take out adjustable-rate mortgages from WMC."

Copies of five of these 12 listed documents are Exhibits (F, G, H, I and J) to ML 11/07/2014. It is apparent that these Credit Policy Memoranda are course-of-business directions to WMC's representatives in the field, charged with the origination of residential mortgages.  Thus Ex. G, dated October 10, 2005, captioned "Credit Policy Update # 0509 and addressed to "Operations Staff," begins by saying "This memorandum serves as a reminder of current WMC policy regarding: Fixed Income Borrowers Eligibility," and continues: "The following information supersedes any previous policy regarding this update.  You may want to print this update and place it in your Guidelines binder for future reference."  One senses that the last-quoted sentence is a command by WMC management, not a simple suggestion.

DBNTC's counsel profess to find, in these 12 WMC Credit Policy Memoranda which counsel have apparently already obtained, a sufficient basis for the accusation that: "WMC's repeated weakening of its underwriting and quality-control standards implies a conscious decision by WMC management to maximize the volumes of loans it sold, even if doing so increased the risk of fraud, predatory lending, or other documents in WMC loans." ML 11/07/2014, at 4.  In order to build upon that indictment, DBNTC demands production of "documents, communications, and electronic data relating to changes in WMC underwriting and quality-control standards from 2004 to 2008," including without limitation the policy changes evidenced by the 12 Credit Policy Memoranda

described in Request No. 7.  If one reduces these exchanges to the vernacular, it is as if DBNTC was

saying to WMC.  "We know what you did.  It was wicked.  Now tell us why you did it."

WMC's response is that "showing *why* WMC's guidelines said what they said is entirely

irrelevant to any issue in these actions." JB 12/12/2014.

Not so, DBNTC says in riposte:

> But why WMC changed its guidelines could well produce highly
> relevant evidence regarding the Trustee's gross-negligence claim.  As
> the Trustee has already explained, WMC's "credit policy memoranda"
> produced in this case show that WMC repeatedly weakened its
> underwriting standards.  If WMC knew of widespread problems and
> fraud but lowered its standards anyway to increase profits, that
> conscious or reckless decision, if proven, would allow an inference
> that WMC was grossly negligent in disregarding the risks of these
> particular loans.

ML 01/09/2015, at 9.

The problem with this gross-negligence argument by DBNTC is that DBNTC can make  the

same argument on the basis of the WMC credit policy memoranda already produced.  There is no,

or at best very little, discernible utility to DBNTC in production of the underlying documents

specified in Request No. 30.  The policy changes or amplifications described in the Credit Policy

Memoranda either weakened WMC's underwriting standards (as DBNTC proclaims) or they did not

(as WMC professes, "as any reasonable view will demonstrate, the guidelines did *not* 'weaken'

between 2005 and 2007", JB 12/12/2014, at 7).  This is a question of fact upon which lay witnesses

can testify, experts opine, and counsel argue.  In like fashion, whether any demonstrated weakening

of WMC's underwriting standards is probative of WMC's gross negligence or bad faith in the

conduct of its business with DBNTC is grist for the trial mill.

WMC's Credit Policy Memoranda, already produced to DBNTC, constitute the best evidence

46

of WMC's guidelines and practices in the mortgage loan business as they evolved during the relevant period of time. The effect of the memoranda's policies on WMC's underwriting standards in the Charles Atlas sense – whether the standards were weakened, strengthened, or left unchanged – can be debated by counsel at trial on the presently available evidence. The seemingly broad scope of the underlying documents covered by Request No. 30 does not pass muster under Civil Rule 26(b)(2)(C)(iii), which bars discovery of designated matter if "the burden or expense of the proposed discovery outweighs its likely benefit," considering, *inter alia,* "the importance of the discovery in resolving the issues."

To state the proposition somewhat differently, the Court accepts the contention of WMC's counsel that evidence of WMC management's subjective reasons for issuing these Credit Policy Memoranda is irrelevant to the objective effect the policies would have in the marketplace, which is the meaningful question at issue. However, it is worth noting that WMC, having contended with some success in response to this motion that the reasons why its management issued these policy memoranda are irrelevant, will be precluded at trial from offering testimony or exhibits purporting to show what those reasons were.

C

**Request Nos. 41 and 42**

Request Nos. 41 and 42 are prompted by two articles published for general readership. The first article, which gives rise to Request No. 41, was titled "Fraud and Folly: The untold story of General Electric's subprime debacle," dated January 6, 2012, and published by the Center for Public Integrity. The second article, which gives rise to Request No. 42, was titled "Boiler Room," dated September 16, 2008, and published in the Columbia Journalism Review.

Request No. 41 demands production of "[d]ocuments and communications concerning the statements made in the January 6, 2012 article by the Center for Public Integrity titled 'Fraud and Folly,' and which relates [*sic*] to WMC employees or branch offices involved in the origination, underwriting, acquisition, review, quality control review, or sale of the Mortgage Loans."  Request No. 42 makes an identically worded demand with respect to the "Boiler Room" article.  Request No. 41 specifically demands,  without limitation, "documents concerning" three individuals who were mentioned in the "Fraud or Folly" article.  Request No. 42 specifically demands, without limitation, "documents concerning" one individual mentioned in the "Boiler Room" article.

What does DBNTC say these articles have to do with these cases?  The answer appears to lie in a contention DBNTC puts forward in the litigation.  DBNTC anticipates WMC will defend against DBNTC's claims on behalf of Certificateholders for money damages on the ground that the cure-or-repurchase provision in the contracts constitutes the sole, bargained-for remedy against WMC in the event of breaches of the representations and warranties WMC gave in the contracts. DBNTC contends that, as a matter of law, gross negligence on the part of WMC in giving those representations and warranties would render unenforceable the concept of the cure-or-repurchase provision as sole remedy; and, as a matter of fact, these articles furnish launching pads for discovery into WMC's possible gross negligence, which if proved would entitle Certificateholders to money damages at large.

It is easy enough to see where the notion of gross negligence by WMC comes from.  The articles in question are redolent with the theme.  For example, the "Boiler Room" article, Ex. M to ML 11/07/2014, at 5, quotes Glen Pizzolorusso, "a young sales manager at WMC Mortgage" earning "$ 75,000 to "$100,000 *a month*", who gave this vivid description of WMC's method of conducting

the home mortgage business: "We looked at loans.  These people didn't have a pot to piss in.  They can barely make car payments and we're giving them a 300, 400 thousand dollar house."  Pizzolorusso is the individual DBNTC singles out for particular attention in Request No. 42.

The present issue is whether the documents sought to be discovered by Request Nos. 41 and 42 pass muster under the discovery formula recited in Part VII.A.  I begin by noting it is arguable that under certain circumstances and for certain purposes, the Court could judicially notice the two articles themselves under Rule 201(c)(1) of the Federal Rules of Evidence.  I put it no higher than that because the parties have not argued the point.  In *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008), the Second Circuit held that "it is proper to take judicial notice of the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters."  (citation omitted) (emphasis in original).  In *Garber v. Legg Mason Inc.,* 347 F. App'x 665, 669 (2d Cir. Sept. 30, 2009), the Second Circuit held that on a motion to dismiss "a court may consider matters of which judicial notice may be taken," and cited *Staehr* for the proposition that "the press articles and SEC filings here were offered only to show that information about Wilby's departure was publicly available, not for the truth of the matters asserted therein."  *See also Rivas v. Fischer*, __F.3d__ , 2015 WL 1036047, at *4 n.4 (2d Cir. March 11, 2015)  ("We take judicial notice of 'the *fact* that press coverage contained certain information, without regard to the truth of [its] contents.'") (citing and quoting *Staehr,* 547 F.3d at 425).

The fact of press coverage may, without regard to the truth of its contents, be probative of issues arising out of a party's subsequent action or lack of action.  In *Staehr*, for example, where the issue was whether a securities fraud action was barred by the statute of limitations, the Second

49

Circuit held that mainstream press reports and other public filings did not constitute sufficient "storm warnings" triggering plaintiff's duty to inquire about defendant's conduct, and therefore the limitations period had not begun to run.  In the cases at bar, if the "Fraud and Folly" and "Boiler Room" articles had appeared in the public press before WMC gave the representations and warranties at issue in these cases, it is certainly arguable that the *fact* of that coverage, quite apart from the truth of its contents, would have placed WMC in the position of having to inquire into the reported pervasive problems in the residential mortgage industry.  WMC's decision to give broad-form representations and warranties, in disregard of such "storm warnings," could reasonably be characterized as grossly negligent.

In the cases at bar, however, WMC entered into the PSAs in suit and gave the allegedly breached R&Ws well before these articles appeared.  The PSA in the action bearing docket number 3:12-cv-933 is dated June 1, 2006 and the amended R&Ws were effective as of June 28, 2006.  In No. 3:12-cv-969, the PSA is dated July 1, 2006.  In No. 3:12-cv-1699, the PSA is dated "as of" November 1, 2006, and the "closing date" is December 1, 2006.  In No. 3:13-cv-1347, the closing date is May 31, 2007.

Where a press article precedes a party's act or failure to act, the evidentiary effect of the article is solely prospective.  But that is not the situation in the cases at bar, where the articles in question appeared after WMC made the representations and warranties, and gave the promise of cure or repurchase, which give rise to these actions.  Courts in comparable RMBS cases have held that for statute of limitations purposes, causes of action for the breach of representations and warranties of the sort at issue accrue at the time the R&Ws are given, that is to say, when the contracts are executed.  Any effect of the articles upon WMC's conduct must be considered in a different time

frame.

DBNTC demands production of all "documents and communications concerning the statements made" in the "Fraud and Folly" and "Boiler Plate" articles which relate to WMC employees or branch offices engaged in the residential mortgage business.   Documents and communications responsive to these requests would be probative of the disputed issue of WMC's gross negligence *at the time of contracting* if they evidenced an awareness of responsible WMC managers *in 2006 and 2007* (when the contracts were executed) of the problematic conditions the articles described *in 2008 and 2012* (when the articles appeared).   Conceptually this is possible, but the prospect is too tenuous to justify the considerable amount of discovery these requests would entail.   DBNTC, as proponent of this  discovery, would not on that theory satisfy the burden-versus-benefit balance commanded by Civil Rule 26(b)(2)(C)(iii).

But DBNTC has a second theory with respect to these documents.   The PSAs  provide in § 2.03(f) that WMC's mortgage cure-or-repurchase obligation is triggered "within 60 days of the *earlier* of either *discovery by* or notice to the  Responsible Party [WMC] of any breach of a representation or warranty, set forth in Section 2.03(b), that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein . . . " (emphases added).[6]   Within the specialized and stratified world of residential mortgage originators-acquirers-securitizers, it seems possible, if not likely, that management at WMC became aware of the lurid and troubling contents of these two articles when they appeared in the public press.   That is particularly true of the "Boiler Room" article, published in the staid and respected Columbia Journalism Review in September 2008, which ascribed a particularly scandalous statement and conduct to a WMC

---

[6]   These sections of the PSAs are quoted in full in *DBNTC I*,  2014 WL 1289234, at *6.

mortgage sales manager.

Even if one makes the charitable assumption that senior WMC management had no prior knowledge of these problems within their company's ranks, and were "shocked, shocked" to read of them in the Columbia Journalism Review in 2008, it is arguable that this article, and the equally damning 2012 article published by the aptly named Center for Public Integrity, should have created a duty on the part of WMC to inquire into, and consequently discover, breaches of the representations and warranties WMC gave at the time of contracting with DBNTC and the Certificateholders.  The cases cited *supra* suggest a ground for the Court to judicially notice the fact of these publications.   Request Nos. 41 and 42 are structured to discover documents and communications which might constitute or lead to evidence about when WMC management learned about these articles, and what they did with the knowledge of the contents thus obtained.  These are legitimate areas of discovery.   Compliance with the Requests will be compelled.

Counsel for WMC objected to Request Nos. 41 and 421 "because each of the requests, literally read, seeks documents that will likely be privileged.  The articles at issue were published in 2008 and 2012, and thus WMC's communications 'concerning' statements made in these articles likely were with counsel."  JB 12/12/2014, at 8.  I give no weight to these *ipse dixit* assertions, offered without the benefit of any particularized examples or proffer of documents for *in camera* inspection.  In responding to these Requests, WMC may, if so advised, submit a privilege log in the form described in prior Parts of this Ruling.

### D

**Request Nos. 6 and 31**

Request Nos. 6 and 31 are considered together because they spring from a common set of

circumstances.

As the troubles afflicting the world of residential mortgage backed securities increased in number, amounts of losses, and notoriety, federal prosecutors in at least two districts obtained indictments charging certain brokers and former WMC employees with mail and wire fraud in connection with mortgage loans.  ML 11/07/2014, at 5, lists four such indictments: one in the Eastern District of New York, and three in the Southern District of Florida.  Some of the loans referred to in the indictments were included in a pool of mortgages sold by WMC to one or another of the four plaintiff DBNTC Trusts in the cases at bar.  These particular circumstances prompted DBNTC to draw up document production Requests 6 and 31, which ML 11/07/2014, at 5, discusses under the single caption "WMC Knowledge of Broker and Employee Fraud."

Request No. 6 calls upon WMC to produce:

> Quality control or other due diligence relating to any correspondent
> lender or broker that originated a Mortgage Loan.

Request No. 31 calls upon WMC to produce:

> Documents and communications concerning the performance of
> brokers, appraisers, underwriters, and quality control or quality
> assurance staff who participated in the origination, underwriting,
> purchase, or acquisition of the Mortgage Loans, including, but not
> limited to, human resources files for such brokers, appraisers,
> underwriters, and quality control or quality assurance staff.

Having listed and summarized four indictments, counsel for DBNTC say in ML 11/07/2014, at 5:

> These criminal cases, together with statements made in the "Fraud
> and Folly" article and elsewhere, suggest that certain WMC brokers'
> and employees' fraud may have affected the loans at issue in this case.
> Further, WMC may have known about that alleged fraud because it
> received  repurchase demands referencing indictments regarding
> loans in the Trusts.

The wording of these Requests, and the argument justifying them in the ML 11/07/2014 letter brief, could be read to limit DBNTC's inquiry to those individuals who participated in a mortgage loan or loans sold to one of the plaintiff Trusts.  But subsequent letter briefs – *see especially* JB 12/12/2014 and ML 01/09/2015 – make it plain that DBNTC is painting with a decidedly broader brush.  I understand DBNTC to limit its demand for the documents specified in Requests 6 and 31 to individuals, WMC employee or independent,  who had something to do with at least one of the loans in one of the Trusts in suit.  However, as to such an individual, documents are demanded which relate to *any and all loans* with which the individual was involved, whether sold by WMC to a DBNTC Trust or not.  That wider scope appears in the following exchange between counsel, captured in a DBNTC letter brief, ML 01/09/2015, at 6-7:

> WMC argues that "the performance of a correspondent lender or independent broker in connection with a loan not in any of the Trusts at issue has no bearing" on this case. [quoting JB 12/12/2014].  But WMC's knowledge of a broker's or lender's misconduct – with respect to any loans – makes it more likely that WMC knew the broker's misconduct affected the particular loans sold to the trusts in this case. . . . . [S]uch evidence shows that WMC was aware of problems with these loans yet failed to warn the Trustee or other PSA parties. Whether or not WMC was the victim or perpetrator of the fraud, WMC's ***knowledge*** of that fraud is relevant here.

This echoes an argument DBNTC made in ML 11/07/2014, at 6:

> Documents showing WMC's knowledge of poor underwriting or fraud by WMC employees or brokers bears on WMC's notice of breaches and its gross negligence.

Notwithstanding WMC's contention that the performance of a lender or broker "in connection with a loan not in any of the Trusts at issue has no bearing" on the cases at bar, there is authority for the proposition that evidence of an individual's conduct, albeit not directly related to the transaction

54

in suit, may be probative of issues relevant to that transaction. Rule 406 of the Federal Rules of Evidence provides: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." Rule 404(b)(1) and (2) provide that while evidence of a person's "other act" is not admissible to prove that person's character, "other act" evidence is admissible for the purposes of proving, *inter alia*, "motive," "opportunity," "intent," "knowledge," or "lack of accident" with respect to the incident in suit. While Rule 404(b)(2) contains notice requirements for "other act" evidence in criminal cases, the Rule's applicability to civil cases is not thus restricted. The Advisory Committee's Notes to the 2006 amendments say: "While Rule 404(b) refers to the 'accused,' the 'prosecution,' and a 'criminal case,' it does so only in context of a notice requirement. *The admissibility standards of Rule 404(b) remain fully applicable to both civil and criminal cases.*" Fed. R. Evid. 404(b)(2) advisory committee nn. (emphasis added).

Assume for the sake of analysis that in the cases at bar, WMC-employed or independent brokers or lenders who participated in loans sold to the plaintiff Trusts also participated in other loans which were not in the Trusts. Further assume that, in connection with those other non-Trust loans, these individuals had engaged in or become aware of fraudulent or grossly negligent behavior with respect to the financial responsibility of the borrowers or the quality of the loans. Finally, assume that such fraudulent or grossly negligent conduct was habitual on the part of the individuals, or constituted the routine practice of the organizations employing them. If DBNTC could show that those assumed facts existed, Rule 406 might enable DBNTC to argue that habitual or routine fraudulent or grossly negligent conduct with respect to non-Trust loans proved that the individuals acted in accordance with those deplorable habits or practices when engaged in Trust loans. Rule

55

404(b) might enable DBNTC to argue that the individuals' prior "other acts" with respect to non-Trust loans proved knowledge of fraud or gross negligence with respect to Trust loans.

Given these Rules and the totality of circumstances pleaded in the complaints, I cannot accept WMC's contention that the performances of lenders and brokers in connection with non-Trust mortgage loans have "no bearing" on the cases at bar. Conceptually, individuals' performances with respect to non-Trust loans may lead to evidence relevant to WMC's liability with respect to Trust loans. It depends on what the facts are. That evidentiary potential is sufficient to justify discovery under Civil Rule 26(b)(1) into what the facts are.

That conclusion, it must be recognized, assumes the validity of DBNTC's contention that gross negligence ascribable to WMC in the origination, acquisition or selling of residential mortgage loans would render unenforceable the sole-remedies provision in the PSAs. DBNTC's letter brief of 11/07/2014 at 2 cites *Deutsche Alt-A Securities Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*, 958 F.Supp.2d 488, 501 (S.D.N.Y. 2013), for the proposition that "sole-remedies clauses are unenforceable in cases of gross negligence" (in counsel's paraphrase). WMC does not accept that proposition. It presses the view that the cure and the alternative repurchase of defaulting mortgages are the only remedies the PSA confers upon Trust investors.

This is a continuing controversy. The *2006-OA1* case, 958 F.Supp. 2d 488, was decided by Judge Sweet. I considered his conclusions and reasoning in *DBNTC I*, 2014 WL 1289234, at *13-19. They do not resolve the issue of the sole-remedies' enforceability in quite the manner DBNTC's counsel's paraphrase suggests. Judge Sweet noted the plaintiff's assertion that "monetary damages are still appropriate because liability limiting provisions are unenforceable where, as here, the breaching party has been grossly negligent or engaged in willful misconduct." 958 F.Supp.2d at 500.

He cited a number of federal and New York trial court decisions supporting that proposition.  Judge Sweet then noted the defendant's contrary assertion that "an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power."  *Id*.  He cited a number of federal and New York trial court decisions for *that* proposition.  The briefs of counsel in the cases at bar are replete with citations to cases on both sides of this question.  It is fair to liken these decisions to a clutch of straws blowing in the winds that whistle through the corridors of federal and state trial courts.  The Second Circuit and the New York Court of Appeals do not appear to have squarely addressed this issue yet, although given the profusion of RMBS lawsuits that is surely only a matter of time.  Judge Sweet dealt with the question in *2006-OA1* by saying that "if Plaintiff's allegations are found to be true, DBSP willfully knew of material breaches of loans and failed to cure these breaches for more than five years, rendering the entire purpose of the cure-or-repurchase obligation meaningless," which conceptually could result – Judge Sweet put in no higher than that – in "the payment of money to make Plaintiff whole."  958 F.Supp.2d at 501.

*2006-OA1* was in its early stages.  Judge Sweet's opinion denied the defendant's motion to dismiss the complaint for failure to state a claim.  He reflected on the district court's responsibility "to fashion the proper remedy after all the relevant facts have been found."  958 F.Supp.2d at 506 (citation omitted).  The cases at bar stand on the same footing.  The relevant facts must be found, preceded by appropriate discovery, including discovery related to DBNTC's cognizable claim that WMC acted in a grossly negligent  or willful manner to the Certificateholders' detriment, and to WMC's defense that the cure-or-repurchase provisions exclude all other remedies.  The Court will not decide that issue until a full record has been developed.

For these reasons, the Court will compel compliance by WMC with DBNTC's Request No. 6. WMC must produce "quality control or other due diligence" documents relating to "any correspondent lender or broker" who "originated a Mortgage Loan," whether the loans in question were transferred to the plaintiff Trusts or not. Request No. 6 will be construed so as to include brokers and lenders employed by WMC, as well as "correspondent" lenders and brokers.

The Court will not compel compliance with Request No. 31, which is cast in such broad terms that it does not survive the balancing process mandated by Rule 26(b)(2)(C)(iii), Fed. R. Civ. P. Number 31 demands production of, *inter alia*, the "human resources files" for "brokers, appraisers, underwriters, and quality control or quality assurance staff" who "participated in the origination, underwriting, purchase or acquisition" of the mortgage loans. The Request stops just short of demanding human resources files for car service drivers who ferried one of these individuals in this expanded universe to a meeting about a mortgage. Full compliance with Request No. 31 would produce acres of haystacks in which, conceptually at least, a needle or two of evidence relevant to an issue might lie concealed. That is not good enough. The required degree of compliance by WMC, as defined and limited by this Ruling, will suffice.

### E

**Alleged Spoliation of Evidence**

Th e next discovery dispute arises out of DBNTC's claim, first stated in the letter brief ML 11/07/2014, that WMC may have destroyed documents under circumstances amounting to spoliation of evidence.

DBNTC says in ML 11/07/2014, at 6, that after a post-hearing conference between counsel on October 20, 2014:

> WMC disclosed for the first time that it has destroyed *all* electronic data relating to at least ten WMC employees, including two "regional vice presidents," two "territory managers," and four "business development representatives" – all of whom the Trustee had previously identified as custodians of potentially relevant documents. Further, WMC revealed in a subsequent letter that data for at least one WMC branch president has been destroyed.

Counsel for DBNTC, professing to find in these revelations "a potentially troubling matter," demands discovery "regarding the scope of WMC's document destruction and the circumstances surrounding the loss of potentially relevant evidence." ML 11/07/2014, at 1. Specifically, DBNTC asks the Court to compel WMC to provide discovery, including information and documents sufficient to identify:

> (1) "The Data" (a collective reference to paper or electronic files "that may be relevant to any party's claim or defenses in these actions").
>
> (2) The names of the individuals responsible "for undertaking all measures necessary to preserve the Data from loss or modification."
>
> (3) The Data that relates to the WMC document custodians the Trustee has previously identified and to "the custodians which [*sic*] WMC has already offered to produce."
>
> (4) The Data that has been destroyed.
>
> (5) The names of the individuals who participated in or witnessed the destruction of the Data, together with the dates, locations, and methods of destruction of the Data.
>
> (6) The names of the individuals directing that the Data be destroyed, together with the dates of the directions, the names of the individuals to whom the directions were provided, "and any policies, procedures, or other directives WMC relied upon in deciding to destroy the Data."

ML 11/07/2014, at 7-8. WMC opposes all of this requested discovery. JB 12/12/2014, at 11-12.

In demanding this discovery, DBNTC has in mind the possibility of ultimately charging WMC with *spoliation*, an unpleasant-sounding noun which the Second Circuit says consists of the unpleasant conduct of "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Bd, of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

Spoliation of evidence may result in a variety of sanctions against the spoliator, in the discretion of the trial judge.  Where a party seeks sanctions based on spoliation of evidence, it must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002).  Expanding upon that first element, the obligation to preserve evidence, Judge Cabranes said in *Kronisch  v. United States*, 150 F.3d 112  (2d Cir. 1998):

> In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed. This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation – most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation. Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence.

150 F.3d at 126 (citations omitted).  The last sentence of this quotation from Judge Cabranes's

opinion in *Kronisch* refers to the second and third elements of an act of spoliation, as delineated in *Residential Funding*.

In the cases at bar, the letter briefs of counsel and exhibits show that WMC hired the outside law firm of Jenner & Block in August 2007, prompted by a sternly worded (and in WMC's perception, litigation-threatening) repurchase demand letter from an unrelated RMBS trust. WMC identifies that date in August 2007 when it "should have known that the evidence may be relevant to future litigation," in Judge Cabranes's phrase. At that time, WMC states further and apparently without contradiction, "a document hold was put in place," JB 12/12/2014, at 11, a date which, WMC adds, was "approximately five years prior to the initiation of the Actions," an accurate reflection since DBNTC filed the first of the four cases at bar in 2012.

DBNTC responds to WMC's recitation and chronology with the suggestion, ML 01/09/2015, at 8, that "numerous longstanding problems with WMC's business in August 2007 – including widespread layoffs, repurchase demands, and management discussions of mounting fraud – show that WMC may well have anticipated litigation (and thus had a duty to preserve documents) long before WMC's arbitrary August 2007 date." This is no more than fashionably attired speculation; and it is hardly fair to dismiss WMC's August 2007 document-hold date as "arbitrary" – that date reflected WMC's specific response to a specific communication which could reasonably be interpreted as a reason to anticipate litigation (as indeed WMC so interpreted it).

Responding in full to DBNTC's "document destruction" discovery demands would be onerous. The present record does not justify the Court compelling compliance with them. DBNTC seems to argue that events occurring even six or seven years before DBNTC filed these actions should have created in WMC an anticipation of future litigation with DBNTC sufficiently vivid to

trigger an obligation to preserve evidence for that litigation.  That is too far a stretch.

I do not hold that DBNTC may never be in a position to complain legitimately about document destruction, or to try to cast WMC in the villainous role of spoliator of evidence. Subsequent discovery, such as depositions or production of other documents, may allow DBNTC to identify a troublesome subject or area with sufficient particularity, and to demand discovery in aid of an adequately grounded suspicion of spoliation.  It commonly occurs that a motion to impose sanctions for spoliation grows directly out of responses to discovery in the usual course. *See, e.g., Pastorello v. City of New York*, No. 95 Civ. 470 (CSH), 2003 WL 1740606, at *8 - 9 (S.D.N.Y. April 1, 2003).  However, the present record in the cases at bar do not entitle DBNTC to this category of discovery.  The "document destruction" discovery DBNTC prays for in the letter briefs of counsel will not be compelled.

## VIII

WMC has made a motion of its own, seeking to compel discovery on several subjects from DBNTC.  That motion, which has not been separately docketed as such, takes the form of a letter motion and brief, JB 11/18/2014.  DBNTC opposes that requested discovery in a letter brief, ML 12/12/2014.  WMC presses its demands in a reply letter brief, JB 01/09/2015.

Counsel's first letter brief, JB 11/18/2014, at 1, asserts demands by WMC for "(1) information concerning the modification and/or liquidation of loans at issue; (2) information concerning mortgage file reviews conducted on behalf of Deutsche Bank; (3) documents sufficient to identify the Certificateholders; and (4) communications with and documents obtained from the Certificateholders."  These categories will be considered in order.

**A**

**Modification and/or Liquidation of the Loans**

WMC's interrogatories under Rule 33, Fed. R. Civ. P.,  call upon DBNTC to specify, "for each of the alleged breaches of WMC's representations and warranties at issue in the Actions," the dates upon which DBNTC or anyone acting on its behalf began the processes of liquidating or modifying each mortgage loan subject to the alleged breach; the dates on which each loan was liquidated or a modification became effective; and the current unpaid balance of each mortgage loan subject to an  alleged breach.

WMC acknowledges that publicly available "remittance reports" state in detail whether a particular loan "was modified or the secured property was foreclosed," but these reports, WMC adds, "do not identify the date a loan was liquidated or modified," nor do they "indicate when the liquidation or modification process began." JB 11/18/2014, at 3.  WMC then states its reason and justification for the requested discovery:

> [These] facts are germane to the question of when Deutsche Bank knew or should have known of certain of the alleged breaches now at issue in the Actions.  When Deutsche Bank knew of or should have known of certain of the alleged breaches bears directly on the question of whether Deutsche Bank complied with its contractual duty to promptly notify WMC of alleged breaches.

*Id*.

DBNTC contends that this information cannot be made the subject of legitimate discovery because it is not relevant to any claim or defense presented by these RMBS actions.  That is a permissible contention.  The formulation produced by the interaction of the discovery and evidence rules requires that matter, to be discoverable, must be admissible at trial or reasonably calculated to

lead to admissible evidence.  Evidence is admissible only if it is relevant; and evidence is relevant only if it is "of consequence in determining the action."  Fed. R. Evid. 401(b).  If a trial court decides particular matter is not discoverable because it fails to satisfy those standards, the court does not "adjudicate the merits of an affirmative defense in a discovery motion," a different although sometimes superficially similar function WMC condemns as "not necessary (or appropriate)" to delineating the proper boundaries of discovery.  JB 01/09/2015, at 4 n. 4.

WMC bases these discovery demands upon what it refers to as DBNTC's "contractual duty to promptly notify WMC of alleged breaches" by WMC of representations and warranties WMC gave in the PSAs.  That is a reference to Section 2.03 of the PSAs, captioned "Representations and Warranties: Remedies for Breaches of Representations and Warranties with Respect to the Mortgage Loans," which provides in the first paragraph: "Upon discovery by any of the parties hereto of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the other."

In point of fact, DBNTC gave written notice of breaches to WMC with respect to each of the four Trusts at issue in these cases.  The notice followed, for the most part, the same form in each case.  Attorneys for DBNTC sent a letter to WMC officers in Woodland Hills, CA, enclosing a Schedule A listing what counsel referred to as "the Breaching Loans."  Counsel explained that sobriquet by saying that the Breaching Loans were "part of a statistically representative sample of the set of Mortgage Loans in Schedule B," referred to as "the Subject Loans."  Counsel stated that a recognized methodology resulted in a breach rate of 99.7 percent ("the Breaching Subject Loans").  Counsel's letter demanded that WMC repurchase the Breaching Loans and the Breaching Subject Loans at the Repurchase Price specified in the PSA.  Those notice and demand letters were dated

as follows:

> Case No. 3:12-cv-933:     April 16, 2012.
>
> Case No. 3:12-cv-969:     May 8, 2012.
>
> Case No. 3:12-cv-1699:   August 24, 2012.
>
> Case No. 3:13-cv-1347:   March 26, 2013.

WMC has not complied with any of these repurchase demands.  In consequence, DBNTC commenced these four actions.  The theory of DBNTC's claims is that WMC breached the representations and warranties ("R&Ws") it gave in the mortgage loans, and breached its contractual obligations in the PSAs to repurchase the loans in question.

A theory of WMC's defenses, as revealed by the letter briefs on these motions, appears to be that while DBNTC gave WMC written notice of breaches of the R&Ws pursuant to Section 2.03 of the PSAs, it did not give "*prompt* written notice," as that Section reads.  The purpose of WMC's challenged discovery, WMC says, is to ascertain "*when* Deutsche Bank knew or should have known of the alleged breaches," in order to determine "whether Deutsche Bank complied with its contractual duty to *promptly* notify WMC of alleged breaches."  The defense WMC appears to envision is that if DBNTC knew or should have known of WMC's R&W breaches before DBNTC sent WMC the notices and demands for repurchase, it necessarily follows that DBNTC breached its obligation to give WMC "prompt written notice" of those breaches, thereby abrogating WMC's liability for any R&W breaches that may have occurred.

The question that arises in the discovery context is whether discovery in aid of that defense may be compelled under Rule 26(b), Fed. R. Civ. P.  In approaching that question, I will assume without deciding that with respect to these four Trusts, created in 2006 and 2007, DBNTC "knew

or should have known" of WMC's breaches of R&Ws at a substantially earlier time – let us say, for the sake of discussion, two years earlier  –   than the dates when DBNTC gave to WMC in 2012 and 2013.   Is that particular assumed fact "of consequence in determining the action"?  If it is not, the fact is not relevant, which means it is not admissible at trial, which means it is not subject to compelled discovery.

As noted, DBNTC gave WMC four notices of R&W breaches by WMC, coupled with demands for repurchase of the affected mortgages: one notice and demand for each of the Trusts in suit.  DBNTC's theory of the case is that WMC, through its own due diligence efforts, discovered or should have discovered numerous R&W breaches, and that its "obligation to repurchase would have been triggered upon its own discovery and does not require notice by Plaintiff."  *DBNTC I*, 2014 WL 1289234, at *11.

If DBNTC proves that theory, the timing of its notices to WMC would be of no consequence or relevance.  Under the clear weight of authority, any failure by DBNTC  to give WMC "prompt notice" of WMC's breaches of representations and warranties would not excuse WMC from performing its obligation to repurchase the mortgages which results from those breaches.  In the scheme of things created by the PSAs, DBNTC's notice obligation is not a condition precedent to WMC's repurchase obligation.  For example, in  *U.S. Bank National Association v. Dexia Real Estate Capital Markets.,*  No. 12-CV-9412, 2014 WL 3368670 (S.D.N.Y. July 9, 2014), Judge Scheindlin noted at *7 n. 88:

> [A] provision requiring a Trustee to "promptly notify" the seller and ask it to cure the breach or repurchase the loan within 60 days is not a condition precedent because "nothing in the agreements . . . expressly conditions [the seller's] repurchase obligation on receiving notice from the Trustee."

(citing and quoting *Ace Sec. Home Equity Loan Trust, Series 2007-HES ex rel. HSBC Bank USA Nat'l Ass'n v. DB Structured Products, Inc.*, 5 F.Supp.3d 543, 562 (S.D.N.Y. 2014)).

The *Series 2007-HES* decision Judge Scheindlin cited and quoted in *Dexia* is Judge Nathan's opinion which I cited and quoted in *DBNTC I*, 2014 WL 1289234, at *14.  In *DBNTC I* I had occasion to say: "As did Judge Sweet in *Series 2006-OA1*, Judge Nathan in *Series 2007-HE3* held that the notice provisions in the PSA did not entitle DBSP to dismiss the complaints." *Id*.  Judge Nathan had said that section 2.03(a)

> provides that if the Trustee discovers or receives notice of a breach, it must promptly notify DBSP and ask it to cure the breach or repurchase the loan within 60 days . . . . However, under the Agreements' terms, notice does not operate as an express condition precedent . . . . [W]ith respect to breaches that DBSP did discover, in the absence of explicit contractual language to the contrary, the Trustee's duty to provide notice of breaches is simply a promise, not an express condition that must be literally performed . . . .

5 F.Supp.3d at 562.

In *Assured Guaranty Municipal Corp. v. Flagstar Bank*, No. 11-Civ. 2375, 2011 WL 5335566, at *7 (S.D.N.Y. Oct. 31, 2011), Judge Rakoff rejected an RMBS defendant's contention that the PSA ("SSA" in the parlance of the case) proscribed "a mandatory procedure by which [plaintiff] AGM must affirmatively notify [defendant] Flagstar of particular breaches affecting certain loans and then may only bring suit if Flagstar does not repurchase or cure the defective loans within 90 days."  Instead, Judge Rakoff reasoned, "notably absent" from the SSA "is any indication that the parties intended this 'notice and opportunity to cure' process to be the exclusive means by which AGM may enforce its rights under the Transaction Documents. . . . Rather, Flagstar's cure or repurchase obligations are triggered merely by Flagstar 'becoming aware of' a breach." *Id.*

In *LaSalle Bank National Association v. Nomura Asset Capital Corp.*, 47 A.D. 3d, 846 N.Y.S.2d 95 (N.Y. App. Div. 1ˢᵗ Dep't 2007), the trustee for certificateholders of commercial pass-through certificates for a pool of 155 commercial mortgages brought an action against the defendant loan sellers, alleging breach of warranties defendants made in the agreements covering the sale of those securities.  The Pooling Service Agreement (PSA) in the case obligated the plaintiff trustee to "give prompt notice to defendants upon becoming aware of any breach of the representations and warranties in the loan documents."[7]  The trial court held that the trustee's failure to give that notice as promptly as it could have precluded any damages for breach of the seller's warranties.  Reversing, the Appellate Division rejected the contention that "the prompt notice provision of the Pooling Service Agreement was a condition precedent to recovery.  The operative analysis, both sides recognize, is a mitigation of damages approach," and "our review of the record does not support a conclusion that plaintiff could have avoided all economic injury by more timely notification once it became aware of the breach."  47 A.D. 3d at 107-09, 846 N.Y.S.2d at 99-100.

*LaSalle* is instructive because the New York appellate court held that a securitized mortgage pool trustee's obligation to give prompt notice of a seller's warranty breaches does not operate as a condition precedent to an action against the seller for breach of the warranty.  That is the conclusion reached by Judges Rakoff, Sweet and Nathan in the cases before them.  I reach that conclusion in the cases at bar.[8]

_____

[7]   The quotation in text is from the Appellate Division's second opinion in the case, following remand.  72 A.D.2d at 410, 899 N.Y.S.2d at 17.

[8]   In its reply letter brief, JB 01/09/2015, at 4 n. 4, WMC says "there is ample support for WMC's contention that Deutsche Bank's failure 'to provide prompt written notice' is a viable defense."  If WMC means that a failure by DBNTC to give WMC prompt written notice of WMC's own breaches of representations and warranties gives WMC a complete defense against liability for

If one assumes that in the cases at bar DBNTC breached its obligation to give WMC *prompt* written notice of WMC's breaches of its representations and warranties (which is to say, *sooner* than it actually did), the only legal consequence of that timing is a possible reduction of recoverable damages, on the theory of a failure to mitigate.  The timing of DBNTC's awareness of WMC's breaches and its giving notice of them to WMC have legal consequences only if WMC had no knowledge, actual or constructive, of those breaches until DBNTC notified WMC about them.

Judge Nathan described such a situation in *Series 2007-HE3*:

> To summarize, because Plaintiff adequately alleges that DBSP discovered breaches and failed to repurchase the defective loans, and because its entitlement to sue to enforce DBSP's repurchase obligation with respect to those loans does not require prior notice, the Court need not address the parties' arguments concerning the timing and adequacy of the notices that Plaintiff provided. Discovery may reveal that DBSP was, in fact, unaware of certain breaches, meaning that its obligation to cure them or repurchase the defective loans would be triggered only upon notice. If so, the adequacy and timing of Plaintiff's notices would remain relevant.

5 F.Supp.3d at 564.

The consequence of that wholly sensible analysis, which I adopt, is that on the liability phase of the cases at bar, the only facts of consequence (and accordingly relevant) with respect to the

_____

those breaches, the contention is contrary to the cases cited in text and I do not accept it.  The cases WMC cites in its footnote do not call for a contrary result.  In *ACE Securities Corp v. DB Structured Products, Inc.*, 112 A.D.3d 522, 977 N.Y.S.2d 229, 231 (N.Y. App. Div. 1st Dep't 2013), the Appellate Division did refer to the trustee's notice obligation as "a condition precedent to commencing suit," but the decision related to when the certificateholders' cause of action accrued for purposes of the statute of limitations, and the quoted phrase, unaccompanied by analysis, was not necessary to that decision.  *Morgan Guaranty Trust Co. of New York v. Bay View Franchise Mortgage Acceptance Co.*, No. 00 Civ. 8613, 2002 WL 818082 (S.D.N.Y. Apr. 30, 2002), involved a contract so different in form from the RMBS contracts in the cases at bar that it has no precedential value.  WMC also cites two cases decided by the District of Minnesota.  To the extent that those decisions may disagree with the conclusion I reach in text, I respectfully decline to follow them.

timing and contents of *notices of R&W breaches* have to do solely with WMC, the relevant questions being:  When WMC received DBNTC's notices; whether at that time WMC had or was chargeable with awareness of breaches of the loans included in DBNTC's notices; and whether DBNTC is seeking to hold WMC liable for damages caused by R&W breaches of which WMC had not been aware and in loans not included in DBNTC's notices.  With these issues, the information WMC seeks about *DBNTC's* modification and liquidation of the loans have precisely nothing to do. Accordingly, the extensive discovery WMC demands in those areas is without justification and will not be allowed at the present time.

That conclusion is without prejudice to a contention WMC might be advised to make in the damages phase of the cases, when liability issues have been decided.  These cases, if not otherwise disposed of, will be resolved by bench trials.  The Court has the requisite discretion and flexibility to manage the taking of discovery.  Liability issues may be resolved in such a manner as to cause questions to arise concerning the scope or mitigation of the Trusts' recoverable damages. Information concerning DBNTC's pre-complaint modification or liquidation of some loans could become the subject of proper discovery in those circumstances.  However, for the reasons stated, such extensive discovery into those subjects will not be allowed at this stage of the cases.

**B**

**Mortgage File Reviews Conducted By or on Behalf of Deutsche Bank**

WMC has also posed interrogatories to DBNTC which seek to "[i]dentify any review, analysis, or inspection of any or all of the Mortgage Files conducted by You or any Person acting on Your behalf."  The requested particulars include, as to each "review, analysis, or inspection," the date, location, persons participating, documents "reviewed, analyzed or inspected," and the persons

"who received any findings, conclusions or analyses from the review, analysis, or inspection."

I conclude that these are not permissible areas of discovery, essentially for the same reasons expressed *supra* in connection with DBNTC's modification or liquidation of loans. Judge Rakoff correctly observed in *Flagstar* that a PSA like those at bar "does not impose an affirmative obligation on [plaintiff] AGM to review or audit its insured loans in search of specific Flagstar breaches. Rather, Flagstar's cure or repurchase obligations are triggered by Flagstar 'becoming aware of' a breach." 2011 WL 5335566, at *7. The same is true of the Certificateholders' owned loans. WMC is asking if DBNTC took actions which the contracts nowhere obligated DBNTC to take. The relevance of the requested information to the issues of consequence "in determining the action" is zero.

WMC's reply letter brief does not persuade to the contrary. It is argued there that any mortgage file reviews conducted by or on behalf of DBNTC are relevant to WMC's "statute-of-limitations defense," as well as to "Deutsche Bank's knowledge of alleged breaches and thus, WMC's prompt-notice defense and Deutsche Bank's failure-to-provide-notice claim." JB 01/09/2015, at 7. There is no substance to these protestations. The bar of a statute of limitations will be determined by the dates the Trustee's causes of action accrued, the dates the complaints were filed, and the applicable limitations period: milestones calculated without input from any pre-complaint mortgage reviews by or on behalf of DBNTC. The purported prompt-notice and failure-to-provide-notice "defenses" are not viable defenses at all to DBNTC's basic contract claim against WMC, for breach of WMC's cure-or-repurchase obligations. The reasons for that conclusion are stated in the preceding sub-part of this Ruling, and need not be restated.

**C**

**Identification of and Communications with Certificateholders**

Lastly, WMC trains its discovery sights upon the Trust Certificateholders, for whose benefit DBNTC as Trustee brings these actions.

WMC's discovery demands concerning Certificateholders are sweeping.  An interrogatory asks for the identity of "all Certificateholders in the Trusts," and a contact name and address for each Certificateholder.  Documents are demanded "sufficient to identify each Certificateholder in the Trusts as well as their total holdings and the price for which they purchased and/or sold each Certificate from inception through the present."  WMC also demands documents from DBNTC consisting of: "communications with the Certificateholders, the Servicer, Borrowers, or any other Person related to the Trust, the Demand Loans, the Action, or WMC"; "documents related to the Demand Loans, the Trust and/or WMC, that Deutsche Bank obtained from the Certificateholders, the Servicer, Borrowers, or any other Person"; and "communications with potential Certificateholders related to the acquisition of any interest in the Trust or the Demand Loans or any property securing any Demand Loan."

DBNTC opposes these discovery requests, principally on the ground that the matters inquired into are irrelevant to the issues to be litigated.  WMC's requests list a universe of potential sources of documents or information, in addition to Certificateholders.  In the letter briefs, WMC limits its efforts to justify this discovery to the Certificateholders.  As to them, WMC contends that the Certificateholders have information or generated documents relevant to certain defenses WMC says it has to DBNTC's claims against it, specifically: (1) "the Certificateholders did not rely on WMC's representations and warranties when purchasing certificates"; (2) "Deutsche Bank failed to provide

72

prompt notice to WMC of any of Deutsche Bank's claims"; and (3) the affirmative defense  of champerty, which would arise if "the Certificateholders impermissibly acquired certificates for the primary purpose of commencing the instant Actions."  JB 11/18/2014,  at 8.

These asserted  defenses do not justify wide-sweeping discovery.  (1):  Reliance upon the truth or accuracy of WMC's express representations and warranties is not an element of DBNTC's claims for breach of those warranties, and whether or not Certificateholders relied upon WMC's warranties when purchasing certificates is irrelevant to the merits of the actions.  *See CBS Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 498, 505-06 (1990).  (2): For the reasons stated *supra*, whether or not DBNTC gave WMC "prompt notice" to WMC of the claimed R&W breaches is irrelevant to the liability issues in the actions.  (3): The prohibition of champerty, which "has always been limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs," *Trust for the Certificate Holders of the Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 199 (2009) (citation and internal quotation marks omitted), has no application to the cases at bar, where under the contractual scheme "the PSA does not authorize certificate holders to provide notices of 'default' in connection with the sponsor's breaches of the representations," *ACE Sec. Corp. v. DB Structured Prods., Inc.,* 977 N.Y.S.2d at 231.  DBNTC as Trustee filed these actions on behalf of Certificateholders because the PSAs required the Trustee to do so, as part of its fiduciary duty; this has nothing to do with the doctrine of champerty, whose salutary purpose is "to prevent or curtail the commercialization or trading in litigation," *Love Funding Corp.*, 13 N.Y.3d at 198 (citation and internal quotation marks omitted).  These professed defenses, alone or in concert, do not entitle WMC to compel the full extent of the requested discovery from or about the Certificateholders.

I take a different view with respect to one aspect of the Certificateholders' presence and participation in these cases. A recurring *leitmotiv* in the four complaints is that the initial forensic review of the mortgage loans in the pools was undertaken at the direction of unnamed "investors" in the Trusts, a noun I take to mean "certificateholders," since an individual invests in the Trust by purchasing a certificate issued by the Trust. The amended complaint, Doc. 109, contains a typical allegation at ¶ 6:

> At the direction of an investor in the Trust, in January 2012, the Trustee commissioned a review into whether certain mortgage loans owned by the Trust breached WMC's representations and warranties in a manner that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein." PSA § 2.03(f). The investor-directed review was conducted in two steps.

Not surprisingly, the phrase "investor-directed loan review," which appears throughout the complaints (*e.g.*, ¶ 9 of the amended complaint, "Promptly after the investor-directed loan review was concluded"), caught the eyes of WMC and its trial counsel.

It has become clear during the litigation that the results and methodology of that forensic review, which led directly to DBNTC's notice and repurchase demand letters to WMC, will lie at the heart of any trial on the merits. WMC is entitled to discovery with respect to the presence, participation, and communications involving the sharp-eyed investor or investors present at the review's creation. DBNTC complains that these inquiries are "no more than an attempt to obtain premature expert testimony from the Trustee." ML 12/12/2014, at 7. That protestation is neither fully accurate nor a sufficient basis to preclude discovery. Potentially at least, this line of inquiry goes beyond the suggested boundary. One does not obtain full discovery about the participation of Professor Henry Higgins by deposing only Eliza Doolittle. I do not press that analogy, because I do

74

not suggest (on the present record) that the "investor(s)" who "directed" the forensic review told the forensic reviewers what to say, or how to pronounce their words. However, under the formulation for allowable discovery stated *supra*, this is a legitimate area for discovery.

Accordingly, WMC is granted leave to resubmit revised interrogatories and document requests, limited to the identity, participation and communications from or to the "investor" or "investors" whose presence, on stage or in the wings or prompter's box, caused counsel for DBNTC to draft the phrase "investor-directed loan review." The Court will not compel discovery with respect to any other requested discovery on the subject of Certificateholders. If DBNTC, in responding to such revised discovery requests, wishes to assert attorney-client privilege or attorney work product rule as a protection against discovery, it must file an appropriate log.

## IX

The parties conclude their letter briefs with a dispute about the time period covered by the responses DBNTC will make to certain of WMC's interrogatories. DBNTC says that for the most part, it will not furnish information available subsequent to June 24, 2012. WMC says that factual answers to interrogatories should speak as of the date the responses are filed.

Some of WMC's interrogatories will not be answered, as the result of this Ruling. WMC's interrogatories that DBNTC will answer in the future should speak as of the date the answers are filed. That is in keeping with the established rule in discovery, that a responding party is under an obligation to supplement its answers if further pertinent information is discovered or comes to hand.

## X

### Conclusion and Order

The extensive and forceful briefs of counsel contain myriad points and authorities. While

I have considered them all, those that are not discussed in this Omnibus Ruling do not affect or alter the conclusions stated herein.  This Ruling defines those areas where discovery is compelled, and those areas where motions to compel discovery are denied.  The parties are directed to conduct further discovery in compliance with this Ruling.

For the foregoing reasons, the motion [Doc. 131] of Plaintiff Deutsche Bank National Trust Company to compel discovery from Defendant WMC Mortgage, LLC is GRANTED IN PART and DENIED IN PART.

The other disputes between the parties relating to discovery, while not articulated in separately numbered and docketed motions, are DECIDED by this Omnibus Ruling.

The responses to interrogatories and production of documents required by the terms of this Ruling must be made on or before **May 29, 2015.**  Any privilege logs a party wishes to submit in compliance with this Ruling must be filed on or before **May 29, 2015.**

The Court has selected a date which is intended to give the parties and counsel sufficient time.  That time may be enlarged, if good cause is shown by application prior to the specified  date.

It is SO ORDERED.

Dated:   New Haven, Connecticut
          April 14, 2015

                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge